FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

FEB - 6 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

ORIGINAL

UNDER SEAL

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

October 2007 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　　　　v.<br><br>DONGFAN "GREG" CHUNG,<br><br>　　　　　Defendant. | No. SA CR08- **SA CR 08 - 00024**<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 371: Conspiracy;<br>18 U.S.C. § 1831(a)(1), (3):<br>Economic Espionage; 18 U.S.C.<br>§ 951: Acting as Agent of<br>Foreign Government Without<br>Prior Notification to<br>Attorney General; 18 U.S.C.<br>§ 1512(b)(3): Obstruction of<br>Justice; 18 U.S.C. § 1001:<br>False Statements; 18 U.S.C.<br>§ 1834: Criminal Forfeiture] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 371]

A.  BACKGROUND

        At all times relevant to this Indictment:

    1.  DONGFAN "GREG" CHUNG ("defendant CHUNG") resided in

Orange County, in the Central District of California.

////

GWS:IAW:gws

2.   The Boeing Company ("Boeing"), headquartered in Chicago, Illinois, was a company that designed and manufactured commercial and military aircraft, rotorcraft, electronic and defense systems, missiles, satellites, launch vehicles, and advanced information and communication systems.  As a major service provider to the National Aeronautics and Space Administration ("NASA"), Boeing operated the Space Shuttle and International Space Station.  The company also provided numerous military and commercial airline support services.  Boeing had facilities in many cities, including Huntington Beach, California.  The products of Boeing were sold and shipped, and were intended to be sold and shipped, in interstate and foreign commerce.

3.   Rockwell International ("Rockwell") was a company that designed and manufactured aircraft and spacecraft.  Rockwell had facilities in many cities, including Downey, California.  The products of Rockwell were sold and shipped, and were intended to be sold and shipped, in interstate and foreign commerce.  In or about December 1996, Boeing acquired Rockwell's defense and space businesses, including the Rockwell facility in Downey, California.

4.   In or around 1996, Boeing began work on a project to upgrade the radar and communications system on the United States Space Shuttle.  Boeing developed a phased-array antenna that would be placed on the Space Shuttle to facilitate communications.  Only Boeing employees who worked in the Space Shuttle program, or otherwise had a need to know, were given access to this technology.

5.   The following documents belonged to Boeing, and

2

contained Boeing's trade secrets on the research and development and processes for the phased-array antenna:

a.   Item Change Analyses for MCR 18849 ("Shuttle Phased-Array Document One").

b.   "Boeing Phased-array Antenna Internal Research and Development, Option for Orbiter Communications Upgrades, March 26, 1999," marked "Boeing Proprietary" ("Shuttle Phased-Array Document Two").

c.   ROM For Cost of Cooling Phased Array Antenna documents ("Shuttle Phased-Array Document Three").

d.   "Boeing Phased-array Antenna Internal Research and Development, Option for Orbiter Communications Upgrades, May 1999," marked "Boeing Proprietary" ("Shuttle Phased-Array Document Four").

6.   The Delta IV is a next-generation booster rocket that is designed to launch manned space vehicles.   The Delta IV requires an umbilical cord mechanism, called a Tail Service Mast ("TSM"), to feed liquid nitrogen fuel and liquid oxygen to the aft engine section of the rocket upon takeoff.   Only Boeing employees who worked in the Delta IV program, or otherwise had a need to know, were given access to this technology.

7.   The following documents belonged to Boeing, and contained Boeing's trade secrets on the Delta IV umbilical release system:

a.   "Delta IV/EELV Common Booster Core (CBC) Tail Service Mast (TSM) Overview," dated September 1998, marked "Boeing North America Proprietary" ("Delta IV Document One").   The Delta IV Document One included information regarding the specific location

3

on the launch pad of each of six TSMs; where and how the umbilical hoses connect to the rocket; a description of the assembly housing of the TSM; operations for backup systems; how to install the TSM and its preparation, setup, and operation; umbilical test plan overview; and electrical requirements.

b. "Common Booster Core (CBC) Tail Service Mast (TSM) Overview," dated September 1998, marked "Boeing Proprietary" ("Delta IV Document Two"). The Delta IV Document Two contained a detailed overview of design and test requirements, design verification procedures, design schematics, functional overview, and implementation of hardware, as well as information on how the quick release mechanism and backup umbilical release systems work.

8. The C-17 Globemaster III ("C-17") is a strategic airlifter manufactured by Boeing and used by the United States Air Force, British Royal Air Force, the Royal Australian Air Force, and the Canadian Forces Air Command. The C-17 is used for rapid delivery of troops and cargo to military bases. In addition to manufacturing the aircraft, Boeing provides competitive testing and maintenance services for the C-17. Only Boeing employees who worked in the C-17 program, or otherwise had a need to know, were given access to this technology.

9. The following documents belonged to Boeing, and contained Boeing's trade secrets regarding the C-17 aircraft:

a. "Durability and Damage Tolerance - Session 6, C-17 D&DT and Force Management Requirements" ("C-17 Document One"). The C-17 Document One is part of a training series for Boeing C-17 analysts and designers, and describes in detail how, when, and

1 | what to inspect throughout the lifetime of the C-17 aircraft.

2 |      b.   "Durability and Damage Tolerance - Session 8, Lessons

3 | Learned from Full Scale Durability Test," marked "Not for General

4 | Distribution" ("C-17 Document Two").  The C-17 Document Two is

5 | part of a training series for Boeing C-17 analysts and designers,

6 | and describes in detail the full scale C-17 durability and

7 | tolerance damage testing set up requirements, testing results,

8 | explanation of findings, measures taken to rectify findings, and

9 | disassembly of the test article.

10 |      10.   From in or around July 1973 to on or about September 5,

11 | 2002, defendant CHUNG was employed by Rockwell at its facility in

12 | Downey, California, and, when Rockwell was acquired by Boeing, by

13 | Boeing at its Huntington Beach facility, as a stress analyst on

14 | the forward fuselage section of the Space Shuttle.

15 |      11.   From in or around March 2003 to on or about September

16 | 11, 2006, defendant CHUNG was employed by Boeing at its

17 | Huntington Beach facility as a contractor working in the Space

18 | Shuttle program.

19 |      12.   At no time during his employment at Boeing did

20 | defendant CHUNG work in the Delta IV or C-17 programs.

21 |      13.   From in or around July 1973 to on or about September 5,

22 | 2002, defendant CHUNG held a secret clearance at Rockwell and

23 | Boeing.  As a condition of his employment at Rockwell and Boeing

24 | and his secret clearance, defendant CHUNG was required to report

25 | any foreign travel, contacts with foreign officials, and any

26 | planned use or disclosure of company information in a foreign

27 | country.

28 |      14.   On or about September 5, 2002, defendant CHUNG signed

an "Employee Action Notification" agreement with Boeing in which he stated that he would not use or disclose without authorization any proprietary, confidential, or trade secret information belonging to Boeing or any Boeing customer or supplier.

15.   On or about September 5, 2002, just prior to his retirement from Boeing, defendant CHUNG signed a statement declaring that he had returned to Boeing "all documents, computer software or databases, and other materials or items which at the time of the termination of my employment were in my possession, custody or control by virtue of my employment with Boeing."

16.   On or about January 29, 2004, defendant CHUNG signed a "Code of Conduct" acknowledgment with Boeing in which he agreed that he read, understood, and was in compliance with Boeing's Code of Conduct and would continue to comply.

17.   On or about January 17, 2005, defendant CHUNG signed a "Non-Employee Code of Conduct" acknowledgment with Boeing in which he agreed that he would follow all restrictions on the use and disclosure of information, including following all requirements for protecting information belonging to Boeing.

18.   On or about January 13, 2006, defendant CHUNG signed Boeing's "Code of Conduct Acknowledgment," in which he agreed that he would follow all restrictions on the use and disclosure of information, including following all requirements for protecting information belonging to Boeing.

B.   THE OBJECT OF THE CONSPIRACY

19.   Paragraphs One through Eighteen are hereby re-alleged and incorporated by reference as if set forth in full herein.

20.   Beginning on a date unknown to the Grand Jury and

continuing until on or about September 11, 2006, in Orange
County, within the Central District of California, and elsewhere,
defendant CHUNG, together with others known and unknown to the
Grand Jury, knowingly combined, conspired, and agreed to:

a. knowingly and without authorization appropriate, take,
carry away, and conceal trade secrets belonging to Boeing; and

b. knowingly possess trade secrets belonging to Boeing
while knowing the same to have been stolen or appropriated,
obtained or converted without authorization;
intending and knowing that the offenses would benefit a foreign
government, namely the People's Republic of China ("PRC"), or
instrumentalities or agents thereof, in violation of Title 18,
United States Code, Sections 1831(a)(1) and (3).

C. MANNER AND MEANS OF THE CONSPIRACY

21. The objects of the conspiracy were carried out, in
part, as follows:

a. In the past, defendant CHUNG was sent requests by
officials and agents of the government of the PRC for information
relating to the United States Space Shuttle, and military and
civilian aircraft, and helicopters.

b. In response to these requests, defendant CHUNG, using
his access as an engineer at Rockwell and Boeing, took, without
authorization, documents containing trade secrets from Rockwell
and Boeing and concealed them in his home.

c. The documents taken by defendant CHUNG from Rockwell and
Boeing matched requests for specific types of technology
contained in letters and tasking lists sent to defendant CHUNG in
the past by officials of the PRC. Defendant CHUNG took the

documents with the intent to benefit the government of the PRC by providing the information in the documents to the government of the PRC.

d. Defendant CHUNG traveled to the PRC to deliver lectures on technology involving the United States Space Shuttle and other programs, and to meet with officials and agents of the government of the PRC. Defendant CHUNG did not report to Rockwell or Boeing his travel to the PRC, his contacts with PRC officials, or the fact that he gave lectures involving Rockwell and Boeing technology in the PRC.

D. REQUESTS TO DEFENDANT CHUNG FROM PRC OFFICIALS FOR AMERICAN TECHNOLOGY

22. Defendant received requests from officials of the PRC to provide American technology to the PRC. The discussion of these requests included the following:

a. Defendant CHUNG sent an undated letter to Professor Chen Lung Ku at Harbin Institute of Technology in the PRC. Defendant CHUNG wrote that he had sent via sea freight three sets of manuals dealing with flight stress analysis. Defendant CHUNG wrote: "I don't know what I can do for the country. Having been a Chinese compatriot for over thirty years and being proud of the achievements by the people's efforts for the motherland, I am regretful for not contributing anything." The letter concluded with defendant CHUNG asking if there were any other materials he could provide. Defendant CHUNG wrote, "I would like to make an effort to contribute to the Four Modernizations of China."

b. Defendant CHUNG received a letter dated September 9, 1979, from Professor Chen Lung Ku in the PRC stating that Ku had

8

1   received "all three types" of information defendant CHUNG had

2   sent.  Ku wrote: "We are all moved by your patriotism.  You have

3   spent so much time to reorganize the notes from several years

4   ago; copying and finding the information that could be needed by

5   us, and you have actively put in your efforts towards the Four

6   Modernizations of the Motherland.  Your spirit is an

7   encouragement and driving force to us.  We'd like to join our

8   hands together with the overseas compatriots in the endeavor for

9   the construction of our great socialist motherland."

10      c.  Defendant CHUNG received a letter dated February 7,

11  1985, from Qinan Chen in the PRC.  Chen was the Deputy Director,

12  Technical Import Department, China National Aero Technology

13  Import and Export Corporation ("CATIC"), in the PRC.  The letter

14  set forth the following "items for your consideration" for

15  lectures defendant CHUNG planned to give during an upcoming trip

16  to China: (1) "The entire process of the aircraft's fatigue life

17  and its major links"; (2) "The static strength and principles of

18  fatigue design when designing new aircraft"; (3) "The formulation

19  of a fatigue test plan"; and (4) "The determination of a

20  helicopter's rotor wings, blades, and propeller hub's load."  The

21  letter concluded by asking defendant CHUNG for a more detailed

22  outline of what he intended to present and what his travel dates

23  to China would be.

24      d.  Defendant CHUNG wrote a letter dated March 18, 1985, to

25  Qinan Chen in the PRC thanking Chen for arranging defendant

26  CHUNG's travel to the PRC, and stated it would be a "real

27  pleasure" to go to China and have a technology exchange.

28  Defendant CHUNG wrote that he had been working on aircraft

9

structural design for more than twenty years, and also had experience in spacecraft design.  Defendant CHUNG listed the topics he proposed covering during his trip to China: (1) "Static force analysis of spacecraft's forward fuselage"; (2) "Finite element analysis of space aircraft's forward fuselage"; (3) "Brief introduction on surface insulation tile of a spacecraft"; and (4) "Stress analysis."

e.  Defendant CHUNG wrote an undated letter to Qinan Chen in the PRC that listed topics defendant CHUNG had prepared for lectures in the PRC: (1) "Flight General Design"; (2) "Flight Fatigue Life Analysis"; (3) "Space Shuttle Forward Fuselage Structure and Static Analysis Principles and Methods"; (4) "Space Shuttle Forward Fuselage Finite Element Analysis"; and (5) "Space Shuttle Heat Resistant Tiles, Brief Introduction and Stress Analysis."  Defendant CHUNG wrote that he would be arriving in Beijing on June 24, 1985, and asked Qinan Chen to arrange the technology exchange.

f.  Defendant CHUNG wrote an undated letter to Qinan Chen in which defendant CHUNG acknowledged receiving a letter dated April 8, 1985, from Chen.  Defendant CHUNG wrote that he had tried to send a detailed outline of his lecture topics in an April 16 letter to Chen, and that the letter was supposed to be hand-delivered to Chen in the PRC by defendant CHUNG's brother-in-law but never was.  In response to Chen's request for more details regarding defendant CHUNG's lectures, defendant CHUNG wrote: (1) "Flight Life"; (2) "Helicopter Structure Design"; (3) "Flight Life Analysis"; (4) "Static Analysis"; (5) "Fatigue Life"; and (6) "F-15 Jet Fighters."  Defendant CHUNG wrote that he would

1  leave for China on June 23, 1985.

2      g.   Defendant CHUNG wrote a letter dated April 26, 1985, to

3  Qinan Chen stating that the "Space Shuttle information was

4  classified secret" and was "completely separate from static

5  structure analysis."  Defendant CHUNG wrote that he had only

6  partial information on helicopter structure design because the

7  information was controlled by the Department of Defense.

8  Defendant CHUNG wrote that he had not worked on helicopters for a

9  long time, but based on the information he still had, "the

10 overall picture could still be explored."  Referring to the Space

11 Shuttle and helicopter topics, defendant CHUNG wrote that he was

12 still doing preparation work on the fatigue/flight life and

13 static analysis issues.  Defendant CHUNG wrote that he had

14 considered Chen's request for information on Flight Life and

15 Helicopter Design Structure.  Defendant CHUNG wrote that he could

16 still provide as much as he knew, and that he had worked on the

17 fatigue life of helicopter analysis and the F-15 fighter.

18     h.   Defendant CHUNG received a letter from Qinan Chen dated

19 May 13, 1985, on CATIC letterhead.  In the letter, Chen

20 acknowledged receiving a letter from defendant CHUNG dated April

21 17, 1985, which contained an outline of technology exchange

22 topics.  Qinan Chen suggested that defendant CHUNG include as

23 topics conventional aircraft design, including fatigue life, and

24 the design of aircraft and armed helicopters that defendant CHUNG

25 had worked on.  Chen wrote that they could still use the material

26 defendant CHUNG was planning to present on spacecraft.  Chen

27 wrote that defendant CHUNG should give any material for delivery

28 to the PRC to defendant CHUNG's brother-in-law as it was "more

11

convenient that way."

i.   Defendant CHUNG wrote a letter to Qinan Chen dated May 27 in which defendant CHUNG acknowledged receiving Chen's letter of May 13.  Defendant CHUNG wrote that another lecture topic was attached: "General Aircraft Design and Fatigue Life."  Defendant CHUNG wrote that he would deliver the lectures in Chinese, although some technical terms would be expressed in English.

j.   Defendant CHUNG traveled to the PRC on June 24, 1985, to give lectures on aircraft and spacecraft technology at government-controlled universities and aircraft manufacturers in the PRC.

k.   Defendant CHUNG received a list of questions from the Nan Chang Aircraft Company in the PRC dated July 14, 1985, which included the following requests for information: (1) "Please introduce in detail how to determine the safety life and damage tolerance for the life conceptual design and operating procedure of an aircraft or part thereof"; (2) "Should non-failure probability and confidence level be considered for the actual measurement of the flight load spectrum?  U.S. military specification recommends using mainly average spectrum, what is the basis of this recommendation?"; (3) "How does the U.S. perform flight measurement and compiling of the tail load spectrum?  Please introduce in detail"; (4) "For aircraft life estimation by the aircraft companies in the U.S., what are the few commonly used engineering approaches?"; (5) "What are the differences in determining the aircraft life for large civil aircraft vs. military fighter planes?"; (6) "Introduce procedures and implementation processes for aircraft maintenance and

inspection outlines.  Specific contents and frequency for
inspections, monitoring technology for major parts under stress";
(7) "What is the purpose of adding a spacer in the design (such
as Boeing 707 airplanes) for the butt joint on the wing?"; (8)
"How many types of loaded flights are used for the fatigue test
of small fighter planes?  What are the percentages for the mobile
loading and the non-symmetrical loading?  When performing loading
test, are the sequences of the loading random or are they derived
manually?"; and (9) "What approaches are used in the U.S. to
determine the helicopter's life?  Is the safety life, fail-safe
or damage-tolerance approach being used to assure flight safety?
What is the application?"

    1.  Defendant CHUNG wrote a letter dated December 31, 1985,
to "Chief Engineer Feng" of the Nan Chang Aircraft Company.
Defendant CHUNG wrote that after returning to the United States,
he gradually began collecting "the manuals."  The manuals
referred to were two manuals from North American Aviation, a
division of Rockwell: one manual was for use in the design of the
F-100, X-15, and B-70 aircraft, and the second manual addressed
aircraft fatigue.  Another of the twenty-seven manuals dealt with
S-N curves, which graphically depict how long an object, such as
a jet fighter's plexiglass canopy, will last before it fails over
a period of time under repeated stress loads.  The other twenty-
four manuals were from Rockwell's B-1 Bomber Division.  The
letter stated that the "lack of serial numbers on the [B-1]
manuals was [because they were] scheduled for printing but not
executed.  There was no revision after the [initial] manual's
publishing."  The twenty-four manuals on the B-1 included a cover

page with the following restriction:

> Possession of this publication is restricted to the
> engineering personnel of Rockwell International Aerospace
> Divisions.   Its disclosure to organizations other than
> Rockwell International or selected federal agencies is
> prohibited.

Defendant CHUNG wrote that he had difficulty mailing the manuals or finding someone to take them to China.  Defendant CHUNG wrote that he sent the manuals to China through Education Consul Zhen Lan Zhao of the PRC Consulate in San Francisco.  Defendant CHUNG wrote that Education Consul Zhao would give the manuals to Manager Chen, and that Feng could get the manuals from Chen.

m.   Defendant CHUNG received a letter dated May 25, 1986, from Gu Weihao of the PRC's Ministry of Aviation and the China Aviation Industry Corporation, which referred to a recent visit by Gu Weihao to the United States where he met with defendant CHUNG and his wife.  The letter stated that Gu Weihao did not receive defendant CHUNG's December 31, 1985, letter (referenced above) until March 1986, as it was hand-carried.  The letter referred to the B-1 manuals that defendant CHUNG sent, but stated that Chen had not received them yet.  Gu Weihao wrote that he or Chen would write to CHUNG to let him know when the manuals arrived.  Gu Weihao wrote:

> Currently I am doing research and exploration work.  I would
> like to push the damage tolerance one step further, to
> achieve the standards of dependability and durability as
> soon as possible.  I hope you can advise us in the area
> often.

n.   Gu Weihao wrote a letter to defendant CHUNG dated May 2, 1987.  The letter stated that China was in the process of developing trunkline airplanes of 150 seats, and developing a space shuttle orbiter.  Gu Weihao asked defendant CHUNG to provide assistance on technical issues for those programs.  The letter referred to previous information provided by defendant CHUNG, and stated that defendant CHUNG would be paid for his efforts.  Gu Weihao wrote that arrangements would be made for defendant CHUNG to get the money out of the PRC.  Gu Weihao asked defendant CHUNG to come to Guangzhou in the PRC where Gu Weihao would arrange a meeting with colleagues in a place that was "safe."  The letter suggested "cover stories" for travel to the PRC, including an invitation from an art institute to defendant CHUNG's wife, an artist, to visit the PRC.  Defendant CHUNG could then use the cover of traveling with his wife as an excuse to come to the PRC.  Gu Weihao wrote that passing information to the PRC through another engineer in the United States named Chi Mak was "faster and safer."  The letter concluded by stating, "It is your honor and China's fortune that you are able to realize your wish of dedicating yourself to the service of your country."

o.   Defendant CHUNG received a letter from Gu Weihao dated April 12, 1988.  The letter stated that Chi Mak's wife, Rebecca, was in China and had told Gu that the Maks and Chungs had a good relationship.  Gu Weihao wrote of the recent formation of PRC's Ministry of Aeronautics and Astronautics and that high-tech development would be placed in "full gear."  Gu Weihao requested the help of "the foreign country" and asked defendant CHUNG to provide information on "advanced technologies."  Gu Weihao wrote

that under the new ministry the goals would be "greatly expanded"
and told defendant CHUNG that there was no need to limit the
"scope of those proposals" discussed by defendant CHUNG and Gu
Weihao when Gu Weihao was in the United States.   Gu Weihao wrote
that it was faster and safer to send information through Chi Mak.
The letter concluded by stating "please ask Mrs. Mak for the
remaining issues.   I am finishing my letter here."

E. OVERT ACTS

23.   In furtherance of the conspiracy, and to accomplish its
objects, defendant CHUNG, together with others known and unknown
to the Grand Jury, committed and caused others to commit the
following overt acts, among others, in Orange County, in the
Central District of California, and elsewhere:

a.   On or about April 6, 2001, defendant CHUNG traveled to
the PRC where he delivered lectures on the United States Space
Shuttle.

b.   On or about September 26, 2002, defendant CHUNG traveled
to the PRC at the invitation of the PRC government to attend
National Day celebrations as a delegate.

c.   On or about December 27, 2003, defendant CHUNG traveled
to the PRC.

d.   On September 11, 2006, defendant CHUNG possessed a
numbered list in Chinese handwriting.   The items on the list were
aircraft design manuals, fatigue design manuals, materials
manuals, S-N curve manuals, military specifications user manuals,
fighter-jet structural details design manuals, Space Shuttle
design manuals and information on the Space Shuttle's
environmental conditions, the Space Shuttle's heat-resistant tile

1 design and material composition process, life-span

2 extension/reliability analysis of United States fighters and

3 airborne equipment, and S-N curves for fighter plane cabin

4 plexiglass and cabin canopy.

5     e.  On September 11, 2006, defendant possessed and concealed

6 in his home, without authorization from Boeing, the Shuttle

7 Phased-Array Document One.

8     f.  On September 11, 2006, defendant possessed and concealed

9 in his home, without authorization from Boeing, the Shuttle

10 Phased-Array Document Two.

11     g.  On September 11, 2006, defendant possessed and concealed

12 in his home, without authorization from Boeing, the Shuttle

13 Phased-Array Document Three.

14     h.  On September 11, 2006, defendant possessed and concealed

15 in his home, without authorization from Boeing, the Shuttle

16 Phased-Array Document Four.

17     i.  On September 11, 2006, defendant possessed and concealed

18 in his home, without authorization from Boeing, the Delta IV

19 Document One.

20     j.  On September 11, 2006, defendant possessed and concealed

21 in his home, without authorization from Boeing, the Delta IV

22 Document Two.

23     k.  On September 11, 2006, defendant possessed and concealed

24 in his home, without authorization from Boeing, the C-17 Document

25 One.

26     l.  On September 11, 2006, defendant possessed and concealed

27 in his home, without authorization from Boeing, the C-17 Document

28 Two.

COUNTS TWO THROUGH NINE

[18 U.S.C. § 1831(a)(1), (3)]

24.   Paragraphs One through Twenty-three are hereby re-alleged and incorporated by reference as if set forth in full herein.

25.   On or about September 11, 2006, in Orange County, in the Central District of California, defendant CHUNG, intending and knowing that the offense would benefit a foreign government, namely the People's Republic of China, and its instrumentalities and agents, possessed and concealed without authorization in his home the following trade secrets belonging to Boeing, knowing them to have been appropriated, obtained, and converted without authorization:

| COUNT | TRADE SECRET |
| --- | --- |
| Two | Shuttle Phased-Array Document One |
| Three | Shuttle Phased-Array Document Two |
| Four | Shuttle Phased-Array Document Three |
| Five | Shuttle Phased-Array Document Four |
| Six | Delta IV Document One |
| Seven | Delta IV Document Two |
| Eight | C-17 Document One |
| Nine | C-17 Document Two |

18

COUNT TEN

[18 U.S.C. § 951]

26.   Paragraphs One through Twenty-three are hereby re-alleged and incorporated by reference as if set forth in full herein.

27.   Beginning on a date unknown and continuing to on or about September 11, 2006, in Orange County, within the Central District of California, and elsewhere, defendant CHUNG knowingly acted in the United States as an agent of a foreign government, namely the People's Republic of China, knowing that he had not given prior notification to the Attorney General of the United States, in violation of 18 U.S.C. § 951.

COUNT ELEVEN

[18 U.S.C. § 1512(b)(3)]

28.   On or about September 11, 2006, in Orange County, within the Central District of California, defendant CHUNG corruptly persuaded another person, namely his son, Shane Chung, with the intent to hinder, delay, and prevent the communication to a law enforcement officer by Shane Chung of information relating to the commission and possible commission of a Federal offense.   Defendant CHUNG told his son that FBI agents would be interviewing him and that he should tell the agents that he could not remember anything about a meeting in Beijing in 1985 attended by defendant CHUNG, Shane Chung, and Gu Weihao, an official with China's Ministry of Aviation and the China Aviation Industry Corporation.

COUNT TWELVE

[18 U.S.C. § 1001]

29.   On or about April 6, 2006, in Orange County, within the Central District of California, in a matter within the jurisdiction of the Executive Branch of the Government of the United States, specifically, the Federal Bureau of Investigation, defendant CHUNG knowingly and willfully made materially false, fictitious, and fraudulent statements and representations.  More specifically, defendant CHUNG claimed that he had reported to the Boeing Security Office all of his travels to the PRC while in the employment of Boeing, when, in truth and in fact, as defendant CHUNG then well knew, he had not reported to the Boeing Security Office his travels to the PRC while in the employment of Boeing.

COUNT THIRTEEN

[18 U.S.C. § 1001]

30.   On or about September 11, 2006, in Orange County, within the Central District of California, in a matter within the jurisdiction of the Executive Branch of the Government of the United States, specifically, the Federal Bureau of Investigation, defendant CHUNG knowingly and willfully made materially false, fictitious, and fraudulent statements and representations.   More specifically, defendant CHUNG said he had traveled to the PRC only in 1985 and 2000, when, in truth and in fact, as defendant CHUNG then well knew, defendant CHUNG had traveled to the PRC in 1985, 2001, 2002, and 2003.

COUNT FOURTEEN

[18 U.S.C. § 1001]

31.   On or about September 11, 2006, in Orange County, within the Central District of California, in a matter within the jurisdiction of the Executive Branch of the Government of the United States, specifically, the Federal Bureau of Investigation, defendant CHUNG knowingly and willfully made materially false, fictitious, and fraudulent statements and representations.   More specifically, defendant CHUNG claimed he received permission from his supervisor at Boeing, Bill Novak, to take work documents home from Boeing, when, in truth and in fact, as defendant CHUNG then well knew, he had never received permission from Novak to take work documents home from Boeing.

COUNT FIFTEEN

[18 U.S.C. § 1834]

32.   The allegations contained in Counts One through Nine of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 1834.

33.   Upon conviction of any of the offenses in violation of Title 18, United States Code, Section 1831 set forth in Counts One through Nine of this Indictment, defendant CHUNG shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 1834:

a.   Any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of the offenses; and

b.   Any property used, or intended to be used, in any manner or part, to commit or facilitate the commission of the offenses.

c.   A sum of money equal to the total value of the property described in Paragraph Thirty-two (a)-(b).

The property to be forfeited includes, but is not limited to: Parcel 2 in the City of Orange, County of Orange, State of California, according to Parcel Map No. 83 751 filed in book 181 pages 44 and 45 of Parcel Maps, records of said Orange County, California, APN 093-270-57.

34.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 1834(b), defendant CHUNG shall forfeit substitute property, up to the value of the total amount described in Paragraph Thirty-two

////

(a)-(b), if, as the result of any act or omission of said defendant, said property, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL


_____/s/_____
Foreperson

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

ROBB C. ADKINS
Assistant United States Attorney
Chief, Santa Ana Branch Office