104TH CONGRESS } HOUSE OF REPRESENTATIVES { REPORT
2d Session }                                   { 104–788

## ECONOMIC ESPIONAGE ACT OF 1996

SEPTEMBER 16, 1996.—Committed to the Committee of the Whole House on the
State of the Union and ordered to be printed

Mr. McCOLLUM, from the Committee on the Judiciary,
submitted the following

## R E P O R T

[To accompany H.R. 3723]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill
(H.R. 3723) to amend title 18, United States Code, to protect pro-
prietary economic information, and for other purposes, having con-
sidered the same, report favorably thereon with an amendment and
recommend that the bill as amended do pass.

CONTENTS

| | Page |
|---|---|
| The Amendment | 1 |
| Purpose and Summary | 3 |
| Background and Need for Legislation | 4 |
| Hearings | 8 |
| Committee Consideration | 8 |
| Committee Oversight Findings | 8 |
| Committee on Government Reform and Oversight Findings | 8 |
| New Budget Authority and Tax Expenditures | 8 |
| Congressional Budget Office Estimate | 9 |
| Inflationary Impact Statement | 10 |
| Section-by-Section Analysis and Discussion | 10 |
| Agency Views | 14 |
| Changes in Existing Law Made by the Bill, as Reported | 15 |

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof
the following:

SECTION 1. SHORT TITLE.

This Act may be cited as the "Economic Espionage Act of 1996".

SEC. 2. PROTECTION OF TRADE SECRETS.

(a) IN GENERAL.—Chapter 31 of title 18, United States Code, is amended by add-
ing at the end the following:

"§ 670. Protection of trade secrets

"(a) OFFENSE.—Whoever—

29–006

Exhibit # 2

2

"(1) with the intent to, or with reason to believe that the offense will, benefit any foreign government, foreign instrumentality, or foreign agent; or

"(2) with the intent to divert a trade secret, that is related to or is included in a product that is produced for or placed in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and with the intent to, or with reason to believe that the offense will, disadvantage any owner of that trade secret;

wrongfully copies or otherwise controls a trade secret, or attempts or conspires to do so shall be punished as provided in subsection (b).

"(b) PUNISHMENT.—

"(1) GENERALLY.—The punishment for an offense under this section is—

"(A) in the case of an offense under subsection (a)(1), a fine under this title or imprisonment for not more than 25 years, or both; and

"(B) in the case of an offense under subsection (a)(2), a fine under this title or imprisonment for not more than 15 years.

"(2) INCREASED MAXIMUM FINE FOR ORGANIZATIONS.—If an organization commits an offense—

"(A) under subsection (a)(1), the maximum fine, if not otherwise larger, that may be imposed is $10,000,000; and

"(B) under subsection (a)(2), the maximum fine, if not otherwise larger, that may be imposed is $5,000,000.

"(c) DEFINITIONS.—As used in this section—

"(1) the term 'foreign instrumentality' means any agency, bureau, ministry, component, institution, association, or any legal, commercial, or business organization, corporation, firm, or entity that is substantially owned, controlled, sponsored, commanded, managed, or dominated by a foreign government;

"(2) the term 'foreign agent' means any officer, employee, proxy, servant, delegate, or representative of a foreign government;

"(3) the term 'trade secret' means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

"(A) the owner thereof has taken reasonable measures to keep such information secret; and

"(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public; and

"(4) the term 'owner', with respect to a trade secret, means the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed.

"(d) CRIMINAL FORFEITURE.—

"(1) Notwithstanding any other provision of State law, any person convicted of a violation under this section shall forfeit to the United States—

"(A) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation; and

"(B) any of the person's property used, or intended to be used, in any manner or part, to commit or facilitate the commission of such violation, if the court in its discretion so determines, taking into consideration the nature, scope, and proportionality of the use of the property in the offense.

"(2) The court, in imposing sentence on such person, shall order, in addition to any other sentence imposed pursuant to this section, that the person forfeit to the United States all property described in this section.

"(3) Property subject to forfeiture under this section, any seizure and disposition thereof, and any administrative or judicial proceeding in relation thereto, shall be governed by the provisions of section 413 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853), except for subsections (d) and (j) of such section, which shall not apply to forfeitures under this section.

"(e) ORDERS TO PRESERVE CONFIDENTIALITY.—In any prosecution or other proceeding under this section, the court shall enter such orders and take such other action as may be necessary and appropriate to preserve the confidentiality of trade secrets, consistent with the requirements of the Federal Rules of Criminal and Civil Procedure, the Federal Rules of Evidence, and all other applicable laws. An interlocutory appeal by the United States shall lie from a decision or order of a district court authorizing or directing the disclosure of any trade secret.

"(f) CIVIL PROCEEDINGS TO ENJOIN VIOLATIONS.—

Exhibit # 2

3

"(1) GENERALLY.—The Attorney General may, in a civil action, obtain appropriate injunctive relief against any violation of this section.

"(2) EXCLUSIVE JURISDICTION.—The district courts of the United States shall have exclusive original jurisdiction of civil actions under this subsection.

"(g) TERRITORIAL APPLICATION.—

"(1) This section applies to conduct occurring within the United States.

"(2) This section also applies to conduct occurring outside the United States if—

"(A) the offender is—

"(i) a United States citizen or permanent resident alien; or

"(ii) an organization substantially owned or controlled by United States citizens or permanent resident aliens, or incorporated in the United States; or

"(B) an act in furtherance of the offense was committed in the United States.

"(h) NONPREEMPTION OF OTHER REMEDIES.—This section shall not be construed to preempt or displace any other remedies, whether civil or criminal, provided by United States Federal, State, commonwealth, possession, or territory law for the misappropriation of a trade secret

"(i) EXCEPTIONS TO PROHIBITION.—

"(1) This section does not prohibit and shall not impair any otherwise lawful activity conducted by an agency or instrumentality of the United States, a State, or a political subdivision of a State.

"(2) This section does not prohibit the reporting of any suspected criminal activity to any law enforcement agency or instrumentality of the United States, a State, or a political subdivision of a State, to any intelligence agency of the United States, or to Congress.".

(b) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 31, United States Code, is amended by adding at the end the following new item:

"670. Protection of trade secrets.".

SEC. 3. WIRE AND ELECTRONIC COMMUNICATIONS INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS.

Section 2516(1)(c) of title 18, United States Code, is amended by inserting "section 670 (relating to economic espionage)," after "(bribery in sporting contests),".

## PURPOSE AND SUMMARY

H.R. 3723, the Economic Espionage Act of 1996, creates a new crime of wrongfully copying or otherwise controlling trade secrets, if done with the intent either to (1) benefit a foreign government, instrumentality, or agent, or (2) disadvantage the rightful owner of the trade secret and for the purpose of benefitting another person. The term "trade secret" is defined in the bill to include all types of financial, business, scientific, technical, economic, or engineering information, whether tangible or intangible, and regardless of the means by which the information is stored, compiled, or memorialized. The definition of the term trade secret also requires both that the owner of the information have taken some reasonable measures to keep the information secret and that the information derives independent economic value from not being generally known to the public and not being readily ascertainable through legal means. This new crime applies to conduct occurring in the United States and also to conduct occurring outside the United States provided, in the latter instance, that the offender is either a United States person or resident alien, an organization substantially owned or controlled by a United States citizen or permanent resident, or an organization incorporated in the United States; or that an act in furtherance of the offense was committed in the United States.

The bill provides for punishments consisting of a fine, imprisonment, or both. The maximum term of imprisonment is 25 years if the criminal act was done with the intent to benefit a foreign gov-

Exhibit # 2

4

ernment and 15 years in all other cases. The bill also provides for a significantly increased maximum fine if the crime is committed by an organization. If the intent of the organization was to benefit a foreign government, the maximum fine that may be imposed under the bill is $10 million. In all other cases the maximum fine that may be imposed on an organization committing this crime is $5 million.

The bill requires courts hearing cases brought under the statute to enter such orders as may be necessary to protect the confidentiality of the information involved in the case. The bill also empowers the Attorney General to file a civil action, in advance of the commencement of the criminal case, in order to obtain appropriate injunctive relief against a violation of the new criminal section. The bill provides for criminal forfeiture of the proceeds of the crime and limited forfeiture of the property used to commit the crime. Finally, the bill amends the wiretap statute to authorize the interception of communications in furtherance of the new crime when such interceptions are approved by a federal court.

### BACKGROUND AND NEED FOR THE LEGISLATION

#### INTRODUCTION

For many years federal law has protected intellectual property through the patent and copyright laws. With this legislation, Congress will extend vital federal protection to another form of proprietary economic information—trade secrets. There can be no question that the development of proprietary economic information is an integral part of America's economic well-being. Moreover, the nation's economic interests are a part of its national security interests. Thus, threats to the nation's economic interest are threats to the nation's vital security interests.

#### GROWING IMPORTANCE OF PROPRIETARY ECONOMIC INFORMATION

The United States produces the vast majority of the intellectual property in the world. This category of property includes patented inventions, copyrighted material, and proprietary economic information. Trade secrets, in contrast with copyrighted material and patented inventions, are information as to which owners take steps to keep confidential. The value of the information is almost entirely dependent on it being closely held. It includes, but is not limited to, information such as production processes, bid estimates, production schedules, computer software, and technology schematics. For many companies this information is the keystone to their economic competitiveness. They spend many millions of dollars developing the information, take great pains and invest enormous resources to keep it secret, and expect to reap rewards from their investment.

In the last few decades, intangible assets have become more and more important to the prosperity of companies. A recent analysis by the Brookings Institute indicates that in 1982, the tangible assets of mining and manufacturing companies accounted for 62 percent of their market value. By 1992, they represented only 38 percent of the market value. As the nation moves into the high-technology, information age, the value of these intangible assets will only continue to grow. Ironically, the very conditions that make

Exhibit # 2

5

this proprietary information so much more valuable make it easier to steal. Computer technology enables rapid and surreptitious duplications of the information. Hundreds of pages of information can be loaded onto a small computer diskette, placed into a coat pocket, and taken from the legal owner.

This material is a prime target for theft precisely because it costs so much to develop independently, because it is so valuable, and because there are virtually no penalties for its theft. The information is pilfered by a variety of people and organizations for a variety of reasons. A great deal of the theft is committed by disgruntled individuals or employees who hope to harm their former companies or line their own pockets. In other instances, outsiders target a company, systematically infiltrate it, and then steal its vital information. More disturbingly, there is considerable evidence that foreign governments are using their espionage capabilities against American companies.

The term economic or industrial espionage is appropriate in these circumstances. Espionage is typically an organized effort by one country's government to obtain the vital national security secrets of another country. Typically, espionage has focused on military secrets. But as the cold war has drawn to a close, this classic form of espionage has evolved. Economic superiority is increasingly as important as military superiority. And the espionage industry is being retooled with this in mind.

It is important, however, to remember that the nature and purpose of industrial espionage are sharply different from those of classic political or military espionage. The phrase industrial espionage includes a variety of behavior—from the foreign government that uses its classic espionage apparatus to spy on a company, to the two American companies that are attempting to uncover each other's bid proposals, or to the disgruntled former employee who walks out of his former company with a computer diskette full of engineering schematics. All of these forms of industrial espionage are problems. Each will be punished under this bill.

At hearings before the Subcommittee, Louis Freeh, the Director of the Federal Bureau of Investigation, testified that the FBI is currently investigating reports and allegations of economic espionage activities conducted against the United States by individuals or organizations from 23 different countries. Some of these governments are ideological and military adversaries which continue to target U.S. economic and technological information as an extension of the concerted intelligence assault on the United States conducted throughout the cold war. Other governments targeting U.S. economic and technological information are long time political and military allies of the United States or have been traditionally neutral. These countries target the United States despite their friendly relations with our government and, in some cases, take advantage of their considerable legitimate access to U.S. information to collect sensitive information more easily than our traditional adversaries. Some of these countries find no contradiction in maintaining a military alliance with the United States while at the same time using their intelligence services to target U.S. technologies.

Incidents of economic espionage are not limited to foreign governments or foreign companies. A recent survey by the American Soci-

Exhibit # 2

6

ety for Industrial Security International noted that foreign nation-
als had been identified in 21% of incidents involving intellectual
property loss where the nationality of the perpetrators was known.
In cases not involving a foreign government or a company, the per-
petrator of the theft of intellectual property was an individual with
a trusted relationship with the company, often an employee or
former employee, retiree, contractor, vendor supplier, consultant or
business partner. The survey noted that there has been a 323% in-
crease in reported incidents since a survey four years ago. That
study estimates the potential losses for all American industry could
amount to $63 billion annually.

### NEED FOR LEGISLATION

At the hearing before the Subcommittee, Director Freeh testified
that the FBI has experienced difficulties in prosecuting cases of
economic espionage. While the FBI attempts to use various crimi-
nal statutes currently in force to investigate and prosecute this
crime, these laws do not specifically cover the theft or improper
transfer of proprietary information and, in the opinion of Director
Freeh, are insufficient to protect this type of information. He testi-
fied further that in some instances, the FBI has conducted inves-
tigations only to have federal prosecutors decline the FBI's request
to use further investigative procedures or to actually prosecute the
case itself out of a concern over the lack of statutory criminal au-
thority to do so.

The principal problem appears to be that there is no federal stat-
ute directly addressing economic espionage or which otherwise pro-
tects proprietary information in a thorough, systematic manner.
The statute that federal prosecutors principally rely upon to com-
bat this type of crime, the Interstate Transportation of Stolen Prop-
erty Act (18 U.S.C. § 2314), was passed in the 1930s in an effort
to prevent the movement of stolen property across State lines by
criminals attempting to evade the jurisdiction of State and local
law enforcement officials. That statute relates to "goods, wares, or
merchandise." Consequently, prosecutors have found it not particu-
larly well suited to deal with situations involving "intellectual
property," property which by its nature is not physically trans-
ported from place to place. Courts have been reluctant to extend
the reach of this law to this new type of property. One court has
held that "the element of physical 'goods, wares, or merchandise' in
sections 2314 and 2315 is critical. The limitation which this places
on the reach of the Interstate Transportation of Stolen Property
Act is imposed by the statute itself, and must be observed." *United
States* v. *Brown*, 925 F.2d 1301 (10th Cir. 1991). Other statutes on
which the government relies to prosecute this type of crime, such
as the mail fraud statute or the fraud by wire statute, have also
proved limited in their use. The mail fraud statute is only applica-
ble when the mails are used to commit the criminal act and the
fraud by wire statute requires proof that wire, radio, or television
technology was used to commit the crime.

State laws also do not fill the gaps left by federal law. While the
majority of States have some form of civil remedy for the theft of
proprietary economic information, either by recognizing a tort for
the misappropriation of the information or by enforcing contracts

Exhibit # 2

7

governing the use of the information, these civil remedies often are insufficient. Many companies choose to forego civil litigation because of the difficulties in enforcing a monetary judgment against some defendants which may have few assets or foreign governments with few assets in the United States or because companies do not have the resources or time to bring the civil action. Additionally, private individuals and companies lack the investigative resources necessary to prove that a defendant has in fact misappropriated the proprietary economic information in question. Only a few States have any form of criminal law dealing with the theft of this type of information and most of those laws are misdemeanors, rarely used by State prosecutors.

These problems underscore the importance of developing a systematic approach to the problem of economic espionage. The Committee believes that such a scheme will serve as a powerful deterrent to this type of crime. Additionally, a comprehensive federal criminal statute will better facilitate the investigation and prosecution of this crime.

## GENERAL INTENTIONS OF THE COMMITTEE

This legislation is not intended to apply to innocent innovators or to individuals who seek to capitalize on the personal knowledge, skill, or abilities they may have developed. The statute is not intended to be used to prosecute employees who change employers or start their own companies using general knowledge and skills developed while employed. It is the intent of Congress, however, to make criminal the act of employees who leave their employment and use their knowledge about specific products or processes in order to duplicate them or develop similar goods for themselves or a new employer in order to compete with their prior employer.

H.R. 3723 has been drafted so as to minimize the risk that the statute will be used to prosecute persons who use generic business knowledge to compete with former employers. For example, under the new offense the government is required to prove that the defendant has wrongfully copied or otherwise exerted control over a "trade secret." The definition of trade secret requires that the owner of the information must have taken objectively reasonable and active measures to protect the information from becoming known to unauthorized persons. If the owner fails to attempt to safeguard his or her proprietary information, no one can be rightfully accused of misappropriating it. It is important to note, however, that an owner of this type of information need only take "reasonable" measures to protect this information. While it will be up to the court in each case to determine whether the owner's efforts to protect the information in question were reasonable under the circumstances, it is not the Committee's intent that the owner be required to have taken every conceivable step to protect the property from misappropriation.

The new statute also requires that the government prove that the defendant wrongfully copied or otherwise controlled a trade secret. It is the Committee's intent that the phrase "copies or otherwise controls" be read broadly to include virtually any means by which information can be recorded, altered, or otherwise manipulated. This phrase includes both the taking of physical possession

Exhibit # 2

8

of the medium on which the information is stored, recorded, or otherwise memorialized as well as situations where the information has been copied, duplicated, photographed, drawn, or otherwise reproduced in some form from the original and where the original information continues to remain in the possession of the owner. This concept of control also includes situations in which the information has been transmitted from one place to another (regardless of whether by electronic means, through the mails, or by person), even if in transmitting the information it continues to remain in the possession of its rightful owner. The concept of control also includes the mere possession of the information, regardless of the manner by which the non-owner gained possession of the information.

HEARINGS

The Committee's Subcommittee on Crime held one day of hearings on H.R. 3723 on May 9, 1996. Testimony was received from Louis Freeh, Director of the Federal Bureau of Investigation; Tom Brunner, U.S. Chamber of Commerce; Dr. James P. Chandler, George Washington University; Dr. Raymond Damadian, President, Fonar Corp.; Richard J. Heffernan, American Society of Industrial Security; Pete McCloskey, President, Electronic Industries Association; John Melton, Vice President SDL, Inc.; David Shannon, Senior Counsel, Intel Corporation; Dan Whiteman, Director of Security, General Motors; with additional material submitted by Hughes Corporation.

COMMITTEE CONSIDERATION

On July 10, 1996, the Subcommittee on Crime met in open session and ordered reported the bill H.R. 3723, by a voice vote, a quorum being present. On September 11, 1996, the Committee met in open session and ordered reported favorably the bill H.R. 3732 with one amendment in the nature of a substitute by voice vote, a quorum being present.

COMMITTEE OVERSIGHT FINDINGS

In compliance with clause 2(l)(3)(A) of rule XI of the Rules of the House of Representatives, the Committee reports that the findings and recommendations of the Committee, based on oversight activities under clause 2(b)(1) of rule X of the Rules of the House of Representatives, are incorporated in the descriptive portions of this report.

COMMITTEE ON GOVERNMENT REFORM AND OVERSIGHT FINDINGS

No findings or recommendations of the Committee on Government Reform and Oversight were received as referred to in clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives.

NEW BUDGET AUTHORITY AND TAX EXPENDITURES

Clause 2(l)(3)(B) of House rule XI is inapplicable because this legislation does not provide new budgetary authority or increased tax expenditures.

Exhibit # 2

9

CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

In compliance with clause 2(l)(C)(3) of rule XI of the Rules of the House of Representatives, the Committee sets forth, with respect to the bill, H.R. 3723, the following estimate and comparison prepared by the Director of the Congressional Budget Office under section 403 of the Congressional Budget Act of 1974:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, September 16, 1996.*

Hon. HENRY J. HYDE,
*Chairman, Committee on the Judiciary,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has reviewed H.R. 3723, the Economic Espionage Act of 1996, as ordered reported by the House Committee on the Judiciary on September 11, 1996. CBO estimates that enacting the bill would result in additional discretionary spending of about $3 million over the 1997–2002 period, subject to the availability of appropriated funds. Enacting H.R. 3723 would affect direct spending and receipts by increasing the amount of forfeiture receipts and penalties collected and spent by the government. We estimate that the collection of such receipts would total about $10 million through fiscal year 1998 and the spending of such receipts would total about $5 million over the same period. Because enacting the bill would affect direct spending and receipts, it would be subject to pay-as-you-go procedures. However, we expect that the forfeiture and penalty provisions would have no significant net effect over time because receipts from criminal fines and the sale of forfeited property would be spent, generally within one year of receipt.

*Bill Purpose.*—Enacting H.R. 3723 would make the misappropriation of a trade secret a federal crime. Under current law, cases involving the theft of trade secrets are prosecuted under various statutes; however, none is broad enough to accommodate most cases involving the unauthorized use of such material. Under this bill, trade secrets would include intellectual property as well as physical property, and violations would include duplication of information as well as physical theft. Violators would be subject to imprisonment, criminal fines, and forfeiture of the property involved in the crime. In addition, this bill would enable the Attorney General to obtain court injunctions as relief against any violations of this bill and would enable the federal government to investigate offenses under this bill through the use of authorized wire, oral, or electronic intercepts.

*Federal Budgetary Impact.*—Based on information from the Federal Bureau of Investigation (FBI), CBO expects that the agency's caseload would increase as a result of enacting H.R. 3723. We estimate that, over the next six years, the government would most likely investigate and prosecute a total of about 50 cases covered by this legislation. While pursuing investigations would consume staff time and other resources of the federal government, CBO estimates that the Department of Justice and the FBI would not need significant additional resources to enforce the provisions of the bill over the next two years. However, after fiscal year 1999, resource

Exhibit # 2

10

needs could exceed $1 million each year to support the increasing caseload. CBO estimates that resource needs could total about $3 million from fiscal year 1999 through fiscal year 2002. Any such additional resources would be subject to the availability of appropriated funds.

This bill also would establish penalties—including fines, imprisonment, and the forfeiture of property involved in the crime—for violations of its provisions. Criminal fines and receipts from the sale of forfeited property would be deposited in the Crime Victims Fund and spent in the following year. CBO estimates that the government would collect additional fines and receipts from the sale of forfeited property of about $10 million through fiscal year 1998. Based on information from the FBI, we estimate that additional receipts paid into the Crime Victims Fund after fiscal year 1998 could exceed $10 million a year. Spending from the fund increase by the same amounts, but with a one-year lag. CBO does not expect any significant increase in prison costs as a result of this bill. The following table summarizes the pay-as-you-go effects of enacting this bill.

[By fiscal year, in millions of dollars]

|  | 1996 | 1997 | 1998 |
|---|---|---|---|
| Change in outlays | 0 | 0 | 5 |
| Change in receipts | 0 | 5 | 5 |

*Mandate Statement.*—H.R. 3723 contains no private-sector or intergovernmental mandates as defined in the Unfunded Mandates Reform Act of 1995 (Public Law 104–4), and would have no impact on the budgets of state, local, or tribal governments.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contact is Susanne S. Mehlman.

Sincerely,

JUNE E. O'NEILL, *Director.*

INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(l)(4) of rule XI of the Rules of the House of Representatives, the Committee estimates that H.R. 3723 will have no significant inflationary impact on prices and costs in the national economy.

SECTION-BY-SECTION ANALYSIS

Section 1. TITLE.—Section 1 states the short title of the bill as the "Economic Espionage Act of 1996."

Section 2. PROTECTION OF TRADE SECRETS. This section adds a new section to Chapter 31 of Title 18 of the United States Code. The new section, section 670, creates the crime of wrongfully copying or otherwise controlling a trade secret.

Section 670(a)—OFFENSE.—Subsection (a) of new section 670 creates the criminal offense involving the misappropriation of trade secrets. The offense provides that anyone who "wrongfully copies or otherwise controls" a trade secret, or attempts or conspires to do so, shall be punished in accordance with subsection (b) of that section. In order for a violation of the statute to be proven, the govern-

Exhibit # 2

11

ment must also prove that the defendant committed the offense either (1) with the intent to, or with reason to believe that the offense would, benefit any foreign government, foreign instrumentality, or foreign agent, or (2) with the intent to divert a trade secret related to, or included in, a product that is produced for, or placed in, interstate or foreign commerce, to the use or benefit of anyone other than the owner of the trade secret and with the further intent to, or with reason to believe that the offense would, disadvantage the owner of that trade secret.

This section punishes the theft, unauthorized appropriation or conversion, duplication, alteration, or destruction of a trade secret. This section is intended to cover both traditional instances of theft, where the object of the crime is removed from the rightful owner's control, as well as non-traditional methods of misappropriation or destruction that involve duplication or alteration. When these non-traditional methods are used the original property never leaves the control of the rightful owner, but the unauthorized duplication or misappropriation effectively destroys the value of what is left with the rightful owner. Given the increased use of electronic information systems, information can now be stolen without asportation and the original usually remains intact. The intent of this statute, therefore, is to ensure that the theft of intangible information is prohibited in the same way that the theft of physical items is punished.

This section requires that the government prove that the person charged with the crime acted with the intent to accomplish one of two goals. One, a person will be guilty under this section if they wrongfully copied or otherwise controlled a trade secret with the intent to benefit any foreign government, foreign instrumentality or foreign agent. In this instance, "benefit" is intended to be interpreted broadly. The defendant did not have to intend to confer an economic benefit to the foreign government, instrumentality, or agent, to himself, or to any third person. Rather, the government need only prove that the actor intended that his actions in copying or otherwise controlling the trade secret would benefit the foreign government, instrumentality, or agent in any way. Therefore, in this circumstance, benefit means not only an economic benefit but also reputational, strategic, or tactical benefit.

Alternatively, the government may prove that the defendant intended the misappropriated trade secret to be used for the economic benefit of a person other than the rightful owner (which can be the defendant or some other person or entity). In this situation (i.e., when the defendant does not act with the intent to benefit a foreign government, instrumentality, or agent) the government must prove that the defendant intended to confer an economic benefit, not an abstract benefit or reputational enhancement, through his actions. Therefore, a person who discloses a trade secret but who does not intend to gain economically from it, or intends that some other person economically gain from trade secret, cannot be prosecuted under this section. Additionally, when the defendant does not act with the intent to benefit a foreign government, instrumentality, or agent, the government must also show that the defendant intended to disadvantage the rightful owner of the information. This additional provision does not require the government

Exhibit # 2

12

to prove malice or evil intent, but merely that the actor knew or was aware to a practical certainty that his conduct would cause some disadvantage to the rightful owner.

While the term "wrongfully" is not defined in the statute specifically, the use of the term in this section involves the defendant's knowledge that his or her actions in copying or otherwise exerting control over the information in question was inappropriate. It is not necessary that the government prove that the defendant knew his or her actions were illegal, rather the government must prove that the defendant's actions were not authorized by the nature of his or her relationship to the owner of the property and that the defendant knew or should have known that fact.

Section 670(b)—PUNISHMENT.—The bill provides for several types of punishment, including fines, imprisonment, or both. The maximum term of incarceration varies depending upon the intent of the person convicted of the crime. If the defendant's intent was to benefit a foreign government, foreign instrumentality, or foreign agent the maximum term of imprisonment is 25 years. In all other cases, the maximum term of imprisonment is 15 years.

If an organization commits an offense under the section, the maximum fine amount is substantially increased from that otherwise provided under title 18. If an organization commits an offense involving an intent to benefit a foreign government, foreign instrumentality, or foreign agent the maximum fine which may be imposed is $10 million. In all other circumstances, the maximum fine which may be imposed on an organization violating section 670 is $5 million.

Subsection (c)—DEFINITIONS.—Subsection (c) of new section 670 provides for definitions of some of the key terms used in the section. The definition of the term "trade secret" is based largely on the definition of that term in the Uniform Trade Secrets Act. As defined in H.R. 3723, "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information" if certain conditions exist, as discussed below. This information includes patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether such properties are tangible or intangible, and regardless of the means by which such property is stored or compiled, or memorialized physically, electronically, graphically, photographically, or in writing. These general categories of information are included in the definition of trade secret for illustrative purposes and should not be read to limit the definition of trade secret. It is the Committee's intent that this definition be read broadly.

As defined in the bill, however, in order for information to meet the definition of trade secret, two conditions must be proven to have existed at the time the defendant copied or otherwise exerted control over the information. First, the owner of the information must have taken reasonable measures to keep such information secret. Secret in this context means that the information was not generally known to the public or to the business, scientific, or educational community in which the owner might seek to use the information. The bill requires the owner to take only "reasonable measures" to keep such information secret. The fact that the owner

Exhibit # 2

13

did not exhaust every conceivable means by which the information could be kept secure does not mean that the information does not satisfy this requirement. Rather, a determination of the "reasonableness" of the steps taken by the owner to keep the information secret will vary from case to case and be dependent upon the nature of the information in question.

The definition of trade secret also requires that the information in question derive independent economic value, whether actual or potential, from the fact that the information is not generally known to, and not readily ascertainable through proper means by, the public. Therefore, information which is generally known to the public, or which the public can readily ascertain through proper means, does not satisfy the definition of trade secret under this section.

The term "owner" is defined to include the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret in reposed. In this case, owner includes both natural persons as well as organizations (such as corporations and partnerships) entitled to own property. It also includes federal, state, and local government organizations, as well as foreign government organizations.

Subsection (d)—CRIMINAL FORFEITURE.—This section is designed to permit forfeiture of both the proceeds and assets used to facilitate the commission of the offense described in the bill. This section requires that any person convicted of a violation of section 670 shall forfeit all property constituting, or derived from, any proceeds the person obtained as the result of such violation, regardless of whether the proceeds were obtained directly or indirectly from the criminal conduct. This section also requires that the person convicted of violating section 670 forfeit any of the person's property used, or intended to be used, to commit or facilitate the crime. But this section further provides, however, that in determining the extent of the property to be forfeited, the court may take into consideration the nature, scope, and proportionality of the use of the property in the offense. The intent of this proviso is to minimize the number of instances in which the property forfeited is disproportionate to the harm caused by the defendant's conduct.

The forfeiture provision supplements, and is in addition to, the authorized punishments in the bill. The subsection incorporates existing law that sets forth procedures to be used in the detention, seizure, forfeiture, and ultimate disposition of property forfeited under this subsection.

Subsection (e)—ORDERS TO PRESERVE CONFIDENTIALITY.—This subsection authorizes the court to preserve the confidentiality of alleged trade secrets during legal proceedings consistent with existing rules of criminal procedure, civil procedure, and evidence, and other applicable laws. The intent of this section is to preserve the confidential nature of the information and, hence, its value. Without such a provision, owners may be reluctant to cooperate in prosecutions for fear of further exposing their trade secrets to public view, thus further devaluing or even destroying their worth.

Subsection (f)—CIVIL PROCEEDINGS TO ENJOIN VIOLATIONS.— This section empowers the Attorney General to commence a civil action in the United States District Courts to obtain injunctive re-

Exhibit # 2

14

lief against a violation of new section 670. The standards for obtaining such injunctive relief are to be those provided for under the Federal Rules of Civil Procedure. The district courts shall have exclusive jurisdiction over actions brought under this subsection. This subsection is neither intended to create a general civil cause of action nor does it authorize persons other than the Attorney General to commence a civil action to enjoin a violation of section 670.

Subsection (g)—Territorial Application.—To rebut the general presumption against the extraterritoriality of U.S. criminal laws, this subsection makes it clear that the Act is meant to apply to the specified conduct occurring beyond U.S. borders. To ensure that there is some nexus between the ascertaining of such jurisdiction and the offense, however, extraterritorial jurisdiction exists only if the offender is a United States citizen or permanent resident alien, an organization substantially owned or controlled by United States citizens or permanent resident aliens, or is incorporated in the United States. Alternatively, extraterritorial jurisdiction will exist if an act in furtherance of the offense was committed in the United States.

Subsection (h)—Non-Preemption of Other Remedies.—This subsection makes it clear that the act does not preempt non-federal remedies, whether civil or criminal, for dealing with the theft or misapplication of trade secrets. In particular, the fact that the Attorney General is authorized (under subsection (f) of section 670) to commence civil proceedings in order to enjoin further conduct which would violate section 670 is not to be interpreted to mean that other persons and entities may not also seek injunctive relief that may be available in other civil actions (using state law tort or contract claims) in order to prevent the further misuse of a trade secret.

Subsection (i)—Exceptions to Prohibition.—The Act does not prohibit, and is not to be deemed to impair, any otherwise lawful activity conducted by an agency or instrumentality of the United States, a State, or political subdivision of a State. This subsection is intended to make it clear that the act does not prohibit any lawfully authorized investigative, protective, or intelligence activity by one of those government entities. This subsection also makes it clear that it is not a violation of section 670 to report suspected criminal activity to a law enforcement agency or instrumentality of the United States, a State, or political subdivision of a State, to any intelligence agency of the United States, or to Congress.

Section 3. Wire and Electronic Communications Interception and Interception of Oral Communications.—This section adds new section 670 to the list of offenses which may be investigated through the use of authorized, wire, oral, or electronic intercepts. This section does not alter the existing standard or procedures for obtaining the authorization to conduct such intercepts.

## Agency Views

Agency views were submitted to the Committee with respect to H.R. 3723.

Exhibit # 2

15

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

## TITLE 18, UNITED STATES CODE

## PART I—CRIMES

\*        \*        \*        \*        \*        \*        \*

## CHAPTER 31—EMBEZZLEMENT AND THEFT

Sec.
641.   Public money, property or records.
\*        \*        \*        \*        \*        \*        \*
*670. Protection of trade secrets.*
\*        \*        \*        \*        \*        \*        \*

### *§ 670. Protection of trade secrets*

    *(a) OFFENSE.—Whoever—*

        *(1) with the intent to, or with reason to believe that the offense will, benefit any foreign government, foreign instrumentality, or foreign agent; or*

        *(2) with the intent to divert a trade secret, that is related to or is included in a product that is produced for or placed in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and with the intent to, or with reason to believe that the offense will, disadvantage any owner of that trade secret;*

*wrongfully copies or otherwise controls a trade secret, or attempts or conspires to do so shall be punished as provided in subsection (b).*

    *(b) PUNISHMENT.—*

        *(1) GENERALLY.—The punishment for an offense under this section is—*

            *(A) in the case of an offense under subsection (a)(1), a fine under this title or imprisonment for not more than 25 years, or both; and*

            *(B) in the case of an offense under subsection (a)(2), a fine under this title or imprisonment for not more than 15 years.*

        *(2) INCREASED MAXIMUM FINE FOR ORGANIZATIONS.—If an organization commits an offense—*

            *(A) under subsection (a)(1), the maximum fine, if not otherwise larger, that may be imposed is $10,000,000; and*

            *(B) under subsection (a)(2), the maximum fine, if not otherwise larger, that may be imposed is $5,000,000.*

    *(c) DEFINITIONS.—As used in this section—*

        *(1) the term "foreign instrumentality" means any agency, bureau, ministry, component, institution, association, or any legal, commercial, or business organization, corporation, firm, or en-*

Exhibit # 2

16

tity that is substantially owned, controlled, sponsored, commanded, managed, or dominated by a foreign government;

(2) the term "foreign agent" means any officer, employee, proxy, servant, delegate, or representative of a foreign government;

(3) the term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public; and

(4) the term "owner", with respect to a trade secret, means the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed.

(d) CRIMINAL FORFEITURE.—

(1) Notwithstanding any other provision of State law, any person convicted of a violation under this section shall forfeit to the United States—

(A) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation; and

(B) any of the person's property used, or intended to be used, in any manner or part, to commit or facilitate the commission of such violation, if the court in its discretion so determines, taking into consideration the nature, scope, and proportionality of the use of the property in the offense.

(2) The court, in imposing sentence on such person, shall order, in addition to any other sentence imposed pursuant to this section, that the person forfeit to the United States all property described in this section.

(3) Property subject to forfeiture under this section, any seizure and disposition thereof, and any administrative or judicial proceeding in relation thereto, shall be governed by the provisions of section 413 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853), except for subsections (d) and (j) of such section, which shall not apply to forfeitures under this section.

(e) ORDERS TO PRESERVE CONFIDENTIALITY.—In any prosecution or other proceeding under this section, the court shall enter such orders and take such other action as may be necessary and appropriate to preserve the confidentiality of trade secrets, consistent with the requirements of the Federal Rules of Criminal and Civil Procedure, the Federal Rules of Evidence, and all other applicable laws. An interlocutory appeal by the United States shall lie from a decision or order of a district court authorizing or directing the disclosure of any trade secret.

Exhibit # 2

17

(f) CIVIL PROCEEDINGS TO ENJOIN VIOLATIONS.—
    (1) GENERALLY.—The Attorney General may, in a civil action, obtain appropriate injunctive relief against any violation of this section.
    (2) EXCLUSIVE JURISDICTION.—The district courts of the United States shall have exclusive original jurisdiction of civil actions under this subsection.
(g) TERRITORIAL APPLICATION.—
    (1) This section applies to conduct occurring within the United States.
    (2) This section also applies to conduct occurring outside the United States if—
        (A) the offender is—
            (i) a United States citizen or permanent resident alien; or
            (ii) an organization substantially owned or controlled by United States citizens or permanent resident aliens, or incorporated in the United States; or
        (B) an act in furtherance of the offense was committed in the United States.
(h) NONPREEMPTION OF OTHER REMEDIES.—This section shall not be construed to preempt or displace any other remedies, whether civil or criminal, provided by United States Federal, State, commonwealth, possession, or territory law for the misappropriation of a trade secret
(i) EXCEPTIONS TO PROHIBITION.—
    (1) This section does not prohibit and shall not impair any otherwise lawful activity conducted by an agency or instrumentality of the United States, a State, or a political subdivision of a State.
    (2) This section does not prohibit the reporting of any suspected criminal activity to any law enforcement agency or instrumentality of the United States, a State, or a political subdivision of a State, to any intelligence agency of the United States, or to Congress.

\*      \*      \*      \*      \*      \*      \*

## CHAPTER 119—WIRE AND ELECTRONIC COMMUNICATIONS INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS

### §2516. Authorization for interception of wire, oral, or electronic communications

(1) The Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General, any acting Assistant Attorney General, or any Deputy Assistant Attorney General or acting Deputy Assistant Attorney General in the Criminal Division specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation, or a Federal agency having responsibility for the investigation

Exhibit # 2

18

of the offense as to which the application is made, when such interception may provide or has provided evidence of—
   (a) * * *

   *     *     *     *     *     *     *

   (c) any offense which is punishable under the following sections of this title: section 201 (bribery of public officials and witnesses), section 215 (relating to bribery of bank officials), section 224 (bribery in sporting contests), *section 670 (relating to economic espionage),* subsection (d), (e), (f), (g), (h), or (i) of section 844 (unlawful use of explosives), section 1032 (relating to concealment of assets), section 1084 (transmission of wagering information), section 751 (relating to escape), section 1014 (relating to loans and credit applications generally; renewals and discounts), sections 1503, 1512, and 1513 (influencing or injuring an officer, juror, or witness generally), section 1510 (obstruction of criminal investigations), section 1511 (obstruction of State or local law enforcement), section 1751 (Presidential and Presidential staff assassination, kidnapping, and assault), section 1951 (interference with commerce by threats or violence), section 1952 (interstate and foreign travel or transportation in aid of racketeering enterprises), section 1958 (relating to use of interstate commerce facilities in the commission of murder for hire), section 1959 (relating to violent crimes in aid of racketeering activity), section 1954 (offer, acceptance, or solicitation to influence operations of employee benefit plan), section 1955 (prohibition of business enterprises of gambling), section 1956 (laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), section 659 (theft from interstate shipment), section 664 (embezzlement from pension and welfare funds), section 1343 (fraud by wire, radio, or television), section 1344 (relating to bank fraud), sections 2251 and 2252 (sexual exploitation of children), sections 2312, 2313, 2314, and 2315 (interstate transportation of stolen property), section 2321 (relating to trafficking in certain motor vehicles or motor vehicle parts), section 1203 (relating to hostage taking), section 1029 (relating to fraud and related activity in connection with access devices), section 3146 (relating to penalty for failure to appear), section 3521(b)(3) (relating to witness relocation and assistance), section 32 (relating to destruction of aircraft or aircraft facilities), section 1963 (violations with respect to racketeer influenced and corrupt organizations), section 115 (relating to threatening or retaliating against a Federal official), and section 1341 (relating to mail fraud), section 351 (violations with respect to congressional, Cabinet, or Supreme Court assassinations, kidnapping, and assault), section 831 (relating to prohibited transactions involving nuclear materials), section 33 (relating to destruction of motor vehicles or motor vehicle facilities), section 175 (relating

Exhibit # 2

19

to biological weapons), or section 1992 (relating to wrecking
trains);

  *     *     *     *     *     *     *

○

Exhibit # 2