1  THOMAS P. O'BRIEN
   United States Attorney
2  ROBB C. ADKINS
   Assistant United States Attorney
3  Chief, Santa Ana Branch Office
   GREGORY W. STAPLES
4  Assistant United States Attorney
   California Bar Number: 155505
5  IVY A. WANG
   Assistant Unites States Attorney
6  California Bar Number: 224899
        United States Courthouse
7       411 West Fourth Street, Suite 8000
        Santa Ana, California 92701
8       Telephone: (714) 338-3549
        Facsimile: (714) 338-3561
9       E-mail address: ivy.wang@usdoj.gov

10 Attorney for Plaintiff
   United States of America

11

12                  UNITED STATES DISTRICT COURT

13            FOR THE CENTRAL DISTRICT OF CALIFORNIA

                       SOUTHERN DIVISION
14
   UNITED STATES OF AMERICA,     ) Case No. SA CR 08-024-CJC
15                               )
            Plaintiff,           ) GOVERNMENT'S TRIAL BRIEF
16                               )
              v.                 )
17                               ) Trial Date: June 2, 2009
   DONGFAN "GREG" CHUNG,         )
18                               )
            Defendant.           )
19                               )
   ──────────────────────────────)
20

21

22      The government submits its trial brief.

23 Dated: May 28, 2009           Respectfully submitted,

24
                                 THOMAS P. O'BRIEN
25                               United States Attorney

26

27
                                 _____
28                               GREGORY W. STAPLES
                                 IVY WANG
                                 Assistant United States Attorneys

TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . iv

I.   STATUS OF THE CASE . . . . . . . . . . . . . . . . 1

II.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . 1

     A.   Defendant's Background . . . . . . . . . . . . 2

     B.   April 2006 Interview of Defendant . . . . . . . 4

     C.   Discovery of Letter from PRC Official to
          Defendant Requesting Information on Space
          Shuttle . . . . . . . . . . . . . . . . . . . 5

     D.   Discovery of NASA Documents in Defendant's
          Trash . . . . . . . . . . . . . . . . . . . . 6

     E.   Searches of Defendant's Home and Workspace at
          Boeing . . . . . . . . . . . . . . . . . . . . 6

     F.   Interviews of Defendant and Defendant's Son . . . . . 7

     G.   Taking and Concealment of Documents Containing
          Trade Secrets . . . . . . . . . . . . . . . . 10

          1.   Delta IV rocket technology . . . . . . . . 10

          2.   Phased-array antenna technology . . . . . . 13

          3.   Boeing's security measures . . . . . . . . 14

               a.   Physical security . . . . . . . . . 14

               b.   Information controls . . . . . . . . 16

                    i.   Use of non-disclosure
                         agreements . . . . . . . . . . . 16

                    ii.  Rockwell/Boeing information
                         control policies . . . . . . . . 17

                    iii. Employee training . . . . . . . 20

                    iv.  Compartmentalization . . . . . . 21

     H.   Benefit to a Foreign Government . . . . . . . . 21

          1.   Defendant's intent to help the "great
               socialist motherland" . . . . . . . . . . 21

TABLE OF CONTENTS (CONTINUED)

PAGE

2.   Specific requests for technology from PRC
     officials  . . . . . . . . . . . . . . . . .   23

     a.   CATIC letters/1985 lectures in the PRC . .   23

     b.   Nan Chang Aircraft list/delivery of B-1
          bomber manuals using PRC Consulate  . . .   26

     c.   Gu Weihao letters  . . . . . . . . . . .   29

     d.   Tasking lists  . . . . . . . . . . . . .   31

3.   Unreported travel to the PRC/lectures given
     in the PRC . . . . . . . . . . . . . . . . .   32

4.   Other evidence of defendant's foreign
     contacts . . . . . . . . . . . . . . . . . .   35

     a.   Defendant's attempt to purchase
          Boeing 737s for the PRC . . . . . . . .   35

     b.   Business cards  . . . . . . . . . . . .   35

     c.   Journal entries . . . . . . . . . . . .   36

5.   Rockwell's policies on travel and contacts  . .   39

6.   Boeing's policies on travel and contacts  . . .   39

I.   Defendant's Collection of Documents Responsive
     to Requests from the PRC  . . . . . . . . . . .   40

J.   Defendant's Failure to Register as a Foreign
     Agent or Apply for an Export License  . . . . . .   42

III. ELEMENTS OF OFFENSES . . . . . . . . . . . . . . .   42

A.   Economic Espionage . . . . . . . . . . . . . . .   42

B.   Conspiracy . . . . . . . . . . . . . . . . . . .   45

C.   Foreign Agent  . . . . . . . . . . . . . . . . .   46

D.   Obstruction  . . . . . . . . . . . . . . . . . .   47

E.   False Statement  . . . . . . . . . . . . . . . .   48

F.   Criminal Forfeiture  . . . . . . . . . . . . . .   48

ii

TABLE OF CONTENTS (CONTINUED)

PAGE

1. The Forfeiture Phase Is Tried after a Guilty Verdict . . . . . . . . . . . . . . . 48

2. The Burden of Proof is Preponderance of the Evidence . . . . . . . . . . . . . 51

3. Third Party Interests are Adjudicated Separately . . . . . . . . . . . . . . . 51

IV. EVIDENTIARY ISSUES . . . . . . . . . . . . . . . . . . . 52

A. Admissions of Defendant . . . . . . . . . . . 52

B. Statements of Co-Conspirators . . . . . . . . . . 53

C. Statements by Co-workers Regarding Instructions From Management . . . . . . . . . . . . . . . 55

D. Documentary Evidence . . . . . . . . . . . . . . 56

1. Authentication of documents . . . . . . . 56

a. Self-authentication . . . . . . . . . 56

b. Chain of custody . . . . . . . . . 57

c. Use of copies . . . . . . . . . . 57

E. Other Act Evidence . . . . . . . . . . . . . . 57

F. Summary Witnesses/Admissibility of Charts and Summaries . . . . . . . . . . . . . . . 59

G. Expert Testimony . . . . . . . . . . . . . . . 60

H. Sealed Exhibits . . . . . . . . . . . . . . . 62

iii

TABLE OF AUTHORITIES

PAGE

CASES:

BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC,
    303 F.3d 1332 (Fed. Cir. 2002) . . . . . . . . . . .   45

Bennejas v. United States,
    428 F.2d 1242 (9th Cir. 1970) . . . . . . . . . . . .   55

Bourjaily v. United States,
    483 U.S. 171 (1987) . . . . . . . . . . . . . . . . .   54

Bruton v. United States,
    391 U.S. 123 (1968) . . . . . . . . . . . . . . . . .   53

Buffets, Inc. v. Klinke,
    73 F.3d 965 (9th Cir. 1996) . . . . . . . . . . . . .   45

Crawford v. Garnier,
    719 F.2d 1317 (7th Cir. 1983) . . . . . . . . . . . .   56

Exum v. General Electric Co.,
    819 F.2d 1158 (D.C. Cir. 1987) . . . . . . . . . . .   61

Goldberg v. United States,
    789 F.2d 1341 (9th Cir. 1986) . . . . . . . . . . . .   60

Harvey Barnett, Inc. v. Shidler,
    338 F.3d 1125 (10th Cir. 2003) . . . . . . . . . . .   45

Kennedy v. Collagen Corp.,
    161 F.3d 1226 (9th Cir. 1998) . . . . . . . . . . . .   62

Libretti v. United States,
    516 U.S. 29 (1995) . . . . . . . . . . . . . . . . .   51

Metallurgical Industries, Inc. v. Fourtek,
    790 F.2d 1195 (5th Cir. 1986) . . . . . . . . . . . .   45

Servo Corporation of America v. General Electric Company,
    393 F.2d 551 (4th Cir. 1968) . . . . . . . . . . . .   45

Syntex Opthalmics, Inc. v. Tsuetaki,
    701 F.2d 677 (7th Cir. 1983) . . . . . . . . . . . .   45

United States v. Andersson,
    813 F.2d 1450 (9th Cir. 1987) . . . . . . . . . . . .   55

United States v. Beckman,
    298 F.3d 788 (9th Cir. 2002) . . . . . . . . . . .   58, 59

iv

TABLE OF AUTHORITIES (CONTINUED)

PAGE

United States v. Fleischman,
    684 F.2d 1329 (9th Cir. 1982) . . . . . . . . . . . . .   62

United States v. Garcia-Guizar,
    160 F.3d 511 (9th Cir. 1998) . . . . . . . . . . . . .   51

United States v. Gibson,
    675 F.2d 825 (6th Cir. 1982) . . . . . . . . . . . . .   56

United States v. Harrington,
    923 F.2d 1371 (9th Cir. 1991) . . . . . . . . . . . . .   57

United States v. Inadi,
    475 U.S. 387 (1986) . . . . . . . . . . . . . . .   53, 55

United States v. Kaiser,
    660 F.2d 724 (9th Cir. 1981) . . . . . . . . . . . . .   57

United States v. Keane,
    522 F.2d 534 (7th Cir. 1975) . . . . . . . . . . . . .   56

United States v. Khatami,
    280 F.3d 907 (9th Cir. 2001) . . . . . . . . . . . . .   48

United States v. Layton,
    720 F.2d 548 (9th Cir.) . . . . . . . . . . . . . .   53, 55

United States v. Mason,
    658 F.2d 1263 (9th Cir. 1981) . . . . . . . . . . . . .   54

United States v. McCown,
    711 F.2d 1441 (9th Cir. 1983) . . . . . . . . . . . . .   53

United States v. Moran,
    759 F.2d 777 (9th Cir. 1985) . . . . . . . . . . . . .   52

United States v. Nixon,
    418 U.S. 683 (1974) . . . . . . . . . . . . . . . . .   52

United States v. Ortega,
    203 F.3d 675 (9th Cir. 2000) . . . . . . . . . . . . .   53

United  States v. Ospina,
    739 F.2d 448 (9th Cir. 1984) . . . . . . . . . . . . .   52

v

TABLE OF AUTHORITIES (CONTINUED)

                                                                    PAGE

United States v. Rabb,
      752 F.2d, 1320 (9th Cir. 1984)  . . . . . . . . . . .   54

United States  v. Reilly,
      33 F.3d 1396 (3d Cir. 1994) . . . . . . . . . . . . .   55

United States v. Warren,
      25 F.3d 890 (9th Cir. 1994) . . . . . . . . . . . . .   52

United States v. Williams,
      989 F.2d 1061 (9th Cir. 1993) . . . . . . . . . . .     54

United States v. Workinger,
      90 F.3d 1409 (9th Cir. 1996) . . . . . . . . . . .      56

Vermont Microsystems, Inc. v. Autodesk, Inc.,
      88 F.3d 142 (2d Cir. 1996) . . . . . . . . . . . . .    45

STATUTES:

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . .    1

18 U.S.C. § 951 . . . . . . . . . . . . . . . . . . . . . .    1

18 U.S.C. § 1001  . . . . . . . . . . . . . . . . . . . . .    1

18 U.S.C. § 1512  . . . . . . . . . . . . . . . . . .   1, 51

18 U.S.C. § 1831  . . . . . . . . . . . . . . . . . .   passim

18 U.S.C. § 1834  . . . . . . . . . . . . . . . . . . . .    49

18 U.S.C. § 1839  . . . . . . . . . . . . . . . . . 42, 44, 45

18 U.S.C. § 2323  . . . . . . . . . . . . . . . . . . . .    50

RULES:

Fed. R. Crim. P. 32.2 . . . . . . . . . . . . . . . .   50-52

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . .    61

Fed. R. Evid. 704 . . . . . . . . . . . . . . . . . . . .    62

**I.   STATUS OF THE CASE**

A.   Trial is set for June 2, 2009.  Jury trial has been waived.

B.   Defendant has been free on bond since his arrest on February 11, 2008.[1]

C.   The indictment contains fifteen counts.  Count 1 charges defendant with conspiracy to commit economic espionage in violation of 18 U.S.C. § 371.  Counts 2 through 9 charge defendant with economic espionage to benefit a foreign country in violation of 18 U.S.C. § 1831.  Count 10 charges defendant with acting as an agent of the People's Republic of China ("PRC") in violation of 18 U.S.C. § 951.  Count 11 charges defendant with obstructing justice in violation of 18 U.S.C. § 1512(b)(3).  Counts 12 through 14 charge defendant with making false statements to the FBI in violation of 18 U.S.C. § 1001.  Count 15 is a criminal forfeiture allegation against defendant's house based on its use to facilitate the possession and concealment of the trade secrets.  The forfeiture allegation would only be litigated upon conviction for economic espionage.

Concurrently with this trial brief, the government is filing a motion to dismiss counts 8 and 9 (the trade secret documents involving the C-17 cargo plane), and counts 12 and 13 (charging false statements).

**II.   STATEMENT OF FACTS**

Since at least the late 1970s, defendant has given technology to the PRC government.  Defendant stole and concealed

---

[1]   So as to give adequate notice to defendant, in the event of a conviction, the government will seek the immediate remand of defendant into custody, given his age, his close ties to the Chinese government, and the potential length of his sentence.

Boeing trade secrets and other restricted technology for the benefit of the PRC.  He did so in response to specific requests from PRC officials.  During the searches of defendant's home on September 11 and November 7, 2006, agents found more than 250,000 pages of documents dealing with aerospace and defense technology.  Defendant made several unauthorized trips to the PRC between 1985 and 2004.  During most of the trips he gave lectures on the Space Shuttle and defense technology.  One letter from a PRC official refers to payments defendant received and would receive for providing information to the PRC.  Defendant also received a medal from the PRC aviation ministry and pins from PRC aircraft manufacturers.  In 2002, defendant was one of only 1,000 people worldwide to receive an invitation from the Communist Party to attend the 53rd anniversary celebration of the PRC's National Day.

### A.  Defendant's Background

Defendant was born in the PRC in 1936 and moved to Taiwan in 1948.  Government Ex. 219-3, 219-9.  He graduated from National Taiwan University in 1960 with a degree in civil engineering, and came to the United States in 1962.  Government Exs. 219-14, 302-11.  He graduated from the University of Minnesota in 1963 with a master's degree in civil engineering.  Government Exs. 219-78, 302-11.  After a year working at a civil engineering firm in Philadelphia, he was hired by Boeing and worked as a stress analyst on the airframe and rotor hub for the CH-47 helicopter.  Government Ex. 302-12.

In 1969, defendant moved to McDonnell Douglas where he worked as a strength engineer on the wing structure of the DC-10

1  airliner and on the wing and armament support for the F-15
2  fighter.  Id.  In 1972 and part of 1973, defendant worked at
3  Boeing in Wichita on the B-52 Life Extension Program.  Id.
4  Defendant became a naturalized citizen in 1972.  Government Ex.
5  219-54.  In Fall 1973, defendant moved to Rockwell in Downey,
6  California.  Rockwell's space division was acquired by Boeing in
7  1996, including its facility in Downey where defendant worked.
8  In 1999, defendant moved to Boeing's plant in Huntington Beach.
9  For most of his career at Rockwell and Boeing, defendant worked
10 as a stress analyst on the forward fuselage section of the Space
11 Shuttle.  Defendant had a secret clearance from 1973 to 2002,
12 when he was laid off from Boeing.  Government Ex. 302-13.

13        In 2002, Boeing moved parts of its Space Shuttle program to
14 Houston.  Defendant declined to move and was laid off in
15 September 2002.  After the crash of the Columbia orbiter in
16 February 2003, however, defendant was brought back as a
17 contractor to assist in the evaluation of the crash.  He remained
18 at Boeing until September 11, 2006, when search warrants were
19 executed at his home and workspace.  Boeing then fired defendant.
20        When defendant first left Boeing in 2002, he signed an
21 agreement stating that he would not use or disclose any
22 proprietary, confidential, or trade secret information belonging
23 to Boeing or any Boeing customer or supplier.  Government Ex.
24 195.  Defendant verified that he had returned to Boeing "all
25 documents, computer software or databases, and other materials or
26 items which at the time of the termination of my employment were
27 in my possession, custody or control by virtue of my employment
28 with Boeing."  Id.

                              3

**B.    April 2006 Interview of Defendant**

During a search of the home of Chi Mak in October 2005, address books were found containing contact information for defendant.[2]  Government Exs. 353, 354, and 355.  As part of the investigation in the Chi Mak case, defendant was interviewed on April 24, 2006.  Defendant said he received a secret clearance from McDonnell Douglas, where he worked on a Department of Defense helicopter project.  Defendant said he worked for Rockwell/Boeing from 1973 until his retirement in 2002.  Defendant said he was hired back at Boeing as a sub-contractor in 2003.  Defendant said he first met Chi Mak in 1992 through a mutual friend "Mr. Gu" (later identified as Gu Weihao of the Chinese Ministry of Aviation), whom he described as an exchange scholar from China.  Defendant said he and Chi Mak would meet at restaurants or talk on the phone occasionally, the last time being 2002 or 2003.  Defendant claimed that engineering topics were never discussed.  Defendant said he first met Gu in China at Qing Hua University in 1985, when he took his children to study Chinese at the University.  Defendant said he and his wife traveled to Shanghai and Peking Universities and spoke with students about their careers.  Defendant claimed he reported all of his trips to China to Rockwell/Boeing's security department.  Defendant also said that he was never approached by any Chinese

---

[2]  During a search of the home of Tai Mak, who was not an engineer, agents found the names of defendant and his wife written in a daily calendar.  Government Ex. 351.  Written beneath their names were the names and phone number for Pu Pei Liang and Cai, PRC officials who were handlers for the Mak family.

government or military officials during his travels.  These statements were false.  As set forth below, defendant later admitted meeting Gu and Chi Mak at different times and he never reported his lectures in China or his contacts with Chinese officials to Rockwell or Boeing.

**C.   Discovery of Letter from PRC Official to Defendant Requesting Information on Space Shuttle**

During a second search of Chi Mak's home in June 2006, letters to defendant were found from Gu Weihao of China's Ministry of Aviation.[3]  One letter, dated May 2, 1987, from Gu Weihao asked defendant to provide information on airplanes and the Space Shuttle, and referred to previous information provided by defendant.  Government Ex. 359.  The letter stated that any information defendant gathered could be given to Chi Mak, who was a "safe" channel.  The letter concluded:

> It is your honor and China's fortune that you are able to realize your wish of dedicating yourselves to the service of your country.

Id.

////

---

[3]   Gu Weihao was also a senior official with the China Aviation Industry Corporation ("AVIC").  AVIC was a large national industrial corporation under the direct leadership of the PRC State Council. It was a consortium of aircraft manufacturers (including Chengdu, Harbin, Xi'an, and Nan Chang), which encompassed 111 enterprises, 36 research institutes, and six universities and colleges with a total staff of 560,000.  It was responsible for developing and manufacturing military and civil aircraft, missiles, and airborne equipment.  It also had research capabilities in aerodynamics, structures, flight testing, materials, manufacturing technology, computational methods, and automatic control.

**D.  Discovery of NASA Documents in Defendant's Trash**

Following the discovery in June 2006 of the letter to
defendant from Gu Weihao, surveillance and trash searches were
conducted at defendant's house in July and August.  Trash
searches showed that defendant was taking pages from documents
relating to the Shuttle and inserting them between pages of
Chinese-language newspapers, which were then thrown in the trash.
Government Ex. 173.  Agents recovered approximately 1,000 pages
from the trash and were able to reconstruct partial and complete
documents.  The documents included design drawings and diagrams,
structural and material specifications, project management data,
and engineering modification reports for the Space Shuttle and
the International Space Station.  Government Ex. 168-72.  Some of
the discarded documents were from the Shuttle Drawing System
("SDS") and stress analysis reports generated using NASTRAN (NASA
structural analysis program) software at Boeing.  Government Ex.
35.  The data on SDS is password-protected and export-controlled.
Government Exs. 70, 74, 208-1.  One of the NASTRAN documents
defendant put in the trash bore a legend stating it was a trade
secret.  Government Ex. 170-5.

A surveillance video shows defendant acting surreptitiously
just prior to trash collection.  Government Ex. 230.

**E.  Searches of Defendant's Home and Workspace at Boeing**

On September 11, 2006, FBI and NASA agents searched
defendant's house and found more than 250,000 pages of work-
related documents from Boeing, Rockwell, and other defense
contractors inside the house and in a crawl space underneath the
house.  Among the documents found in the crawl space were

6

approximately 145 blue and brown binders containing NASTRAN stress analysis reports, test results, and design information/diagrams for the Space Shuttle from 1970 through 2006.  Government Exhibit 181 contains photographs of the binders in the crawl space.

In addition to the Space Shuttle data, agents also found documents relating to the Delta IV rocket and other technologies. Agents also found more letters from Chinese officials to defendant requesting technology, as well as drafts and handwritten copies of letters from defendant to the Chinese officials.  Six technology briefings written on transparencies were also found in defendant's home.  Government Exs. 294-296, 298-300.  The briefings were handwritten in Chinese.  Agents found a medal from CATIC,[4] which defendant admitted he received for lectures he gave in China in 1985, and pins from CAE (Chinese Aerospace Research) and Xi'an Aircraft company, a part of AVIC. Government Exs. 15, 18, 308.

On the top of defendant's desk at Boeing a handwritten contacts list was found with a post-it note containing the name and phone number for Chi Mak.  Government Ex. 154.

**F.   Interviews of Defendant and Defendant's Son**

Agents re-interviewed defendant before searching his house on September 11, 2006.  Defendant said he had worked as a stress analyst on the Space Shuttle since he was hired by Rockwell in 1973.  Defendant said he first met Chi Mak during a meeting held to honor Gu Weihao at a hotel in Los Angeles in 1980, twelve

---

[4]  CATIC, the China National Aero Technology Import and Export Corporation, is a subsidiary of AVIC.

years earlier than he claimed in the April 2006 interview.
During the 1980 meeting, defendant told Gu that he worked on the
Space Shuttle.  Defendant recalled that Gu worked for the Chinese
government as a senior engineer for the Ministry of Aviation.
Defendant claimed he met Gu on only three occasions.  The second
time defendant met Gu was in 1985, at a Beijing hotel.  Defendant
claimed that during this meeting Gu asked defendant to provide
information on how defendant designed the Space Shuttle (again,
contradicting his prior statement that he had never been asked
for technology by PRC officials).  The third time defendant said
he met Gu was in the 1990s in the U.S.  Defendant denied ever
communicating with Gu Weihao other than the three in-person
meetings.

Defendant was then shown a copy of the Gu Weihao letter
found at Chi Mak's home.  Government Ex. 359.  After reading it,
defendant stated he had never seen the letter before.  Defendant
later said he received the letter but threw it away.

Defendant falsely stated that he never conducted business-
related activities in China, and had only traveled there for
sightseeing.  Defendant said he traveled to China in 2001 to meet
with students at Beijing University.  According to defendant, he
again went to China in 2002 to provide money to poor students.
An Internet search previously conducted by the agents, however,
showed that defendant and his wife attended the 2002 Chinese
National Day celebrations in Beijing.  Defendant was quoted in
Chinese media praising the rapid development taking place in the
PRC.  After being shown the Chinese Internet article, defendant
admitted going to the National Day celebration but claimed he

1  never made any statements.  Defendant said he traveled to
2  Shanghai in December 2003.

3       When asked about the work documents found in his trash,
4  defendant admitted placing Shuttle-related documents in old
5  newspapers and throwing them away.  He said he had been doing it
6  for approximately one year.  Defendant said he was afraid someone
7  would find a collection of NASA documents at the dump, so he hid
8  them in old newspapers.

9       Defendant said he brought work home from his job when he
10 retired in 2002.  Defendant said he brought the material home
11 because Boeing was going to destroy it.  Defendant said most
12 documents were not allowed to be taken out of the office, but his
13 boss gave him permission to take them home.  (His supervisor,
14 William Novak, will testify that no such permission was ever
15 given.  Further, the documents defendant took were not scheduled
16 for destruction.)

17      Defendant told agents that his son, Shane Chung, was present
18 at a meeting with Gu Weihao in 1985.  At the conclusion of the
19 interview, agents told defendant they wanted to speak to his son
20 about the 1985 meeting with Gu.  Agents asked him not to speak
21 with his son before they had a chance to interview him.
22 Defendant agreed to the request.  The agents then called the son
23 who agreed to meet the agents later that day.  Defendant then
24 received a telephone call from his son.  An agent who spoke
25 Chinese was standing near defendant at the time.  She heard
26 defendant tell his son in Chinese that the FBI would be coming to
27 speak with him.  Defendant told his son to say that he could not
28 remember anything to do with a trip to Beijing in 1985 when they

9

1    met with Gu Weihao.

2         When agents contacted Shane Chung later that day, he said he
3    last spoke with his father on the previous day.  He said he could
4    not remember details of the 1985 trip.  When confronted with the
5    fact that agents overheard his conversation with his father
6    earlier that day, Shane Chung admitted that he did speak with his
7    father hours earlier, and that his father told him to tell the
8    agents he could not remember anything about the trip.

9         Defendant was interviewed again later during the search of
10   his home.  Defendant said he and his wife traveled to China to
11   teach classes at Zhong Zhang University for approximately two
12   months in 1985 (a contradiction of his earlier statement that he
13   and his wife were only sightseeing in the PRC and visiting poor
14   students).  Defendant said he taught classes regarding parts of
15   the Space Shuttle and its manufacturing process.  When asked
16   about the Chinese briefing transparencies found in his house
17   related to the Shuttle, defendant said he translated the
18   documents in order to write a book about the Shuttle.  He changed
19   his statement after being asked why they were written in Chinese.
20   He then claimed that the briefing slides were used to teach
21   students at Zhong Zhang University.

22        **G.    Taking and Concealment of Documents Containing Trade**
23              **Secrets**

24        The trade secret documents are from two Boeing programs that
25   correspond to requests in tasking letters.

26              **1.  Delta IV rocket technology**

27        The Delta IV is the next-generation booster rocket that will
28   be used for launching Department of Defense and commercial

                                   10

payloads.   One of the issues in development is the release of umbilical systems, notably fuel lines, from the rocket at lift off.   Unlike current rockets which do not lift immediately at ignition, the Delta IV rocket reaches an altitude of at least fourteen feet within one second of ignition.   The umbilical cords that feed liquid nitrogen fuel and liquid oxygen to the rocket must be disengaged and retracted from the rocket within one-half of a second.   Any longer and an explosion would destroy the rocket and most of the launch pad.   The umbilical cord mechanism that feeds the liquid nitrogen and oxygen to the aft engine section of the rocket - called a Tail Service Mast ("TSM") - weighs more than a thousand pounds.

Boeing developed a method in which the TSM could be detached and retracted within one-half of a second.   Numerous documents were found in defendant's home concerning research and development that Boeing conducted on this mechanism.[5]   Government Ex. 75.   While all of the documents are proprietary to Boeing, two documents contain trade secrets.   The first document is entitled "Delta IV/EELV Common Booster Core (CBC) Tail Service Mast (TSM) Overview," dated September 1998.   Government Ex. 76-56.   It is marked "BNA Proprietary."   The second document is entitled "Common Booster Core (CBC) Tail Service Mast (TSM) Overview," and is dated September 1998.   Government Ex. 76-1.   It

---

[5]   The two charged documents were found in a folder containing other research related to Delta IV.   Exhibit 75 is the complete contents of the folder; Exhibit 76 is just the two charged documents.   This is also the case with the Shuttle documents discussed below.   The charged documents are in Exhibit 65.   They were found in a folder containing other Shuttle documents.   The contents of the entire folder are Exhibit 66.

is marked "Boeing Proprietary."

The documents are a detailed overview of the TSM.  The first document includes the following information:

1.   The specific location on the launch pad of each of six TSMs.

2.   Where and how the umbilical hoses connect to the rocket.

3.   A description of the assembly housing of the TSM.

4.   Systems operations for redundancies (the TSM has two backup systems in the event of failure).

5.   Theory of operation - how to install the TSM, its preparation, set up, and operation.

6.   Umbilical test plan overview which includes test parameters and acceptance criteria.

7.   Backup documents, including electrical requirements and various diagrams.

The second document is a detailed overview of design and test requirements, design verification procedures, design schematics, functional overview, and implementation of hardware. The documents are a "do-it-yourself kit" for building a complex umbilical release system that moves very fast.  Disclosure would cause significant damage to Boeing because another company or country could use these documents to build a proven system that works.

Boeing spent $16 million for the research, development, design, and testing for this program.  The documents are considered the core knowledge base of TSM technology.  The work was being done by Boeing for the Air Force.

12

1    The documents were maintained at Boeing as electronic files
2    and in hard copies.  The electronic files are stored on a Delta
3    IV computer system called Genesis.  To access Genesis, an
4    employee has to be given authorization.  Only Boeing employees
5    working on the Delta IV program with a need to know are granted
6    access.  In order to obtain access to Genesis, employees must go
7    through four hours of web-based training.

8         Hard copies of the documents could only be given to Delta IV
9    engineers with a need to know.  Because of the proprietary nature
10   of the documents, hard copies were required to be secured at
11   night.

12                    **2.  Phased-array antenna technology**

13        In 1996, Boeing began work on a project to upgrade the radar
14   and communications system on the Shuttle.  The program was
15   designed to replace the then-existing system, which combined
16   radar and communications in one system, with two systems.  The
17   phased-array antenna was to be used for communications.  Phased-
18   array antennae would be placed in various spots in the skin of
19   the Shuttle.

20        The four charged trade secret documents relating to this
21   program are as follows:

22        1.   Boeing Phased-array Antenna Internal Research and
23             Development, Option for Orbiter Communications
24             Upgrades, "May xx 1999," marked "Boeing Proprietary."
25             Government Ex. 65-1 to 65-18.

26        2.   Boeing Phased-array Antenna Internal Research and
27             Development, Option for Orbiter Communications
28             Upgrades, March 26, 1999, marked "Boeing Proprietary."

                                  13

1          Government Ex. 65-19 to 65-30.

2      3.    Item Change Analysis for MCR 18849.  Government Ex. 65-

3          33 to 65-69.

4      4.    MCR 19124 Integrated Com ROM Estimate for D270,

5          September 2, 1997.  Government Ex. 65-12 to 65-18.

6  These documents would show an engineer outside of Boeing how the

7  company approached the technological problems it faced in

8  developing the antenna, including the plan for development and

9  costing data.  As Boeing is the world leader in aerospace

10 research and development, its internal business and engineering

11 plans and processes would be of great value to a competitor or,

12 more particularly, a foreign country developing its own space

13 program.

14     As a security measure, Rockwell and Boeing compartmentalized

15 access to this information.  Only those Rockwell and Boeing

16 employees who worked in the Shuttle engineering group or had a

17 need to know were given access to the phased-array antenna

18 project.  Shuttle engineers were given access to a shared network

19 computer drive where the research and development were stored.

20 Boeing employees who did not work on the Shuttle program could

21 not access the shared drive.

22          **3.   Boeing's security measures**

23               **a.   Physical security**

24     Boeing's facility in Huntington Beach is not open to the

25 public.  The parking lots have open access, but are monitored by

26 video cameras and patrolled by Boeing security officers.  The

27 buildings are fenced off and have security alarms.

28     The main entrance to Building 12, where defendant worked, is

                                   14

the "East Gate" entrance, which is staffed by an armed Boeing
security guard at all times during business hours, and sometimes
staffed on weekends and holidays.  Government Ex. 202.  Boeing
employees who enter through the East Gate must present their work
badges to the guard.  Other entrances to the facility are
accessible only to employees, who must swipe their work badges to
enter.  These entrances are monitored by video cameras and Boeing
maintains records of the badge numbers that enter and exit
through the unmanned entrances.

Boeing employees are issued badges which contain their
photograph, name, and security clearance level.  Other symbols or
colors are used on employee badges to indicate areas to which
they have access.  Boeing employees are required to wear their
badges at all times while in the facility.

All visitors require an assigned Boeing employee to sponsor
their visit.  All visitors to Building 12 must enter through the
East Gate.  A sponsored visitor must present identification, sign
in and out, and be escorted at all times by the sponsoring Boeing
employee.

In the case of a foreign visitor, the sponsoring Boeing
employee must submit an advanced written request for access to
the facility.  Upon receipt of a request, Boeing conducts a
database check of the proposed visitor.  If authorization is
granted, the security office is notified and a special badge is
issued for the foreign visitor.  The badge has a green stripe
with a white "I" on it indicating an international visitor.
Different badges are given to visitors who are U.S. citizens.

Boeing does not allow sensitive or proprietary material to

15

be openly stored in the facility.  All such information must be
put away before an employee leaves for the day.  Each night a
security officer patrols the work spaces at the facility to
ensure that no sensitive information is left out in the open.  In
addition to nightly security walkthroughs, security personnel
conduct random document security audits to monitor compliance
with Boeing's policies.  A Boeing industrial security officer and
a uniformed security officer conduct random searches of employees
leaving the facility to check for the removal of classified and
proprietary documents.  Boeing security personnel are also
authorized to search employees' cars.

     Banners and posters are in place throughout the facility
bearing reminders about the need to adhere to security policies.
Government Ex. 202-10 to 202-11.  The posters are moved
periodically to increase their visibility and effectiveness.  The
video monitors in the facility cafeteria also show slides
regarding Boeing's security policies.

                    **b.   Information controls**

                    **i.   Use of non-disclosure agreements**

     Boeing required its employees and contract workers to
protect all information belonging to Boeing from improper
disclosure.  As noted above, when defendant left Boeing in
September 2002, he signed an agreement stating he would continue
to protect Boeing's trade secrets and that he had returned all
property belonging to Boeing.  Government Ex. 195.  When
defendant returned to Boeing the following year as a contractor,
defendant signed an agreement in which he agreed not to disclose
any proprietary information belonging to Boeing.  Government Ex.

                              16

194.   Notably, the agreement defined proprietary information to mean "information not generally known outside" Boeing, including inventions, ideas, concepts, and research and development relating to engineering, manufacturing, and finances, among other areas.  Id.  Defendant continued to sign acknowledgments that he was adhering to Boeing's policies.  Government Ex. 206-2 to 206-4.  The acknowledgments defendant signed in 2005 and 2006 certified that defendant would

> follow all restrictions on use and disclosure of information.  This includes following all requirements for protecting Boeing information and ensuring that non-Boeing proprietary information is used and disclosed only as authorized by the owner of the information or otherwise permitted by law.

Id. At 206-3 and 206-4.

In addition, Boeing required that Proprietary Information Agreements be in place before proprietary information could be shared outside the company.  Government Ex. 83-33.

### ii.   Rockwell/Boeing information control policies

Both Rockwell and Boeing had policies in place that stressed the need to protect information of the companies.  Found in the search of defendant's house was a Rockwell training binder entitled "Ethics and Standards of Business Conduct."  Government Ex. 140.  Notably the binder contained the following:

> Information is the lifeblood of any corporation.  It is particularly sensitive when the corporation does work in advanced technology, aerospace or defense disciplines.  Many

17

1    Rockwell employees are exposed to information that is

2    nobody's business but ours - proprietary trade and pricing

3    data, for example . . . We have a personal and professional

4    obligation to properly protect information provided by our

5    suppliers . . . Your obligation to protect this information

6    is the same as that imposed for the handling of highly

7    confidential or classified information . . . Since Rockwell

8    does business with the United States Government, any

9    mishandling of information may compromise national security

10    and jeopardize our country's defense.

11  Government Ex. 140-20.  Indeed, the first "Ethical Dilemma"

12  presented in the training involves an employee "giving a talk at

13  a professional organization" from an "approved" outline, who

14  strays into giving "specific examples to defend Rockwell's

15  competitive position."  Id. at 140-10.

16      Boeing's company procedure PRO-2227, entitled "Control of

17  Sensitive Company Information," dated July 28, 1999, sets forth

18  some of the protective measures used by the company.  Government

19  Ex. 191.  These include contractual agreements with all employees

20  obligating them to protect information entrusted to them as part

21  of their employment, non-disclosure agreements with third

22  parties, and administrative, physical, communications, and

23  electronic security measures.  The policy also includes the

24  following:

25      1.  Security designations for information.

26                        ******

27          b.    "Boeing Proprietary" is information "which gives

28                the company a competitive advantage or otherwise

18

is important, but which **may be disclosed to third parties** . . . provided appropriate safeguards are in place."

  2.   Distribution of Boeing information.

                     * * * * * *

  b.   Boeing Proprietary information may be disclosed in confidence to third parties who have a need to know, when the disclosure is approved by the company and the third party is obligated in writing to preserve the confidence of the information.[6]

Id. at 191-3 (emphasis in original).

The policy required that Proprietary information be encrypted when transmitted electronically outside of Boeing's internal network.  Government Ex. 191-10.  Notably, the policy states that "[t]here is a high risk that foreign governments may intercept international facsimile transmissions of sensitive information; therefore, when encryption is not available, contact Security for assistance in identifying alternative means of transmission."  Id. at 191-11.  Proprietary information may not be left unattended in any area or facility where third parties have unrestricted access.  Government Ex. 191-12.  Access to

---

  [6]   The policy states that "Business and Technical Information," which is all company information that is not given a Proprietary or higher restriction, "should not be disclosed outside the company without appropriate restrictions on use and further disclosure of the information by the recipient."  Government Ex. 191-9.  The information owner and Boeing management are responsible for deciding whether, and under what circumstances, outside disclosures of Business and Technical Information shall be made.  Id.

Proprietary or export-controlled information on Boeing's computers is restricted by password or other method.  Id. Proprietary information must be disposed of by "methods that prevent reconstruction from the residue."[7]  Government Ex. 191-13.

Finally, the policy required employees to recognize "the importance of information to the success of the company" and to "[p]resume all information has value."  Government Ex. 191-15. The government will offer at trial additional policies of Boeing regarding the steps the company took to safeguard not only its trade secrets, but also other restricted information.  Government Exs. 188 (export control compliance); 192 (control of articles entering or leaving company property); 193 (foreign person contact authorization); 198 (release of information outside the Boeing company); and 199 (access to ITAR information).

### iii.  Employee training

Boeing trained its employees regarding its policies for document security.  Boeing records show that between 1998 and 2005, defendant attended eleven training sessions dealing with security, including two on trade secrets and competitive intelligence, and one on export control laws.[8]  Government Ex. 200.  The materials for the ethics training given by Boeing

---

[7]  Tellingly, even Business and Technical Information could only be placed in the normal paper recycle system "as long as foreign nationals can not gain access to it."  Government Ex. 191-13.

[8]  As noted above, Rockwell had similar training for its employees.  A Rockwell Training Completion Notice dated 11/12/87 indicating that defendant had taken ethics training on that date was found in defendant's home.  Government Ex. 78.

20

1  include a reference to the Economic Espionage Act and 18 U.S.C. §
2  1831 specifically, and a definition of trade secrets.  Government
3  Ex. 207-3.  The materials warn of potential personal criminal
4  liability for failure to protect proprietary information, and
5  state the following:

6      Pay close attention to restrictive legends such as
7      "proprietary," "confidential," "sensitive," "private,"
8      "limited," etc.  But realize that proprietary information
9      can also be verbal or unmarked.  Each of us has to be alert
10     to the potential character of information, whether marked or
11     unmarked.

12  Id. at 207-2.

### iv.  Compartmentalization

14     Boeing compartmentalized its programs so that information
15  specific to a program could be accessed only by those employees
16  working in the program or who otherwise had a need to know.  As
17  noted with respect to the trade secrets in this case, access to
18  the information online required authorization and was password
19  protected.  This was also true for the SDS database.  Government
20  Exs. 208-1, 221-23.

**H.  Benefit to a Foreign Government**

**1.  Defendant's intent to help the "great socialist
        motherland"**

24     In an undated letter from defendant to a Professor Chen Lung
25  Ku at Harbin Institute of Technology, defendant wrote that he had
26  sent via sea freight three sets of materials dealing with flight
27  stress analysis.  Government Ex. 274.  Defendant also wrote that
28  he had mailed two magazines dealing with machine design and

precision metallurgy.  Defendant wrote:

> I don't know what I can do for the country.  Having been a
> Chinese compatriot for over thirty years and being proud of
> the achievements by the people's efforts for the motherland,
> I am regretful for not contributing anything.

The letter concluded with defendant asking if there were any
other materials he could provide.  Defendant wrote, "I would like
to make an effort to contribute to the Four Modernizations of
China."

In a letter dated September 9, found in an envelope
postmarked September 7, 1979, Professor Ku replied to defendant
that he had received "all three types" of information defendant
had sent, and that information mailed to "the Library" was also
received.  Government Ex. 278.  Ku wrote:

> We are all moved by your patriotism.  You have spent so much
> time to reorganize the notes from several years ago; copying
> and finding the information that could be needed by us, and
> you have actively put in your efforts towards the Four
> Modernizations of the Motherland.  Your spirit is an
> encouragement and driving force to us.  We'd like to join
> our hands together with the overseas compatriots in the
> endeavor for the construction of our great socialist
> motherland.

An undated letter from defendant to a Huan-Quan stated that
defendant's brother-in-law (Wang Er Zhao) recently returned from
China and brought defendant a letter from "Manager Chen," a
deputy director of CATIC.  Government Ex. 259.  Defendant wrote
that the letter from Chen mentioned a "technology exchange" and

22

that defendant was interested.  Defendant thanked Huan-Quan for
introducing him to Chen.  Defendant wrote that he was working on
an outline for the exchange.  Defendant wrote it was a great
honor and he was excited to make a contribution to the Four
Modernizations of the Motherland.

Defendant was rewarded for his efforts.  The letter from Gu
Weihao, mentioned above, referred to previous efforts to pay
defendant for collecting technology, and promised to pay him for
more.  Government Ex. 359.  Defendant received a medal and pins
from Chinese aircraft manufacturers.  Government Exs. 15, 18,
308.  Defendant and his wife attended the 53rd anniversary of
China's independence in Beijing in 2002.  Official invitations to
the event from the Communist Party of China were found in
defendant's home, along with VIP badges, travel receipts, and
photographs taken during the trip.  Government Exs. 32, 131, 297,
306, 307.  As set forth below, defendant's journal entries
confirm that defendant frequently attended parties at the PRC
consulate and met with consular officials.

**2.  Specific requests for technology from PRC officials**

**a.  CATIC letters/1985 lectures in the PRC**

Found in defendant's home were a number of letters to and
from Qinan Chen, Deputy Director, Technical Import Department,
CATIC, a state-run corporation.  These letters preceded a visit
by defendant to China in the summer of 1985 when he gave
presentations on his work.  (In an interview with agents,
defendant said he received the medal from CATIC for the
presentations he gave in the PRC in 1985.)

A letter dated February 7, 1985, from Chen to defendant set

23

forth "items for your consideration" for defendant's lectures
during his upcoming trip to China:

1.   The entire process of the aircraft's fatigue life and
     its major links;

2.   The static strength and principles of fatigue design
     when designing new aircraft;

3.   The formulation of a fatigue test plan; and

4.   The determination of a helicopter's rotor wings,
     blades, and propeller hub's load.

Government Ex. 261.  The letter concluded by asking defendant for
a more detailed outline of what he intended to present and when
he was traveling to China.

A letter dated March 19, 1985, from defendant to Chen
thanked Chen for arranging defendant's travel, and stated it
would be a "real pleasure" to go to China and have a technology
exchange.  Government Ex. 272.  Defendant wrote that he had been
working on aircraft structural design for more than twenty years,
and also had experience in spacecraft design.  Defendant listed
the topics he proposed covering during his trip to China:

1.   Static force analysis of spacecraft's forward fuselage;

2.   Finite element analysis of space aircraft's forward
     fuselage;

3.   Brief introduction on surface insulation tile of a
     spacecraft; and

4.   Stress analysis.

The first two topics were defendant's field of work at Rockwell
and Boeing.

Defendant and Chen continued to correspond prior to the

24

trip.  Government Exs. 260, 264 (defendant wanted to allow more
time for discussions and technology exchange with "those with
hands-on experience," to visit PRC aircraft manufacturers in
Harbin, Xi'an, Chengdu, Shanghai, and elsewhere, and conduct
technology exchanges at those locations), 265 (outline of
topics), 266 (Chen suggested defendant include conventional
aircraft design, including fatigue life, and the design of
aircraft and armed helicopters that defendant worked on.  Chen
wrote that they could still use the material defendant was
planning to present on spacecraft.  Chen wrote that defendant
should give any material for delivery to defendant's brother-in-
law, Wang Er-Zhong, as it was "more convenient that way"), and
256 (defendant wrote he would deliver lectures in Chinese,
although some technical terms would be expressed in English).

     Defendant wrote Chen a letter dated April 26, 1985, that the
Space Shuttle information was classified secret and was
completely separate from static structure analysis.  Government
Ex. 251.  Defendant wrote that he had only partial information on
helicopter structure design because the information was
controlled by the Department of Defense.  Defendant wrote that he
had been away from the position too long (a reference to his work
on helicopters at Boeing's VERTOL division in the 1960s).
Defendant wrote that, based on the information he still had, the
overall picture could still be explored.  Referring to the
Shuttle and helicopter topics, defendant wrote that he was still
doing preparation work on the fatigue/flight life and static
analysis issues.  Defendant wrote that he considered Chen's
proposed exchange topics on Flight Life and Helicopter Design

25

Structure.  Despite the fact that he no longer worked on those

programs, defendant wrote that he could still provide as much as

he knows, and that he was involved with the fatigue life of

helicopters and the F-15 fighter.

### b.   Nan Chang Aircraft list/delivery of B-1 bomber manuals using PRC Consulate

A list of questions from the Nan Chang Aircraft Company

dated July 14, 1985, was found in defendant's house.  Government

Ex. 267.  A journal entry stated that defendant left Beijing for

Nan Chang on July 14, 1985.  Government Ex. 310-2.  As previously

stated, Nan Chang Aircraft is part of AVIC, where Gu Weihao

worked.  Nan Chang manufactured military aircraft and missile

systems.  The list was divided by four headings, and included the

following excerpts:

A.   General Rules and Methods for Determining Fatigue Life

*******

4.   Should non-failure probability and confidence
     level be considered for the actual measurement of
     the flight load spectrum?  U.S. military
     specification recommends using mainly average
     spectrum, what is the basis of this
     recommendation?

*******

6.   How does the United States perform flight
     measurement and compiling of the tail load
     spectrum?  Please introduce in detail.

7.   For aircraft life estimation by the aircraft
     companies in the United States, what are the few

26

1                    commonly used engineering approaches?

2          8.    What are the differences in determining the

3                aircraft life for large civil aircraft vs.

4                military fighter planes?

5                          *******

6      B.   Life Estimation and Detailed Design Issues

7                          *******

8          12.   What is the purpose of adding a spacer in the

9                design (such as Boeing 707 airplanes) for the butt

10               joint on the wing?

11                         *******

12     C.   On Fatigue Test

13                         *******

14         2.    How many types of loaded flights are used for the

15               fatigue test of small fighter planes?  What are

16               the percentages for the mobile loading and the

17               non-symmetrical loading?  When performing loading

18               test, are the sequences of the loading random or

19               are they derived manually?

20   In response to this list, defendant sent twenty-seven manuals to

21   the PRC via the Chinese consulate in San Francisco.  Two of the

22   manuals were from North American Aviation, a division of

23   Rockwell: one manual was for use in the design of the F-100, X-

24   15, and B-70 aircraft; the second manual addressed aircraft

25   fatigue.  Another manual from Rockwell dealt with S-N curves,

26   which graphically depict how long an object, such as a jet

27   fighter's plexiglass canopy, will last before it fails over a

28   period of time under repeated stress loads.  The other twenty-

                                  27

four manuals were from Rockwell's B-1 Division.  The introductory
volume for the twenty-four manuals on the B-1 included a page
with the following restriction:

> Possession of this publication is restricted to the
> engineering personnel of Rockwell International Aerospace
> Divisions.  Its disclosure to organizations other than
> Rockwell International or selected federal agencies is
> prohibited.[9]

Government Ex. 101-5.  Defendant also wrote responses to some of
the questions.  Government Ex. 252.

A letter dated December 31, 1985, from defendant to Chief
Engineer Feng, who worked at Nan Chang Aircraft Company, referred
to the B-1 manuals.  Government Ex. 271.  Defendant wrote that
after returning to the U.S., he gradually began collecting the
manuals.  Defendant wrote that he had difficulty mailing them or
finding someone to take them to China.  Defendant wrote that he
sent the manuals to China through Education Consul Zhen Lan Zhao
of the Chinese Consulate in San Francisco.  Defendant wrote that
Zhao would give the manuals to Manager Chen (of the Harbin
Institute, identified above), and that Feng could get the manuals
from Chen.  The State Department has confirmed that Zhao was a
Consul at the PRC's San Francisco Consulate from 1983 to 1988.
Government Ex. 220-2.

An undated, unaddressed letter from defendant referred to
defendant sending the twenty-seven manuals to China.  Government

---

[9] A number of B-1 manuals were found in defendant's home.
Government Exs. 63, 98-101.  Not all of the B-1 manuals found in
his home were the same ones he gave to the PRC in 1985.

1  Ex. 253.   The letter contained a list of the manuals sent.   The
2  letter stated that the "lack of serial numbers on the [B-1]
3  manuals was [because they were] scheduled for printing but not
4  executed.   There was no revision after the [initial] manual's
5  publishing."

6                        **c.  Gu Weihao letters**

7       A letter dated March 25, 1986, from Gu Weihao to defendant
8  and his wife referred to a recent visit by Gu to the U.S. where
9  he met with defendant and his wife.   Government Ex. 319.   The
10  letter stated that Gu did not receive defendant's December 31,
11  1985, letter until March 1986, as it was hand-carried.   The
12  letter referred to the B-1 manuals that defendant sent, but
13  stated that Chen had not received them yet.   Gu wrote that he or
14  Chen would write to defendant to let him know when the manuals
15  arrived.   Gu mentioned:

16       currently I am doing research and exploration work.   I would
17       like to push the damage tolerance one step further, to
18       achieve the standards of dependability and durability ASAP.
19       I hope you can advise us in the area often.

20       As noted above, a letter to defendant from Gu Weihao was
21  found during a search of Chi Mak's house.   Government Ex. 359.
22  The letter, dated May 2, 1987, introduced Chi Mak to defendant
23  (although by his own admission defendant had already met Mak in
24  1980).   The letter stated that China was in the process of
25  developing trunkline airplanes of 150 seats, and developing a
26  space shuttle orbiter.   Gu asked defendant to provide assistance
27  on technical issues for those programs.   The letter referred to
28  previous information provided by defendant, and stated that

                                29

1    defendant would be paid for his efforts.

2         In order for you to take the payment with you abroad, in the
3         future I will find a way to personally pay you back in cash
4         for the costs you bore for collecting or purchasing the
5         information.  If it is going through me, I can guarantee you
6         this.  While as before, going through Manager Yang and Chen,
7         they probably couldn't do it!  As I am still pressing them
8         [for the payment].  I hope you can allocate some time this
9         year to come to Guangzhou, this way would save some time and
10        expenses.  At that time I'd try my best to get a couple of
11        colleagues together and go down south to Guangzhou to
12        discuss with you in a smaller area, very safe.

13   Government Ex. 359-3.  The letter suggested covers for travel to
14   China, including an invitation from an art institution to
15   defendant's wife, who is an artist, to visit China.  Defendant
16   could then use the cover of traveling with his wife as an excuse
17   to come to China.  Gu wrote that passing information through Chi
18   Mak was faster and safer.  The letter concluded by stating "It is
19   your honor and China's fortune that you are able to realize your
20   wish of dedicating yourselves to the service of your country."

21        A third letter from Gu Weihao to defendant and his wife,
22   dated April 12, 1988, stated that Chi Mak's wife, Rebecca, was in
23   China and had told Gu that the Maks and Chungs had a good
24   relationship.  Government Ex. 336.  Gu discussed the formation of
25   the new Ministry of Aeronautics and Astronautics and how high-
26   tech development would be placed in full gear.  He requested the
27   help of "the foreign country" and asked defendant to provide
28   information on advanced technologies.  Gu stated that under the

30

new ministry the goals would be greatly expanded and told
defendant there was no need to limit the scope of those proposals
discussed when Gu was in the United States.  Gu again said that
it was faster and safer to send information through Chi Mak.  The
letter concluded by stating "please ask Mrs. Mak for the
remaining issues."

### d.  Tasking lists

A numbered list in Chinese handwriting was found in
defendant's house.  Government Ex. 273.  The list was handwritten
on thin paper that was pre-printed with a few Chinese characters,
and consisted of twelve numbered items.  The list contained the
following terms: aircraft design manuals, fatigue design manuals,
materials manuals, S-N curve manuals, military specifications
user manuals, fighter-jet structural details design manuals,
Space Shuttle design manuals and information on the Shuttle's
environmental conditions, the Shuttle's heat-resistant tile
design and material composition process, life-span
extension/reliability analysis of U.S. fighters and airborne
equipment, and S-N curves for fighter plane cabin plexiglass and
cabin canopy.

In addition, a tasking list was discovered in Chi Mak's
house.  Government Ex. 352.  The list stated an "urgent need" for
"manufacturing and process standards for fighter planes,"
"process standards for the manufacturing of the F-15," "finite
element analysis software . . . NASTRAN - NASA Structural
Analysis Program," and requests for "specific information"
related to "Boeing Company's technical information on chemical
milling."  Other technologies requested on the list related to

31

stress analysis software, computer-aided design software, and
specific process standards and design manuals for U.S. fighter
jets.   Chi Mak, a naval engineer, did not have access to these
programs; defendant did.   Manuals and documents responsive to
these request were found in defendant's home.

### 3.   Unreported travel to the PRC/lectures given in the PRC

Since at least 1985, defendant has been traveling to China
to give lectures.   The six briefing transparencies in defendant's
home were in handwritten Chinese and English.   They were entitled
Space Shuttle, Shuttle Design Concept, Fatigue Life Briefing,
Aircraft Design (related to helicopters), Finite Element Analysis
(related to the Space Shuttle), and Thermal Protection System
(related to the Space Shuttle).   Government Exs. 293-96, 299, and
300.   The Shuttle Design Concept briefing is export-controlled.
Government Ex. 211.   All the briefings contained proprietary
information that was not to be released outside of Rockwell of
Boeing.   Defendant's supervisor at the time, Paul Benson, will
testify that defendant told him he was going to China in 1985.
But defendant said he was just sightseeing and did not tell
Benson he was giving briefings on the Space Shuttle and other
technologies.   In addition to the letters and defendant's
admission, the trip is corroborated by defendant's passport,
photographs, and journal entries.   Government Exs. 10-2, 34, and
310-2.

Journal entries refer to a presentation defendant gave in
the PRC in 2001.   Beginning on March 7, 2001, defendant recorded
entries on eleven days referring to his preparation of

32

"presentation materials on space shuttle to be given in China."[10]
Government Ex. 325-3 to 325-4.   In an entry dated April 4, 2001,
defendant wrote "packed luggage and organized slides."
Government Exs. 241-2, 325-4.[11]   An April 5 entry stated,
"boarded China Eastern Airlines, departed LA at 1:30 p.m."   Id.
An April 6 entry said, "Arrived Beijing International Airport at
5:40 p.m." Id.   On April 7, 2001, defendant wrote "review
presentation materials."   Id.   Defendant wrote a journal entry
dated April 8, 2001, which said "made a presentation at Peking
University in the morning introducing the Space Shuttle."   Id.
An April 11, 2001, entry states "gave a presentation at Shanghai
University."   Id. at 241-3 and 325-5.   Defendant's passport and
train tickets and airplane boarding passes found in his home
confirm he was in the PRC in 2001.   Government Exs. 10-5, 302-2
to 302-5.

Defendant went back to the PRC on September 25, 2002, for
the National Day celebration.   There is no reference in the
journals to a presentation given during that trip.   However, the
evidence will show that in the months prior to the trip,
defendant downloaded a large number of specifications from the
SDS.   Specifications from the SDS found in defendant's house
included date/time stamps.   See e.g., Government Ex. 183-2 to
183-13, 183-25 to 183-83, 183-88 to 183-108, and 183-117 to 183-

[10]   In a prior entry on April 21, 2000, defendant wrote "I
think there is a conspiracy by foreign country(s) - to weaken
China's space technology."   Government Ex. 325-2.

[11]   Exhibit 241 appears to be a journal defendant kept
during the trip.   When he returned home, he apparently copied the
entries into the journal marked Exhibit 325.

118.  Defendant was notified in April 2002 that he would be laid off from Boeing.  In his home, there were 73 SDS specifications dated before April 2002, when defendant was given his notice. There were 514 specifications in his home that were printed after the termination notice to defendant but prior to his departure from the company on September 5, 2002, and his trip to the PRC twenty days later.  By comparison, only 16 specifications were found for the period of February 2003 to September 2006, when defendant returned to Boeing as a contractor.  More than a third of all the specifications found in defendant's home had been altered with correction fluid to mask the user name, date/time stamp, or other identifying information.  In addition, two files were found on defendant's home computer that were indices for the specifications.  The indices included an index number, part numbers, document titles, and descriptions of the referenced documents.  Government Ex. 41.  The indices are not Boeing documents.  In addition to journal entries, the trip is corroborated by defendant's passport, a boarding pass, and photographs.  Government Exs. 10-6, 32, 131.

Defendant traveled to China on December 27, 2003.  Journal entries from January 2003 to December 8, 2003, refer to organizing and inputting specification material.  Government Ex. 325-9 to 325-12.  (The government's computer expert will testify that defendant created and accessed the SDS index files on dates consistent with the journal entries.)  Defendant's passport and travel documents confirm he was in the PRC in 2003.  Government Exs. 10-7, 27.

////

34

1          **4.   Other evidence of defendant's foreign contacts**

2               **a.   Defendant's attempt to purchase Boeing 737s**

3                    **for the PRC**

4          In March 1985, three months before going to the PRC to give

5    briefings on the Space Shuttle, defendant wrote a letter to Delta

6    Airlines trying to buy Boeing 737 jets for the PRC.   Government

7    Ex. 16-4.   In the letter, written on the letterhead of Sing Sing

8    Technology and Development Corporation (his brother-in-law's

9    company), defendant wrote "I represent a foreign country" that

10   wanted to buy used 737s.   The sale of 737s to the PRC was

11   prohibited because of advanced avionics in the jet.   Delta wrote

12   back to defendant that it was "unable to offer" 737s, but could

13   sell used 727s.   Id. at 16-1.

14              **b.   Business cards**

15        Defendant's residence contained numerous business cards of

16   PRC officials involved in foreign affairs and the aerospace and

17   defense industries, including the following:

18        - Wu Hui Jun, Consul General, Los Angeles PRC Consulate;

19        - Bu Shi Lin, Head of the Department of the Bureau, Ministry

20        of Aerospace Industry (AVIC);

21        - Sun Yafu, Assistant Director, Taiwan Work Office - Central

22        Committee of the Chinese Communist Party;

23        - Qinan Chen. Deputy Director, Technology Import Department,

24        CATIC;

25        - Jongwen Yang, Engineer, Foreign Affairs Bureau, CATIC;

26        - Gao Zhan Min, Vice President, Xi'An Aircraft;

27        - Gu Weihao, Senior Engineer, Ministry of Aero-Space

28        Industry (AVIC);

                              35

1   - He Zhang Ming, Assistant Minister/Vice Section Chief,
2   Department of Public Relations for All-China Taiwanese
3   Association;
4   - Hou Yin Chu, Senior Engineer, Chinese Aeronautical
5   Establishment (the CAE which gave defendant a company pin);
6   - Wang Yi, Director, United Front Work Department;
7   - Dr. Ya, Minggao, Director, Scientific and Technical
8   Committee, Institute of Aeronautical Materials; and,
9   - Guodong Zhang, Professor, Beijing University of
10   Aeronautics and Astronautics.
11  Government Ex. 184.  Defendant never reported contacts with any
12  of these individuals.

13              **c.   Journal entries**
14      Defendant's journals provide details of meetings and
15  correspondence with PRC officials and Chi Mak.  Pertinent
16  excerpts of the journals include the following:
17      01/19/1990:   Chief Gu [Weihao] and Professor Zhang
18                    [Guodong of Beijing University of Aeronautics
19                    and Astronautics] came by.  Invited Mr. and
20                    Mrs. Chi Mak to come over in the evening.
21                    Government Ex. 326-2.
22      01/20/1990:   Took Chief Gu and Zhang to Cal Tech.  Id.
23      03/10/1990:   Mr. and Mrs. Chi Mak came by.  Id.
24      03/17/1990:   Mr. and Mrs. Chi Mak.  Id.
25      04/29/1990:   Bought things at Price Club, took to Chi
26                    Mak's house.  Id.
27      11/25/1990:   Mr. and Mrs. Chi Mak came in the afternoon.
28                    Id.

36

| | | |
|---|---|---|
| 1 | 02/02/1991: | Picked up Chief Gu at airport.  Id. at 326-3. |
| 2 | 02/04/1991: | Took half day off to spend time with Chief |
| 3 | | Gu.  Id. |
| 4 | 08/02/1991: | Dinner with Bu Shi Lin [Ministry of Aerospace |
| 5 | | Industry, Department Chief, AVIC].  Id. |
| 6 | 11/07/1991: | Dinner with Consul officials Shang and Yu. |
| 7 | | Id. |
| 8 | 12/22/1992: | Met Mr. Gu.  Government Ex. 314-2. |
| 9 | 02/19/1993: | Dinner with Chen Qi Nan [Manager Chen of |
| 10 | | CATIC, referenced above].  Id. |
| 11 | 08/08/1993: | Visited Mr. Bu [Shi Lin, Department Chief |
| 12 | | with AVIC] and a delegation he led to the |
| 13 | | U.S.  Id. |
| 14 | 10/13/1993: | Dinner farewell party for Consul Shang.  Id. |
| 15 | 07/15/1995: | Invited Mr. and Mrs. Chi Mak for dinner. |
| 16 | | Government Ex. 314-3. |
| 17 | 01/04/1996: | Wrote letters to Chief Gu and Zhang Guodong. |
| 18 | | Id. |
| 19 | 05/12/1997: | Wrote a letter to Chief Gu.  Government Ex. |
| 20 | | 315-2. |
| 21 | 04/26/1999: | Organized information brought back from |
| 22 | | company.  Government Ex. 315-3. |
| 23 | 09/30/2000: | Celebrate National Day with comrades from the |
| 24 | | Society of Chinese Scholars.  Id. |
| 25 | 12/22/2000: | Invited to dinner with [Consul] Wu |
| 26 | | Huijun.  Purpose is to ask members to support |
| 27 | | students in China.  Id. |
| 28 | 01/13/2001: | Dinner with Consul Official Lan.  Government |

37

1                              Ex. 325-3.

2    01/19/2001:    Attended Consulate Chinese New Year party.

3                              Id.

4    02/10/2001:    Dinner with [Consul] Wu after discussing

5                              issues of going to China with Yeh.   Id.

6    04/07/2001:    Met Mr. Sun Yafu (in Beijing) [Assistant

7                              Director, Taiwan Work Office - Central

8                              Committee of the Chinese Communist Party].

9                              Government Ex. 241-2.

10   04/09/2001:    Dinner with Vice Chairman Hu Chun Hua [Hu

11                             Chun Hua was the Secretary for the Central

12                             Committee of the Communist Youth League and

13                             Vice Chairman of the All China Youth

14                             Federation in 2001].   Id.

15   06/07/2001:    Met [Consul] Wu for dinner.   Government Ex.

16                             325-3.

17   07/28/2001:    Mr. and Mrs. Chi Mak came and had chat in

18                             afternoon.   Id.

19   03/08/2002:    Evening party at Consulate.   Government Ex.

20                             325-4. Id.

21   09/04/2002:    Dinner to welcome Tang Shu Bei [Deputy

22                             Director of Office for Taiwan Affairs of the

23                             Communist Party of China].   Handed photos and

24                             passports to Consul Wu for Visa application.

25                             Id.

26   09/28/2002:    Attended National Day celebration reception

27                             hosted by PRC National Committee.   Id.

28   11/01/2002:    Dinner with Mr. and Mrs. Chi Mak.   Government

                                    38

1          Ex. 325-5.

2    11/10/2002:    [Consul] Wu and family came to visit.  Id.

3    01/06/2003:    Dinner with [Consul] Wu.  Id.

4          **5.  Rockwell's policies on travel and contacts**

5    As noted above, defendant held a secret clearance from 1973

6    to 2002.  Rockwell required employees with security clearances to

7    report foreign travel to the security office both before and

8    after such trips.  Additionally, employees were required to

9    report contacts with foreign officials.  Rockwell employees could

10   not provide briefings in other countries without obtaining

11   permission from Rockwell management and security.

12         **6.  Boeing's policies on travel and contacts**

13   Boeing employees were required to report foreign travel if

14   any company data was being taken or if the intention was to

15   discuss company information during the travel.  In such cases,

16   the employee had to fill out a Foreign Person Contact Request.

17   Boeing's Export Control would then screen the persons named in

18   the Request and approve or disapprove the Request.  If the

19   traveler intended to take Boeing data for any reason, such as a

20   legitimate business contact, the employee had to fill out a

21   Request for Release of Information.  That request had to be

22   signed by Boeing management and then screened for export control

23   and contractual issues.  If there was a contract that governed

24   the information to be taken, the customer (such as NASA or the

25   Air Force) also had to approve the release.  The request was

26   additionally screened for trade secrets and proprietary

27   information.  A final screening was done by Boeing's

28   Communications Department to keep track of what was being

39

1   released.   Any request to take information to China would have
2   been denied because China is a proscribed country.   Defendant
3   never made such requests in any event.

4        Any contacts with persons requesting information while an
5   employee was traveling were required to be reported to Boeing's
6   Export Compliance Office and Security.   Defendant reported no
7   such contacts.

8        **I.    Defendant's Collection of Documents Responsive to**
9              **Requests from the PRC**

10        The Shuttle Phased Array and Delta IV documents containing
11   trade secrets were responsive to requests from the PRC government
12   for technology relating to spacecraft.   So too were the SDS
13   documents found in defendant's home and his trash, which were
14   also export-controlled.

15        As noted above, defendant created briefing transparencies in
16   handwritten Chinese and English that were used for presentations
17   in the PRC.   The briefings were created by defendant cutting out
18   portions of proprietary Rockwell documents and pasting them onto
19   sheets, or in some cases using entire Rockwell documents with the
20   company logo intact.   Government Ex. 294-12 to 294-14, 298-44,
21   299-51.

22        A useful comparison can be made between the unauthorized
23   briefings defendant gave and an authorized briefing that Rockwell
24   gave to a delegation from the PRC in 1990.   Government Ex. 301.
25   The authorized briefing was found in defendant's home.   Even
26   without an engineering degree, it is plain to see the briefing
27   that Rockwell approved for the Chinese delegation contains none
28   of the detail found in the presentations defendant gave in China.

Defendant also had in his home documents pertaining to the
following technologies:

1.  X-37 space plane overview, marked "Boeing Proprietary
    Data."  Government Ex. 85.

2.  B-1 bomber structures analysis manuals, Government Exs.
    63, 98-101.  The restriction on series preface for Ex.
    101 reads "Disclosure to organizations other than
    Rockwell International or selected federal agencies is
    prohibited."  Id. at 101-5.

3.  F-15 fighter.  Government Ex. 86.

4.  B-52 bomber.  Government Ex. 124.

5.  OV-102 [Space Shuttle].  Government Exs. 47, 143, 147.

6.  Helicopters.  Government Exs. 25, 125, 129, 136, 141,
    142.

7.  Solid rocket boosters.  Government Ex. 60.

8.  Reusable cargo vehicle.  Government Ex. 62.

9.  Advanced Composite Design Guides, marked export-
    controlled, "DISTRIBUTION LIMITED TO U.S. GOVERNMENT
    AGENCIES ONLY."  Government Exs. 38, 39, 40, 67.

10. McDonnell Douglas fatigue manual.  Government Ex. 150.

11. Materials Properties Manual: Sandwich and Nonmetals
    Design Data.  Government Ex. 144.

12. Thermal Blanket and Shroud Design Guidelines for the
    International Space Station.  Government Ex. 87.

13. Rockwell System Design and Parts manuals: Non-ferrous
    Materials and Heat Treatments; Surface Treatments,
    Coatings, Cleaning and Inspection; Non-metallic
    Materials, Fluids and Advanced Composites; Casting

41

1    Forging, Extruding and Molding; Thermal Joining,

2    Welding, Brazing, Soldering and Diffusion Bonding;

3    Ferrous Materials and Heat Treatments; Fluid Lines &

4    Fittings; Electrical/Electromechanical, Mechanical;

5    Machining, Chemical Milling, and Metal Fabrication, all

6    marked Rockwell Proprietary Information.  Government

7    Exs. 37, 39, 52, 54.

8    14.  Honeycomb Canopy Data.  Government Ex. 59.

9    **J.   Defendant's Failure to Register as a Foreign Agent or**

10   **Apply for an Export License**

11   Defendant never registered as an agent of the PRC.

12   Government Ex. 214.  Defendant also never applied for an export

13   license to transfer technology to the PRC.  Government Ex. 210.

14   **III. ELEMENTS OF OFFENSES**

15   **A.  Economic Espionage**

16   Only six cases have charged economic espionage under § 1831.

17   This case will be the first case in the nation to proceed to

18   trial under that statute.  As a result there are no model jury

19   instructions from any circuit, and very few reported cases

20   interpreting this statute.  In determining the elements of the

21   offense the government has used statutes, case law, and the

22   legislative history of the Economic Espionage Act ("EEA").

23   Notably, the definition of trade secret in § 1839 is taken

24   from the Uniform Trade Secrets Act.  H. Rep. No. 788, 104th

25   Cong., 2d Sess. 12 (1996).  The UTSA has been adopted in varying

26   forms by 40 of the 50 states.  As a result, cases that interpret

27   the trade secret laws of states are often used as guidance when

28   looking at EEA's definition of trade secret.

42

1    Section 1831 states the following:

2    (a) In general.  Whoever, intending or knowing that the

3    offense will benefit any foreign government, foreign

4    instrumentality, or foreign agent, knowingly-

5         (1) steals, or without authorization appropriates,

6         takes, carries away, or conceals, or by fraud,

7         artifice, or deception obtains a trade secret;

8         (2) without authorization copies, duplicates, sketches,

9         draws, photographs, downloads, uploads, alters,

10        destroys, photocopies, replicates, transmits, delivers,

11        sends, mails, communicates, or conveys a trade secret;

12        (3) receives, buys, or possesses a trade secret,

13        knowing the same to have been stolen or appropriated,

14        obtained, or converted without authorization;

15        (4) attempts to commit any offense described in any of

16        paragraphs (1) through (3); or

17        (5) conspires with one or more other persons to commit

18        any offense described in any of paragraphs (1) through

19        (3), and one or more of such persons do any act to

20        effect the object of the conspiracy,

21   shall, except as provided in subsection (b), be fined not

22   more than $500,000 or imprisoned not more than 15 years, or

23   both.

24   The elements of the crime are as follows:

25   1.   The defendant intended or knew his actions would

26        benefit a foreign government, foreign instrumentality,

27        or foreign agent;

28   2.   The defendant knowingly stole, or without authorization

43

1          appropriated, took, carried away, possessed or

2          concealed, or by fraud, artifice, or deception obtained

3          a trade secret; and;

4     3.   The information was, in fact, a trade secret.

5     18 U.S.C. § 1831(a)(1) (Economic Espionage).

6     Section 1839(3) defines "trade secret" as follows:

7     (3) the term "trade secret" means all forms and types of

8          financial, business, scientific, technical, economic, or

9          engineering information, including patterns, plans,

10         compilations, program devices, formulas, designs,

11         prototypes, methods, techniques, processes, procedures,

12         programs, or codes, whether tangible or intangible, and

13         whether or how stored, compiled, or memorialized physically,

14         electronically, graphically, photographically, or in writing

15         if–

16              (A) the owner thereof has taken reasonable measures to

17              keep such information secret; and

18              (B) the information derives independent economic value,

19              actual or potential, from not being generally known to,

20              and not being readily ascertainable through proper

21              means by, the public. . . .

22    The term "foreign instrumentality" means any agency, bureau,

23    ministry, component, institution, association, or any legal,

24    commercial, or business organization, corporation, firm, or

25    entity that is substantially owned, controlled, sponsored,

26    commanded, managed, or dominated by a foreign government.  The

27    term "foreign agent" means any officer, employee, proxy, servant,

28    delegate, or representative of a foreign government.  18 U.S.C. §

44

1839 (1) and (2).

The government need only prove that the defendant intended that his actions in taking the trade secret would benefit the foreign government in any way.  The benefit may be an economic, reputational, strategic, or tactical one.  18 U.S.C. § 1831(a); H. Rep. No. 788, 104th Cong., 2d Sess. 11 (1996).

Information can be a trade secret even if some of its components are in the public domain, provided that some elements of the information have independent economic value due to their not being widely known, and the owner of the information has taken reasonable steps to protect the elements of the information that are not widely known.  Buffets, Inc. v. Klinke, 73 F.3d 965, 968 (9th Cir. 1996); Harvey Barnett, Inc. v. Shidler, 338 F.3d 1125, 1129 (10th Cir. 2003); BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC, 303 F.3d 1332, 1339 (Fed. Cir. 2002); Vermont Microsystems, Inc. v. Autodesk, Inc., 88 F.3d 142, 147 (2d Cir. 1996); Metallurgical Industries, Inc. v. Fourtek, 790 F.2d 1195, 1201 (5th Cir. 1986); Syntex Opthalmics, Inc. v. Tsuetaki, 701 F.2d 677, 684 (7th Cir. 1983); Servo Corporation of America v. General Electric Company, 393 F.2d 551 (4th Cir. 1968).

**B.  Conspiracy**

Title 18, United States Code, Section 371 provides, in pertinent part, as follows:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object

45

of the conspiracy, each shall be fined under this title or
imprisoned not more than five years, or both.

The elements of the offense are as follows:

(1) There was an agreement between two or more persons to
commit at least one crime;

(2) The defendant became a member of the conspiracy knowing
of at least one of its objects and intending to help
accomplish it; and

(3) One of the members of the conspiracy performed at least
one overt act for the purpose of carrying out the
conspiracy.

**C.   Foreign Agent**

Title 18, United States Code, Section 951 provides, in
pertinent part, as follows:

(a) Whoever, other than a diplomatic or consular officer or
attache, acts in the United States as an agent of a foreign
government without prior notification to the Attorney
General if required in subsection (b), shall be fined under
this title or imprisoned not more than ten years, or both.

* * *

(d) For purposes of this section, the term "agent of a
foreign government" means an individual who agrees to
operate within the United States subject to the direction or
control of a foreign government or official. . . .

The elements of the crime are as follows:

1.   Defendant acted in the United States as an agent of a
foreign government, in this case, the government of the
People's Republic of China;

46

1    2.   Defendant failed to notify the Attorney General of the

2    United States that he would be acting in the United States

3    as an agent of the People's Republic of China prior to so

4    acting; and

5    3.   Defendant acted knowingly, and knew that he had not

6    provided prior notification to the Attorney General.

7    **D. Obstruction**

8    Title 18, Section 1512(b)(3) provides as follows:

9    (b) Whoever knowingly uses intimidation, threatens, or

10    corruptly persuades another person, or attempts to do so, or

11    engages in misleading conduct toward another person, with

12    intent to–

13                             \*\*\*\*\*\*\*

14        (3) hinder, delay, or prevent the communication to a

15        law enforcement officer or judge of the United States

16        of information relating to the commission or possible

17        commission of a Federal offense . . .

18    shall be fined under this title or imprisoned not more than

19    ten years, or both.

20    The elements of the offense are as follows:

21    (1) The defendant persuaded, or tried to persuade, another

22    person to withhold certain information from an FBI agent;

23    and

24    (2) The defendant acted knowingly and with intent to hinder,

25    delay, or prevent the communication to an FBI agent of

26    information relating to the commission or possible

27    commission of a federal offense.

28    18 U.S.C. § 1512(b)(3); Fifth Circuit Model Jury Instruction 2.68

47

[Intimidation to Influence Testimony (modified)].

The Ninth Circuit has held that the phrase "corruptly persuade" includes "non-coercive attempts by a target of a criminal investigation to tamper with a prospective witness." United States v. Khatami, 280 F.3d 907, 908 (9th Cir. 2001).

**E.  False Statement**

Title 18, United States Code, Section 1001 provides, in pertinent part, as follows:

(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully-

* * *

(2) makes any materially false, fictitious, or fraudulent statement or representation . . .

shall be fined under this title, imprisoned not more than 5 years. . . .

The elements of the crime are as follows:

1.   The defendant made a false statement in a matter within the jurisdiction of the FBI.

2.   The defendant acted willfully, that is deliberately, and with the knowledge that the statement was untrue.

3.   The statement was material to the FBI's activities or decisions.

**F.   Criminal Forfeiture**

**1.    The Forfeiture Phase Is Tried after a Guilty Verdict**

In count Fifteen of the Indictment, the government notified

48

defendant pursuant to Rules 7(c)(2) and 32.2(a) of the Federal Rules of Criminal Procedure that it seeks forfeiture of property in the event he is convicted of the economic espionage offenses set forth in Counts 2-7.[12]

Count Fifteen seeks forfeiture of property used to commit or facilitate the offenses.[13]  The applicable forfeiture provision reads as follows:

The court, in imposing sentence on a person for a violation of this chapter, shall order, in addition to any other sentence imposed, that the person forfeit to the United States--

(1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation; and

(2) any of the person's property used, or intended to be used, in any manner or part, to commit or facilitate the commission of such violation, if the court in its discretion so determines, taking into consideration the nature, scope, and proportionality of the use of the property in the offense.

_____

[12]  Count Fifteen also seeks forfeiture for Count One (conspiracy in violation of 18 U.S.C. § 371).  Upon further consideration, the government believes that 18 U.S.C. § 1834(a) would allow for forfeiture only upon conviction of a conspiracy charged under 18 U.S.C. § 1831(a)(5), rather than the conspiracy charged in the indictment.  Therefore, the government does not seek forfeiture on the basis of Count One.

[13]  Count Fifteen also seeks forfeiture of all proceeds of the offenses, but the government elects not to proceed on that ground at trial.

49

1   18 U.S.C. § 1834(a) (2007).[14]

2        In any criminal case in which the Government seeks the

3   forfeiture of the defendant's property as a consequence of the

4   defendant's conviction, the court must conduct a proceeding to

5   determine the forfeitability of the property "as soon as

6   practicable" after a verdict or finding of guilty.  Fed. R. Crim.

7   P. 32.2(b)(1).  During the forfeiture phase of the trial,

8        if the government seeks forfeiture of specific

9        property, the court must determine whether the

10       government has established the requisite nexus between

11       the property and the offense.

12  Id.

13       In this case, the government seeks the forfeiture of

14  defendant's residence, which he used to possess and conceal the

15  documents described in Counts Two through Seven.

16       Because the forfeiture determination is to be made by the

17  court, it need not occur immediately after trial, but instead may

18  be made at a separate proceeding prior to sentencing.

19  ////

20

21       [14]   The forfeiture provision for violations of 18 U.S.C.
22  § 1831(a) and (3) was amended in late 2008 and transferred to 18
    U.S.C. § 2323 (effective October 13, 2008).  See 18 U.S.C. § 1834
23  (2008) ("Forfeiture, destruction, and restitution relating to
    this chapter shall be subject to section 2323, to the extent
24  provided in that section, in addition to any other similar
    remedies provided by law.").  The new provision arguably subjects
25  more facilitating property to forfeiture, by omitting the express
    requirement that the court take into consideration "the nature,
26  scope, and proportionality of the use of the property in the
    offense."  Compare 18 U.S.C. § 2323(a)(1)(B), (b)(1) (effective
27  October 13, 2008).  Therefore, the government recommends using
    the pre-2008 forfeiture provision to avoid potential *ex post
28  facto* issues.

                                  50

1

## 2. The Burden of Proof is Preponderance of the Evidence

Forfeiture is an element of the sentence on a count of conviction, not a substantive offense. <u>Libretti v. United States</u>, 516 U.S. 29, 49, 116 S. Ct. 356 (1995)(because forfeiture is part of the sentencing phase of a criminal case, a defendant has no Sixth Amendment right to have the jury determine the forfeitability of property). Accordingly, the standard of proof regarding the forfeitability of property in a criminal case is preponderance of the evidence. <u>See</u>, <u>e.g.</u>, <u>United States v. Garcia-Guizar</u>, 160 F.3d 511, 518 (9th Cir. 1998) (preponderance standard is constitutional because criminal forfeiture is not a separate offense, but only an additional penalty for an offense that was established beyond a reasonable doubt).

To meet its burden, the government will rely on the evidence presented during the trial. To the extent it deems necessary, the government may present additional evidence pertaining solely to forfeiture during the post-verdict forfeiture phase. The defendant may also present evidence during the forfeiture phase, which the government may seek to rebut just as in the guilt phase. Fed. R. Crim. P. 32.2(b)(1) ("The court's determination may be based on evidence already in the record . . . or, if the forfeiture is contested, on evidence or information presented by the parties at a hearing after the verdict or a finding of guilt.").

## 3. Third Party Interests are Adjudicated Separately

The decision on the issue of forfeitability would serve as the basis for the Court to enter a preliminary order of

forfeiture.  Fed. R. Crim. P. 32.2(b)(2), (3).  If the Government
prevails at the conclusion of the forfeiture phase, the
preliminary order of forfeiture forfeits the interest of the
defendant in the property - whatever that interest may be.  Rule
32.2(b)(2).

The extent of the defendant's interest in specific property
(such as the residence) vis a vis third parties is litigated
separately in a post-trial "ancillary proceeding."  In this
proceeding, the court (without a jury) will decide the claims of
any third parties who assert interests in specific property to be
forfeited.  21 U.S.C. § 853(n)(2).  The final order of forfeiture
would follow this proceeding.  Fed. R. Crim. P. 32.2(b)(2), (c).

**IV.  EVIDENTIARY ISSUES**

**A.   Admissions of Defendant**

The government will seek to introduce certain statements
made by defendant.  Such evidence is admissible as "admissions by
a party opponent."  F.R.E. 801(d)(2)(A); <u>United States v. Nixon</u>,
418 U.S. 683, 702, n. 13 (1974); <u>United States v. Warren</u>, 25 F.3d
890, 895 (9th Cir. 1994)("A defendant's own out-of-court
admissions . . . surmount all objections based on the hearsay
rule . . . and [are] admissible for whatever inferences the trial
judge [can] reasonably draw").  This includes defendant's
writings, such as correspondence, briefings, or journal entries.
<u>United States v. Moran</u>, 759 F.2d 777, 786 (9th Cir. 1985).
Documents or items found in the possession of a defendant are
also admissible as adoptive admissions or to show the
circumstantial relationship of the defendant to the documents,
items, or co-conspirators.  <u>See</u> F.R.E. 801(d)(2)(B); <u>United</u>

52

1  States v. Ospina, 739 F.2d 448, 451 (9th Cir. 1984).

2       Defendant cannot offer his prior statements on his own

3  behalf for proof of the truth of the matter asserted therein

4  because these self-serving statements are hearsay.  See United

5  States v. Ortega, 203 F.3d 675, 682 (9th Cir. 2000) (defendant

6  could not introduce non-self-inculpatory statements because they

7  were inadmissible hearsay).

8       **B. Statements of Co-Conspirators**

9       The government intends to offer into evidence statements by

10 the unindicted co-conspirators in this case.  These statements

11 were made in correspondence found in the homes of defendant and

12 Chi Mak.  The known co-conspirators in this case are Chen Lung Ku

13 at Harbin Institute of Technology; Qinan Chen, Deputy Director,

14 Technical Import Department, CATIC; the Nan Chang Aircraft

15 Company; Chief Engineer Feng at Nan Chang Aircraft Company; Gu

16 Weihao of AVIC; and Chi Mak.

17      Pursuant to Rule 801(d)(2)(E), statements of a co-

18 conspirator made in furtherance of the conspiracy are not

19 considered hearsay, and are admissible against a defendant

20 without a showing that the declarant is unavailable.  See United

21 States v. Inadi, 475 U.S. 387 (1986); United States v. Layton,

22 720 F.2d 548, 555 (9th Cir.).  Moreover, such statements are not

23 barred by the rule enunciated in Bruton v. United States, 391

24 U.S. 123 (1968).  Bruton does not apply to statements made by co-

25 conspirators during the course and in furtherance of the

26 conspiracy.  United States v. McCown, 711 F.2d 1441, 1448-49 (9th

27 Cir. 1983).

28      To admit a co-conspirator's statements against a defendant,

53

the government must establish that the conspiracy existed by a preponderance of the evidence; that the declarant making the statement was a member of the conspiracy; and that the statement was made during the course of and in furtherance of the conspiracy. <u>Bourjaily v. United States</u>, 483 U.S. 171, 175-76 (1987); <u>United States v. Mason</u>, 658 F.2d 1263, 1269 (9th Cir. 1981). The co-conspirator need not be charged for the exception to apply. <u>United States v. Williams</u>, 989 F.2d 1061, 1067 (9th Cir. 1993). Additionally, the person to whom the statement was made need not have been a member of the conspiracy. <u>Id.</u> at 1068.

The Court may examine any evidence, including the co-conspirator's statements themselves, to determine whether the foundation is established by a preponderance of the evidence. <u>Bourjaily</u>, 483 U.S. at 180 ("We think that there is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy"). The foundation may be established before or after the admission of the statements at trial. The Court may admit the statements before the foundation is laid with an admonition to counsel that the evidence will be stricken if the foundation is not later established. <u>United States v. Rabb</u>, 752 F.2d, 1320, 1325 (9th Cir. 1984).

The government need not establish either that the co-conspirator's out-of-court statements are independently reliable. <u>Bourjaily</u>, 483 U.S. at 183-84 ("we hold that the Confrontation Clause does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the

54

1  requirements of Rule 801(d)(2)(E)"); <u>United States v. Inadi</u>, 475

2  U.S. 387, 400 (1986).  A co-conspirator's statement is admissible

3  even though the defendant was not present at the time the co-

4  conspirator made the statement.  <u>Bennejas v. United States</u>, 428

5  F.2d 1242, 1245 (9th Cir. 1970).

6      The statements need not be shown to advance the conspiracy,

7  but may merely keep the participants abreast of what is happening

8  in the conspiracy.  <u>United States v. Andersson</u>, 813 F.2d 1450,

9  1456 (9th Cir. 1987)("statements made to keep a conspirator

10 abreast of a co-conspirator's activities, or to induce continued

11 participation in a conspiracy, or to allay the fears of a co-

12 conspirator are in furtherance of a conspiracy") <u>citing</u> <u>United</u>

13 <u>States v. Layton</u>, 720 F.2d 548, 557 (9th Cir. 1983).

14     **C.   Statements by Co-workers Regarding Instructions From**

15         **Management**

16     The government will offer testimony of engineers who worked

17 with defendant at Rockwell and Boeing regarding instructions they

18 were given in handling and disposing of documents.  In

19 particular, the witnesses will testify that at the time of the

20 move from the Downey plant to the Huntington Beach plant,

21 engineers were given three options for their work documents: (1)

22 pack it for transfer to the Huntington Beach plant; (2) pack it

23 for storage at Iron Mountain; or (3) place it in bins for

24 destruction.  No engineers were allowed to take documents home.

25     These instructions, as well as other Rockwell and Boeing

26 policies and rules regarding the security of information, are not

27 hearsay because they are not declarations of fact.  <u>United States</u>

28 <u>v. Reilly</u>, 33 F.3d 1396, 1410 (3d Cir. 1994)("Instructions to an

                                    55

individual to do something are . . . not hearsay . . . because they are not declarations of fact and therefore are not capable of being true or false") (citing Graham, Federal Practice and Procedure: Evidence 6705 at 409); <u>Crawford v. Garnier</u>, 719 F.2d 1317, 1323 (7th Cir. 1983); <u>United States v. Gibson</u>, 675 F.2d 825, 833-34 (6th Cir. 1982); <u>United States v. Keane</u>, 522 F.2d 534, 558 (7th Cir. 1975).

### D. Documentary Evidence

#### 1. Authentication of documents

The requirement of authentication is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.  F.R.E. 901(a).  The government "need only make a prima facie showing of authenticity so that a reasonable juror could find in favor of authenticity."  <u>United States v. Workinger</u>, 90 F.3d 1409, 1415 (9th Cir. 1996).

#### a. Self-authentication

Self-authentication of certain documents, pursuant to Rule 902, eliminates the requirement of providing extrinsic evidence of authenticity.  Included in this category are domestic public documents under seal: "A document bearing a seal purporting to be that of the United States . . . [bearing] a signature purporting to be an attestation or execution" is self-authenticating. F.R.E. 902(1).  Extrinsic evidence of authenticity is not required as a condition precedent of admissibility.  <u>Id.</u>

In this case, the government will introduce certifications bearing the seal of the Department of State and signature of the Secretary of State that certain technologies found in defendant's home were on the United States Munitions List, and that defendant

1   had not applied for an export license.  Government Exs. 210, 211.
2   The government will also introduce a certification from the
3   Attorney General of the United States that defendant never gave
4   notice that he was acting as an agent of the PRC.  Government Ex.
5   214.  These certifications are admissible without the need to
6   call a witness to authenticate them.

7                    **b. Chain of custody**

8        The chain of custody required in authenticating an item
9   depends on whether the item is unique, has been made unique, or
10  is neither of the above.  Defects in the chain of custody go to
11  the weight of the evidence and not to the item's admissibility.
12  United States v. Harrington, 923 F.2d 1371, 1374 (9th Cir. 1991).
13  There is, however, a presumption of regularity in the handling of
14  exhibits by public officials.  United States v. Kaiser, 660 F.2d
15  724, 733 (9th Cir. 1981).  Absent specific chain of custody
16  issues raised by defendant, the government will introduce the
17  evidence seized during the searches in this case through the case
18  agent, as opposed to calling a different agent for each item
19  found.

20                    **c.  Use of copies**

21       The government intends to offer photocopies of certain
22  documents into evidence during the trial.  The use of copies is
23  specifically permitted by Rule 1003 of the Federal Rules of
24  Evidence, unless a genuine question is raised as to the
25  authenticity of the original, or unless it would be unfair to
26  admit the duplicate in lieu of the original.

27  **E.   Other Act Evidence**

28       The letters and tasking lists are inextricably intertwined

1   with the charged offenses, and are necessary to provide a
2   "coherent and comprehensible story regarding the commission of
3   the crime." <u>United States v. Beckman</u>, 298 F.3d 788, 794 (9th
4   Cir. 2002).

5            Evidence of 'other acts' is not subject to rule 404(b) if it
6            is inextricably intertwined with the charged offense . . .
7            This exception applies when (1) 'particular acts of the
8            defendant are part of . . . a single criminal transaction,'
9            or when (2) 'other act' evidence . . . is necessary [to
10           admit] in order to permit the prosecutor to offer a coherent
11           and comprehensible story regarding the commission of the
12           crime.

13  <u>Id.</u> at 794.

14           The letters and tasking lists are inextricably intertwined
15  with the economic espionage charge because (1) defendant gathered
16  the trade secrets in response to the earlier requests for
17  information; and (2) the letters and tasking lists show an intent
18  to benefit the PRC.  The letters and tasking lists are also
19  intertwined with the foreign agent charge because they show
20  defendant was acting at the direction of the PRC government.

21           The letters and tasking lists are necessary to allow the
22  government to "offer a complete and coherent story regarding the
23  commission of the crime."  <u>Beckman</u>, 298 F.3d at 794.  They
24  explain why defendant took the documents and hid them in his
25  home.

26           Even if the letters and tasking lists were deemed to be
27  evidence of other acts, they are still admissible under Rule
28  404(b) to show knowledge, intent, and lack of mistake.  Other

1  acts evidence is admissible under Rule 404(b) if it

2      (1) tends to prove a material point at issue; (2) is not too

3      remote in time; (3) is proven with evidence sufficient to

4      show that the act was committed; and (4) if admitted to

5      prove intent, is similar to the crime charged.

6  Beckman, 298 F.3d at 794.

7      The letters and tasking lists prove material points: the

8  intent to benefit the PRC, and acting at the direction of the

9  PRC.  They are not too remote in time to be admissible.  Instead

10 they are co-extensive with the criminal conduct in this case.  As

11 an agent of the PRC, defendant was providing information to the

12 PRC at the same time he was receiving the letters (i.e., from at

13 least 1985 onward).  As to the economic espionage charges, the

14 trade secret documents were directly responsive to the requests

15 in the letters and tasking lists, and defendant continued to

16 collect and possess the trade secret information up until the

17 time of his arrest.

18      **F. Summary Witnesses/Admissibility of Charts and Summaries**

19      In light of the volume of documents and their technical

20 nature, the government intends to offer FBI Special Agent Kevin

21 Moberly as a summary witness regarding the 250,000 documents

22 found in defendant's home and the items found during the trash

23 searches.  The government will also offer FBI Special Agent Sean

24 Kim to summarize the SDS documents found in defendant's home with

25 respect to the dates they were obtained, and alterations done to

26 mask identifying information from the date time stamps.

27      Evidence may be summarized by any qualified person who has

28 examined the original documents, or who supervised the

59

1  preparation of the summary.  See, e.g., Goldberg v. United

2  States, 789 F.2d 1341, 1343 (9th Cir. 1986).  The documents

3  underlying the summaries have been produced to defense in

4  discovery and will be made available in court for inspection.

5       F.R.E. 1006 allows the use of summaries when the documents

6  are unmanageable or when the summaries would be useful to the

7  judge and jury.  In light of volume of documents found in this

8  case, most of a highly technical nature, the proposed summaries

9  will greatly contribute to the clarity of the presentation and

10 reduce the potential for confusion.

11      **G.   Expert Testimony**

12      The government expects to call the following witnesses who

13 will provide testimony that may qualify as expert testimony: (1)

14 Ronald Guerin will testify about espionage techniques used by PRC

15 intelligence agencies; (2) FBI SA Christopher Pluhar will testify

16 about the digital information recovered in this case; (3) Michael

17 Danis, Senior Supervisory Intelligence Officer at the Defense

18 Intelligence Agency of the United States Department of Defense,

19 will testify about the Communist Party control of the space and

20 aerospace industries in the PRC; (4) N. Wade Hale, Jr., Deputy

21 Associate Administrator for Strategic Partnerships, NASA, will

22 testify about the Space Shuttle program in general and,

23 specifically, about how NASA's Space Shuttle program involves

24 proprietary, cutting edge technology that has proven essential to

25 the maintenance of the United States' current preeminence in

26 space exploration; (5) Emad Farag, Boeing Senior System Engineer,

27 will testify about Shuttle Phased-Array documents (the trade

28 secrets at issue in Counts Two through Five); (6) Cliff Barnett,

60

Boeing Senior Manager of the Southern California Region, will testify about Delta IV documents (the trade secrets at issue in Counts Six and Seven); (7) Anthony Dearth, Chief, Missile and Spacecraft Division with the U.S. Department of State, Bureau of Political Military Affairs, Directorate of Defense Trade Controls Licensing, will testify about the process by which the State Department certifies that a specific item is on the U.S. Munitions List ("USML") and about specific documents involved in this case that are covered by the USML; and (8) FBI linguists Helen Huang and Len S. Pi, who will testify about documents they translated from Chinese to English. The government has provided defendants with written notice of these witnesses' qualifications and expected testimony.

If specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue, a qualified expert witness may provide opinion testimony on the issue in question. See Fed. R. Evid. 702. To be admissible, expert testimony must satisfy only two basic requirements: (1) the testimony must be helpful to the trier of fact; and (2) the witness must be qualified to deliver the testimony based on his knowledge, skill, experience, training, or education. Exum v. General Elec. Co., 819 F.2d 1158, 1163 (D.C. Cir. 1987); 4 Weinstein & Berger, WEINSTEIN'S FEDERAL EVIDENCE, § 702.06[2], at p. 702-36 (2d ed. 1997) ("WEINSTEIN"). In this context, "helpful" means "relevant." See WEINSTEIN, § 702.03[14] at p. 702-13 ("The helpfulness test requires an ordinary relevance analysis").

An expert may provide opinion testimony even if it embraces

61

an ultimate issue to be decided by the trier of fact.  <u>See</u> Fed. R. Evid 704; <u>United States v. Fleischman</u>, 684 F.2d 1329, 1335 (9th Cir. 1982).  Alleged faults in an expert's use of a specific methodology go to the weight, not admissibility of the testimony. <u>Kennedy v. Collagen Corp.</u>, 161 F.3d 1226, 1230-31 (9th Cir. 1998).

**H.  Sealed Exhibits**

To the extent necessary to protect their contents, the government may move to seal the trade secret documents, Exhibits 65, 66, 75, and 76.