**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>**Plaintiff,**<br><br>vs.<br><br>**DONGFAN "GREG" CHUNG**<br>**Defendant.** | **Case No.: SACR 08-00024-CJC**<br><br><br><br>**MEMORANDUM OF DECISION** |

## I. INTRODUCTION

The United States of America (the "Government") charged Defendant Dongfan "Greg" Chung with one count of acting as a foreign agent, one count of conspiring to violate the Economic Espionage Act of 1996 ( "EEA"), six counts of violating the EEA, one count of making a false statement to the Federal Bureau of Investigation ("FBI"), and

one count of obstructing justice.  After conducting a ten-day bench trial in this matter, the Court finds Mr. Chung guilty on all counts except for the count of obstructing justice.

Mr. Chung has been an agent of the People's Republic of China ("PRC") for over thirty years.  Under the direction and control of the PRC, Mr. Chung misappropriated sensitive aerospace and military information belonging to his employer, The Boeing Company ("Boeing"), to assist the PRC in developing its own programs.  To accomplish his mission, Mr. Chung kept over 300,000 pages of documents reflecting Boeing's trade secret and proprietary information in his home.  Mr. Chung sent information that he misappropriated to the PRC through the mail, sea freight, a Chinese agent named Chi Mak, and even the Chinese consulate.  On several occasions, Mr. Chung also used the information that he misappropriated from Boeing to prepare detailed briefings that he later presented to Chinese officials in the PRC.  The trust Boeing placed in Mr. Chung to safeguard its proprietary and trade secret information obviously meant very little to Mr. Chung.  He cast it aside to serve the PRC, which he proudly proclaimed as his "motherland."  The Court now must hold Mr. Chung accountable for his crimes.

## II. FACTUAL BACKGROUND

Mr. Chung, a naturalized United States citizen, worked as an engineer for his entire adult life.  Ex. 219-54.  At the beginning of his career, Boeing hired him as a stress analyst on the airframe and rotor hub for the CH-47 helicopter.  Ex. 302-12.  In 1969, Mr. Chung moved to another company, McDonnell Douglas, where he worked as a strength engineer on the wing structure of the DC-10 airliner and on the wing and armament support for the F-15 fighter.[1]  *Id.*  In 1972 and part of 1973, Mr. Chung returned to Boeing and worked at its facility in Wichita, Kansas on the B-52 Life Extension Program.

---

[1] Boeing acquired McDonnell Douglas in 1997.

*Id.* In the fall of 1973, Mr. Chung moved to Rockwell International ("Rockwell") in Downey, California and worked there for the next twenty-six years. Boeing acquired Rockwell's space division in 1996. In 1999, Mr. Chung moved to Boeing's plant in Huntington Beach. For most of his career at Rockwell and Boeing, Mr. Chung worked as a stress analyst on the forward fuselage section of the Space Shuttle. Mr. Chung held a secret clearance[2] from 1973 until 2002. Ex. 302-11.

In 2002, Boeing moved parts of its Space Shuttle program to Houston, Texas. Mr. Chung declined to move, and Boeing laid him off in September 2002. After the crash of the Columbia orbiter in February 2003, however, Mr. Chung came back to Boeing as a contractor to assist in the evaluation of the crash. He remained at Boeing until September 11, 2006.

Federal agents first suspected that Mr. Chung was spying for the PRC during its 2005 investigation of another engineer named Chi Mak, who worked for a naval defense contractor. Mr. Chung had significant contact with Chi Mak over the years, and the federal agents were concerned that their relationship was more than purely social. Federal agents knew that Chi Mak was using his position and security clearance to pass sensitive naval technology to the PRC. In 2007, a jury convicted Chi Mak of conspiring to export defense articles, attempting to export defense articles, acting as an unregistered agent of a foreign government, and making a false statement. This Court sentenced Chi Mak to approximately twenty-four years in prison for his crimes.

During a search of Chi Mak's home in October 2005, federal agents found address books containing contact information for Mr. Chung. Exs. 353–355. As part of the investigation in the Chi Mak case, Mr. Chung was interviewed on April 24, 2006. Mr.

---

[2] Because he held a security clearance, Mr. Chung had to disclose any foreign travel or contacts with foreign officials.

Chung told federal agents he first met Chi Mak in 1992 through a mutual friend "Mr. Gu" (later identified as Gu Weihao of the Chinese Ministry of Aviation), whom he described as an exchange scholar from China.  In June 2006, during a second search of Chi Mak's home, federal agents discovered letters to Mr. Chung from Gu Weihao.  In one letter, dated May 2, 1987, Gu Weihao asked Mr. Chung to provide information on airplanes and the Space Shuttle and referred to information that Mr. Chung had previously provided to the PRC.  Ex. 359.

Following the discovery of the letter to Mr. Chung from Gu Weihao, federal agents conducted surveillance and trash searches at Mr. Chung's home.   In August and September 2006, federal agents discovered that Mr. Chung had disposed of technical documents taken from work by secreting them within the pages of newspapers.  Tr. 47:14–19, 50:6–8, 54:19–55:22, 63:19–24, 68:9–14, June 2, 2009.  The documents included design drawings and diagrams, structural and material specifications, project management data, and engineering modification reports for the Space Shuttle and the International Space Station.  Exs. 170–173.

Based on the information found in Mr. Chung's trash, federal agents believed that it was necessary to take a closer look at him and his activities.  On September 11, 2006, federal agents interviewed Mr. Chung and searched his home.[3]  Federal agents were astonished at what they found.  Mr. Chung had over 300,000 pages of sensitive and proprietary documents belonging to Boeing.  More specifically, federal agents found a veritable treasure trove of Boeing's documents relating to the Space Shuttle, Delta IV Rocket, F-15 fighter, B-52 bomber, CH-46/47 Chinook helicopter, and other proprietary aerospace and military technologies.  Federal agents also found numerous letters, tasking lists, and journals detailing Mr. Chung's communications with officials in the PRC.  As

---

[3] Federal agents conducted a follow-up search of Mr. Chung's home on November 7, 2006, during which they found a few additional technical documents.  Tr. 99:5–6, June 2, 2009.

federal agents sifted through the hundreds of thousands of pages of documents in Mr. Chung's home, the story of Mr. Chung's secret life became clear.  He was a spy for the PRC.

The Government presented the evidence that federal agents collected against Mr. Chung to the grand jury, and on February 6, 2008, the grand jury returned an indictment against Mr. Chung.  The grand jury charged Mr. Chung with one count of acting as a foreign agent, one count of conspiring to violate the EEA, six counts of violating the EEA, one count of making a false statement to the FBI, and one count of obstructing justice.  Mr. Chung waived his right to a jury, and the Court conducted a ten-day bench trial.  This memorandum sets forth the Court's findings of fact and conclusions of law.

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Foreign Agent

Mr. Chung is charged with acting as a foreign agent pursuant to 18 U.S.C. § 951, which provides, in pertinent part:

(a) Whoever, other than a diplomatic or consular officer or attaché, acts in the United States as an agent of a foreign government without prior notification to the Attorney General if required in subsection (b), shall be fined under this title or imprisoned not more than ten years, or both.

 (d) For purposes of this section, the term "agent of a foreign government" means an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official . . . .

18 U.S.C. § 951.

To show that Mr. Chung is guilty of acting as a foreign agent, the Government must prove that: (1) Mr. Chung acted in the United States as an agent of the PRC; (2) Mr. Chung failed to notify the Attorney General of the United States that he would be acting in the United States as an agent of the PRC prior to so acting;[4] and (3) Mr. Chung acted knowingly and knew that he had not provided prior notification to the Attorney General. The Government proved each of these elements beyond a reasonable doubt.

The extensive library that Mr. Chung maintained and concealed at his home is incredibly incriminating evidence of his service as a foreign agent for the PRC. This library was staggering in terms of its size and content. It contained over 300,000 pages of trade secret and proprietary information belonging to Boeing. For instance, Mr. Chung had over 700 documents related to the Shuttle Drawing System ("SDS"), a system that contains specifications created by Rockwell and Boeing engineers for performing processes related to all aspects of the Space Shuttle. Some SDS documents were found hidden in newspapers under stairs on the day of the search, and others were recovered from Mr. Chung's fireplace and garbage. On one of the SDS documents, Mr. Chung wrote Chi Mak's name, in Chinese, as well as Chi Mak's work and home phone numbers. Ex. 19-3. In addition to the documents themselves, Mr. Chung created an index of the SDS documents on his home computer. Ex. 41.

The SDS was, and is, export-controlled. Tr. 129:10–15, June 5, 2009. Engineers must have a password and a need to know in order to access to the system. *Id.* 129:3–4. Mr. Chung signed an SDS access agreement in 2001 in which he confirmed that he understood that the SDS was export-controlled. Ex. 70.

---

[4] Mr. Chung never notified the Attorney General that he was acting as an agent of the PRC. Ex. 210. Mr. Chung did not contest this fact or present any evidence to the contrary at trial.

Mr. Chung's library also consisted of other Space Shuttle-related documents, many of which contain export-controlled or proprietary information. These documents include detailed Space Shuttle structure diagrams, Space Shuttle specifications, as well as an organization chart containing the names and contact information for Boeing's stress and structural specialties organization. Ex. 15. Mr. Chung possessed an export-controlled Space Shuttle parts list printed from the SDS. Ex. 19. Mr. Chung kept a Space Shuttle tutorial marked with export restrictions. Ex. 31. Mr. Chung had close to a thousand pages of documents relating to the Ku-Band Antenna on the Space Shuttle, some of which are proprietary. Exhibit 68; Tr. 39:13–22, June 9, 2009. A portion of the pages within these documents are Ku-Band project quotes that are marked "Trade Secret," "Boeing Proprietary," "Confidential," "Privileged." Ex. 68-483–68-502. He had a document regarding the Space Shuttle hatch. Ex. 137. He possessed proprietary engineering data relating to the lower forward fuselage of the Orbiter Vehicle 102. Ex. 139. He had Rockwell manuals, including a Rockwell design stress analysis manual on the Orbiter Vehicle 102 and a Rockwell manual titled "Space Shuttle Program Thermodynamic Design Data Book, Thermal Control System, Book 5." Exs. 143, 145. Mr. Chung kept proprietary information regarding the X-37 space vehicle. Ex. 85; Tr. 66:16, June 10, 2009. Mr. Chung also had proprietary documents concerning the thermal protection system on the International Space Station. Ex. 87; Tr. 139:25–140:8, June 5, 2009.

Mr. Chung's library contained a variety of information on other wide-ranging military topics, too. Mr. Chung had proprietary documents related to the F-15 fighter and the CH-46/47 Chinook Helicopter. Exs. 25, 86, 125, 136, 141. Mr. Chung also had documents relating to the B-52 bomber, which, as information regarding a weapons system, is subject to export-control laws, Ex. 124, and B-1 manuals, which specified that they could not be shared with organizations other than Rockwell or selected federal agencies. Exs. 98–101.

Mr. Chung's library also provided an answer to a perplexing question: why did he take all of this sensitive Boeing information home?  The undeniable answer provided by the numerous letters, tasking lists, and journals is that he was a spy for the PRC.  Indeed, these documents tell a very disturbing story of his betrayal of Boeing's trust.

In the 1970s, as part of its "Four Modernizations" program to improve its military and other industries, the PRC[5] began to undertake efforts to acquire scientific information and technology from the West.  Mr. Chung had a profound desire to contribute to China's Four Modernizations, and did so by sending materials via sea freight to Professor Chen Lung Ku of the Harbin Institute of Technology.  Ex. 274.  Professor Ku thanked Mr. Chung for his efforts profusely.  Professor Ku wrote, "[y]ou have spent so much time to reorganize the notes from several years ago; copying and finding the information that could be needed by us, and you have actively put in your efforts towards the Four Modernizations of the motherland. . . . We'd like to join our hands together with the overseas compatriots in the endeavor for the construction of our great socialist motherland."  Ex. 278-3.

Mr. Chung also agreed to return to the PRC in 1985 to conduct a "technical exchange" on topics requested by Chen Qinan, a project manager of CATIC.  Exs. 259-261, 266.  Again, Mr. Chung was eager to help the PRC in its endeavor to acquire advanced technology:

It's a great honor and I am excited to be able to make some contributions to the four modernizations of the **motherland**. . . .  As to the outline details for

---

[5] The PRC government controls its aviation and aerospace industries through a state-run military industrial complex that includes the Ministry of Aviation ("AVIC") and an AVIC-subsidiary that manufactures aircraft called CATIC, as well as such academies as the Beijing University of Aeronautics and Astronautics, and the Harbin Institute of Technology, which feed students into the PRC aviation and aerospace industries.

the exchange, I am working actively on its draft recently.  I'm hopeful it can be done very well. . . .  I may arrange a vacation of several weeks to take a good look at the **motherland** with my own eyes.

Ex. 259-2 (emphases added).  Mr. Chung also told Chen Qinan that he had particular experience "space shuttle design," so he could "provide some information in this field." Ex. 272.  He went on to propose an outline including static analysis for the forward fuselage structural design of the Space Shuttle, finite element analysis for the forward fuselage of the Space Shuttle, and the heat shield on the skin of Space Shuttle.  Ex. 272. As part of the exchange, Mr. Chung offered to give presentations in Beijing regarding flight general design, flight fatigue life analysis, Space Shuttle forward fuselage structure, and Space Shuttle thermal protection, and Mr. Chung informed Chen Qinan that prior to his arrival each topic had "been prepared."  Ex. 265.  Mr. Chung also prepared presentations regarding the Space Shuttle and helicopter structural design (as requested by Chen Qinan), despite acknowledging that "[i]nformation regarding the Space Shuttle is classified as secret" and helicopter structural design information is "controlled by the Department of Defense."  Ex. 251.  Mr. Chung indicated that he would spend one to two hours giving each presentation.  Ex. 264.

Mr. Chung further expressed a desire to visit aircraft manufacturers to "contribute [his] expertise."  Ex. 264.  After he departed from Beijing, Mr. Chung went to Nanchang. On July 14, 1985, Mr. Chung received a detailed tasking list from the Nanchang Aircraft Company, an aircraft production facility of AVIC.  Ex. 267.  The tasking list contained more than forty-five highly technical questions, including specific questions regarding U.S. military aircraft.  *Id.*  After returning to the United States, Mr. Chung sent Engineer

Feng of Nanchang Aircraft "answers for the questions that were not answered when I was in Nanchang."[6]  Ex. 269 (letter to Engineer Feng); 252 (answers); 262 (answer).

Mr. Chung also informed Engineer Feng that he had collected B-1 manuals that would be delivered through Zhao Zhen Lan, a PRC Consul based in San Francisco.  Exs. 220, 269.  Mr. Chung later sent a list of the 27 design manuals he had provided for delivery to the PRC, including 24 manuals from the B-1 Bomber Division of Rockwell. Ex. 253.

Two other tasking lists prepared by the PRC and clearly directed to Mr. Chung are significant.   The first tasking list was kept in Mr. Chung's home, and contained twelve items: aircraft design manuals; fatigue design manuals; materials manuals; S-N curve manuals; military specifications user manuals; fighter-jet structural details design manuals; Space Shuttle design manuals and information on the Space Shuttle's environmental conditions; the Space Shuttle's airtight cabin; the Space Shuttle's heat-resistant tile design and material composition process; life-span extension/reliability analysis of U.S. fighter planes and airborne equipment; and S-N curves for fighter plane cabin plexiglass and cabin canopies.  Ex. 273.  Mr. Chung also possessed a large amount of information that was responsive to these requests.  Exs. 15, 19, 35, 68, 137, 139, 143, 145.  The other tasking list prepared by the PRC and directed to Mr. Chung was kept at Chi Mak's home.  Ex. 352.  The list stated an "urgent need" for "[m]anufacturing and [p]rocess [s]tandards for fighter planes," "[p]rocess [s]tandards for the manufacturing of the F-15," "finite element analysis" software for "NASTRAN - NASA Structural Analysis Program," and requested "specific information" related to "Boeing Company's

---

[6] Mr. Chung also documented his trip to the PRC in June 1985 in journal entries.  Ex. 310-2.  On his visit to the Institute of Aeronautical Materials in Beijing on July 3, 1985, Mr. Chung wrote that he "[d]iscussed presentation script" on July 5, 1985.  Ex. 310-2.  He also recorded a visit in Beijing by "Huang [Haui De] and Hu [Zi Xi] from the Ministry of Aviation Industry" on July 13, 1985.  Ex. 310-2.

[t]echnical [i]nformation on [c]hemical [m]illing." *Id.* The list requested other technologies, including information related to stress analysis software, computer-aided design software, and specific process standards and design manuals for U.S. fighter jets. *Id.* Chi Mak, a naval engineer, did not have access to these programs. Mr. Chung, however, did.

Tasking lists were not the only method by which the PRC directed Mr. Chung. Mr. Chung also received numerous letters requesting specific information and informing him how he could most effectively transmit the information he gathered. In a letter to Mr. Chung, Gu Weihao wrote that "[i]t is your honor and China's fortune that you are able to realize your wish of dedicating [yourself] to the service of your country." Ex. 359. Mentioning that there were some "difficult technical issues that need your assistance," Gu Weihao requested that Mr. Chung "collect information on airplane design for the trunkline and the development of the Space Shuttle" in addition to the quality control information he had previously asked Mr. Chung to collect. Ex. 359. Gu Weihao instructed Mr. Chung that he could pass information through Chi Mak,[7] "a channel [that] is much safer than others," and once in Guangzhou, Mr. Chung would be able to have a discussion with Gu Weihao and Gu Weihao's colleagues in a "small setting, which is very safe." Ex. 359. Gu Weihao also told Mr. Chung that his travel and stay to Guangzhou would be paid for by the PRC, and Mr. Chung could use various cover stories such as traveling to Hong Kong, visiting relatives, or accompanying his wife to an arts academy in the PRC. Ex. 359. In another letter, Gu Weihao later reiterated to Mr. Chung that "it [was] safer and faster" to forward information through Chi Mak. Ex. 336. Gu Weihao also noted that he "hope[d] that [Mr. Chung would] introduce advanced technologies and provide information on advanced technologies. . . . There is no need to

---

[7] Mr. Chung also used his brother-in-law, Wang Er-Chung, to pass information to the PRC. Ex. 251.

limit the scope that we proposed while we were in the United States.  Please provide at any time." Ex. 336.

Mr. Chung did not respond to Gu Weihao's letters immediately, but apologized in a follow-up letter to Gu Weihao.  Mr. Chung explained that he had not had time to write for more than a year, but Gu Weihao was always on his mind.  Ex. 245.  Mr. Chung apologized that "[d]ue to interruptions in my busy life, I have put off [writing to you] . . . .  Please forgive me!" *Id.*

The journals in Mr. Chung's library also reflect that his relationships with PRC officials were extensive and strong.  Indeed, those relationships persisted for decades.  Mr. Chung recorded in his journal on January 19, 1990 that "Chief Gu [Gu Weihao] and Professor Zhang came.  Took a day off to host them." Ex. 326-2.  Mr. Chung also noted that he invited Mr. and Mrs. Chi Mak to come over that evening.  Ex. 326-2.  On February 2, 1991, Mr. Chung again wrote in his journal that he picked up Chief Gu from John Wayne Airport and brought him home.  Ex. 326-3.  He also documented spending time with Chief Gu and taking Chief Gu back to John Wayne Airport.  Ex. 326-3.  In August 1991, Mr. Chung wrote in his journal that he had dinner with Bu Shi Lin, a Department Director and Vice Senior Researcher of AVIC.  Ex. 326-3.  The following year, on December 22, 1992, Mr. Chung met with Gu Weihao.  Ex. 314-2.  On at least two occasions in August 1993, Mr. Chung met with Bu Shi Lin.  Ex. 314-2.  Mr. Chung continued to meet with Chi Mak and PRC consulate officials well into the next decade.  *See, e.g.*, Ex. 326-2 (contact with Chi Mak on March 10, 1990, March 17, 1990, April 29, 1990, and November 25, 1990); Ex. 326-3 (dinner with Consul Shang and Consul Yu on November 7, 1991); Ex. 314-3 (farewell party to Consul Shang on October 13, 1994); Ex. 314-3 (dinner with Mr. and Mrs. Chi Mak on July 15, 1995); Ex. 325-2 (dinner at invitation of PRC Consul Wu Hui Jun on December 22, 2000); Ex. 325-2–325-3 (dinner with Consul Lan on January 13, 2001); Ex. 325-3 (dinner with "Little Wu" (PRC Consul

Wu Hui Jun) on February 10, 2001); Ex. 325-6 (contact with "Little Wu" on June 7, 2001); Ex. 241-4 (contact with Chi Mak on July 28, 2001); Ex. 325-7 (went to party at Consulate); Ex. 325-7 (contact with "Little Wu" at dinner function to welcome Deputy Director of the Office for Taiwan Affairs of the Communist Party of China); Ex. 325-9 (passed "stuff" to "Little Wu" from his family in Beijing on October 9, 2002); Ex. 325-9 (contact with Chi Mak on November 1, 2002); Ex. 325-9 (PRC Consul Wu Hui Jun, wife and daughter came to Mr. Chung's home for afternoon and evening together on November 10, 2002); Ex. 325-9 (invited "Little Wu" and Wu's wife and daughter, for a farewell party on January 6, 2003). Finally, Mr. Chung continued to correspond with Gu Weihao through at least 2003. Exs. 314-3 (1996), 315-2 (1997), 325-6 (2001), 325-9 (2003).

Mr. Chung's library contained voluminous evidence that Mr. Chung traveled to the PCR to share proprietary aerospace technology between 2001 and 2003. Mr. Chung's library contained numerous proprietary briefings concerning various aspects of the Space Shuttle and aircraft design. Exs. 293–296, 298–300. [8] Mr. Chung's journals reflect that he passed this information in a series of briefings in the PRC. In April 2001, Mr. Chung traveled to the PRC, and prior to his trip, Mr. Chung embarked on extensive preparations. Ex. 10-2. He noted in separate journal entries that he "[m]ade preparation for presentation materials on Space Shuttle," "[r]ead Space Shuttle materials," and "[p]repared presentation materials to be given in China." Ex. 325-3. On the three days preceding his trip to Beijing, Mr. Chung wrote in his journal that he "[o]rganized presentation materials" and "[p]acked luggage(s), organize slides." Ex. 325-4. After arriving in Beijing, Mr. Chung "review[ed] presentation materials" the day before he "[m]ade a presentation at the Peking University in the morning—introducing the Space

---

[8] A similar presentation found in Mr. Chung's home that was written for a Chinese delegation visiting Rockwell in 1990 contains none of the sensitive details included in the other briefings federal agents found. Ex. 301.

Shuttle." Ex. 325-4.  On the same trip, Mr. Chung traveled to Shanghai where he also "[g]ave a presentation at Shanghai University . . . at the big classroom of the Civil Engineering Department in the old campus."   Ex. 325-5.

Mr. Chung went back to the PRC on September 25, 2002 for the National Day Celebration.  Ex. 10-3.  In the months prior to his 2002 trip to the PRC, Mr. Chung downloaded a large number of specifications from the SDS.  Mr. Chung's library contained over 700 pages of documents from the SDS.  Of the 600 SDS documents that contain time and date information, 514 of these documents indicate that they were printed in the period between when Mr. Chung first learned he would be laid off from Boeing and when Mr. Chung left for the PRC.  Tr. 16:23–25, 18:1–5, 26:12–19, June 11, 2009.

Mr. Chung last traveled to the PRC on December 27, 2003.  Ex. 10-3.  Prior to this trip, Mr. Chung created his own SDS index on his home computer.  Tr. 11:24–25, 13:1–2, June 11, 2009.  His journal entries from January 2003 to December 2003 refer to organizing and inputting information into this SDS index.  Ex. 325-9–325-12.  Mr. Chung modified the index on December 15, 2003, just two weeks before his trip, and he last accessed the index on August 29, 2006.  Tr. 12:2–11, June 11, 2009.

In the course of his extensive travels, technological exchanges, briefings, and correspondence with the PRC, Mr. Chung collected an immense library of information.  By 2002, however, Mr. Chung had effectively shared much of the information he possessed with the PRC.  Around the time when Mr. Chung was notified that he would be laid off from Boeing, Mr. Chung began to secretly dispose of the documents for which he no longer had a use.  Ex. 325-7.  In an effort to pare down his library without detection, Mr. Chung placed technical documents between the pages of newspapers and put them out for garbage collection.  Tr. 47:14–25, June 2, 2009.  During August and September 2006, federal agents conducted five searches of Mr. Chung's trash, and each time they

found technical documents hidden within the pages of newspapers. *Id.* 46:18–71:25. Based on these searches, federal agents interviewed Mr. Chung, searched his home, and learned that Mr. Chung possessed a secret library. [9]

The Court finds overwhelming evidence of Mr. Chung's guilt on the charge of acting as an agent for the PRC. The evidence presented at trial establishes without a doubt that Mr. Chung was collecting highly technical aerospace and military technology belonging to Boeing and then passing that technology to the PRC. Mr. Chung engaged in this conduct under the direction and control of PRC officials. Mr. Chung has no plausible explanation for misappropriating, cataloging, passing, and selectively destroying documents. The suggestion that Mr. Chung was doing so because he was a "pack rat" is ludicrous. Mr. Chung did so because he was a spy.[10]

**B. The EEA**

**1. Economic Espionage Act Counts**

Mr. Chung is charged with six counts of possessing a trade secret with the intent to benefit the PRC under the EEA. The EEA provides, in pertinent part:

(a) In general.—Whoever, intending or knowing that the offense will benefit any foreign government, foreign instrumentality, or foreign agent, knowingly—

---

[9] For his continued efforts over his nearly three decades of service, the PRC not only graciously acknowledged Mr. Chung's service, but rewarded him. The PRC honored Mr. Chung with medals and pins from the aviation entities that benefited from Mr. Chung's technical information. Exs. 14, 18, 308. Mr. Chung also received an invitation to the National Day celebration in the PRC in 2002. Ex. 297.

[10] At closing argument, Mr. Chung's counsel argued that Mr. Chung did not act as an agent within the limitations period. This argument is contradicted by the evidence. Through 2006, Mr. Chung possessed documents, selectively destroyed documents, and accessed his personal SDS index.

> (3) receives, buys, or possesses a trade secret, knowing the
> same to have been stolen or appropriated, obtained, or
> converted without authorization . . .

shall . . . be fined not more than $500,000 or imprisoned not more
than 15 years, or both.

18 U.S.C. § 1831.[11]  Section 1839 defines "trade secret" as follows:

> (3) the term "trade secret" means all forms and types of financial, business,
> scientific, technical, economic, or engineering information, including
> patterns, plans, compilations, program devices, formulas, designs,
> prototypes, methods, techniques, processes, procedures, programs, or codes,
> whether tangible or intangible, and whether or how stored, compiled, or
> memorialized physically, electronically, graphically, photographically, or in
> writing if—
>> (A) the owner thereof has taken reasonable measures to keep
>> such information secret; and
>> (B) the information derives independent economic value, actual
>> or potential, from not being generally known to, and not being
>> readily ascertainable through proper means by, the public.

18 U.S.C. § 1839.

It is not explicitly clear from the language of section 1831(a)(3) whether the word
"knowingly" modifies the "trade secret" element of the offense.  The Government argues

---

[11] The indictment also charges Mr. Chung with violating Section 1831(a)(1) by concealing the
documents in his home.  However, the Court need not address this issue given its finding that Mr. Chung
is guilty of violating the EEA based on his possession of trade secrets pursuant to Section (a)(3).

that it does not, and therefore it does not have to prove that Mr. Chung knew the information that he possessed was a trade secret. Mr. Chung contends that the Government must prove that he had such knowledge. The Court agrees with Mr. Chung.

Because the purpose of the criminal law is to punish intentional conduct, "[t]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." *Dennis v. United States*, 341 U.S. 494, 500 (1951). "Traditionally, the *mens rea* of a crime extends to each element of that crime." *United States v. Sua*, 307 F.3d 1150, 1154 (9th Cir. 2002) (citing MODEL PENAL CODE § 2.02(1)). As Justice Stevens noted, "the normal, commonsense reading of a subsection of a criminal statute introduced by the word 'knowingly' is to treat that adverb as modifying each of the elements of the offense identified in the remainder of the subsection." *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 79 (1994) (Stevens, J., concurring).

The United States Supreme Court has long recognized a presumption in favor of an intent requirement for "the crucial element" that separates lawful from unlawful conduct. In *Morissette v. United States*, 342 U.S. 246 (1952), the Supreme Court interpreted a statute that reads, in pertinent part: "[w]hoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof." 342 U.S. at 248 n.2 (citing 18 U.S.C. § 641). The Supreme Court held that to be convicted under the statute, the government must prove that the defendant knew that the property he converted belonged to the United States. Although "knowingly" is separated from the government property element of the offense, the Supreme Court concluded that "that the term 'knowingly' also required that the defendant have knowledge of the facts that made the taking a conversion—i.e., that the property belonged to the United States." *X-Citement Video, Inc.*, 513 U.S. at 70. The Court held that the defendant "must have had knowledge of the facts, though not

necessarily the law, that made the taking a conversion." *Morissette*, 342 U.S. at 271.
The Court went on to write "it is not apparent how Morissette could have knowingly or
intentionally converted property that he did not know could be converted, as would be the
case if it was in fact abandoned or if he truly believed it to be abandoned and unwanted
property." *Id.*

The Supreme Court reached a similar conclusion in *Staples v. United States*, 511
U.S. 600 (1994). In that case, the Supreme Court interpreted the National Firearms Act,
which criminalizes possession of an unregistered firearm, including a machinegun. The
statute defines a machinegun as a weapon that automatically fires more than one shot
with a single pull of the trigger. 26 U.S.C. § 5845. Mr. Staples was convicted of
possessing an unregistered machinegun. *Staples*, 511 U.S. at 600. He appealed, arguing
that he did not know that his semiautomatic rifle was a machinegun within the meaning
of the statute. *Id.* The Supreme Court held that to obtain a conviction, "the Government
should have been required to prove beyond a reasonable doubt that Staples knew that his
rifle had the characteristics that brought it within the statutory definition of a
machinegun." *Id.* As the Supreme Court noted, "the Government's construction of the
statute potentially would impose criminal sanctions on a class of persons whose mental
state-ignorance . . . makes their actions entirely innocent." *Id.* at 614–15. Furthermore,
the statute imposed substantial penalties for violations of the law. The Court concluded
that a defendant should not face harsh criminal penalties for conduct that he truly
believed was lawful. *Id.* at 619.

Again in *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994), the Supreme
Court concluded that the government had to prove the defendant's knowledge of the key
element of an offense. The case involved a prosecution for interstate distribution of child
pornography. In the statute at issue, knowingly did not appear near one of the key
elements of the offense—"use of a minor." 18 U.S.C. § 2252. Relying on *Morissette* and

*Staples*, the Supreme Court held that "the term 'knowingly' . . . extends to both the sexually explicit nature of the material and to the age of the performers."  513 U.S. at 78. Because "the age of the performers is the crucial element separating legal innocence from wrongful conduct," the Supreme Court concluded that Congress did not intend to dispense with an intent requirement for this key element.  *Id.* at 73.  Any other interpretation, the Supreme Court held, would yield results that are not only "merely odd, positively absurd."  *Id.* at 69.  Again, the fact that the statute imposed severe penalties was a " 'significant consideration in determining whether the statute should be construed as dispensing with *mens rea*.' "  *Id.* at 71 (quoting *Staples*, 511 U.S. at 616).

Federal courts have also consistently held that a defendant must have knowledge of the underlying facts that make his conduct illegal.  *United States v. Alghazouli*, 517 F.3d 1179 (9th Cir. 2008) (holding defendant need not have specific knowledge of the fact that he was violating stratospheric ozone regulations by possessing a class I controlled substance under the Clean Air Act, but he must have knowledge that the substance he possessed was, in fact, R-12 freon); *United States v. Godin*, 534 F.3d 51 (1st Cir. 2008) (holding that defendant must have knowledge that he possessed an identification of another person in order to be convicted under an identity theft statute); *United States v. Bronx Reptiles, Inc.*, 217 F.3d 82 (2d Cir. 2000) (holding that a defendant must know he is transporting a wild animal under inhumane or unhealthful conditions to be convicted for the crime of knowingly causing or permitting a wild bird or animal to be transported to the United States under inhumane or unhealthful conditions, otherwise "a vast range of remarkably innocuous behavior is rendered criminal"); *United States v. Lynch*, 233 F.3d 1139 (9th Cir. 2000) (defendant must know that the object he removed was an archeological resource in order to be convicted under statute prohibiting knowingly removing an archeological resource from public land).

In this case, too, the Government must prove that Mr. Chung knew that information he possessed was trade secret information. Whether the information was a trade secret is the crucial element that separates lawful from unlawful conduct. Possession of open-source or readily ascertainable information for the benefit of a foreign government is clearly not espionage. The essence of economic espionage is the misappropriation of trade secret information for the benefit of a foreign government. The EEA imposes a maximum sentence of fifteen years in prison and up to a $500,000 fine. It would be unjust and inconsistent with the purpose of the criminal law to hold Mr. Chung accountable for possession of what he honestly believed was publicly available information. Mr. Chung should not be subject to fifteen years in prison based on conduct that he did not believe constituted espionage.

Contrary to the Government's assertion, requiring it to prove that Mr. Chung knew the information he possessed was a trade secret does not impose an insurmountable or even difficult burden of proof. The Government must prove that Mr. Chung knew that the information he possessed was a trade secret, but not that he knew his behavior was illegal. *United States v. Nosal*, No. Cr 08-00237 MHP, 2009 WL 981336, at *3 (N.D. Cal. Apr. 13, 2009). The statutory definition of a trade secret is not overly technical and requires no specialized knowledge or expertise to understand. Proving that a defendant knows that the owner of a trade secret takes reasonable measures to protect it and that the information has economic value is not exceedingly difficult. A defendant charged with economic espionage will necessarily have some understanding of the measures that have been taken to protect the information he possesses. He will know whether the facility he acquired the information from was gated. He will know if the information in his possession has proprietary, trade secret, or classified markings. If he is an employee, he will know his company's policy about whether documents can be taken home. The Government need not prove that a defendant knew all of the security measures taken to protect the information. Likewise, proving that a defendant charged with economic

espionage knows that the information he possesses has economic value is not exceedingly difficult. A spy does not deal in worthless or readily ascertainable information. He collects information without authorization precisely because it has independent economic value. He passes this information to a foreign government that cannot obtain the information lawfully.

Accordingly, under Section 1831(a)(3), the Government must prove five elements: (1) Mr. Chung intended to benefit a foreign government; (2) Mr. Chung knowingly possessed trade secret information;[12] (3) Mr. Chung knew that the information was obtained without authorization; (4) the information Mr. Chung possessed was, in fact, a trade secret; and (5) Mr. Chung knew the information was a trade secret. Mr. Chung is charged in the indictment with six separate counts of violating the EEA: two counts related to the Tail Service Mast ("TSM") assembly for the Delta IV Rocket and four counts related to the Phased Array Radar and Communications System for the Space Shuttle. The Government proved each of these elements beyond a reasonable doubt with respect to all six documents charged in the indictment.

The Delta IV Rocket is a next-generation booster rocket that is designed to launch manned space vehicles. The TSM assembly is a sophisticated system that removes the TSM that feeds fuel to the rocket. The system moves the TSM and umbilical hoses, together weighing more than two tons, away from the rocket and into a protective shelter in less than one second. Tr. 16:23–17:19, June 5, 2009. The system also includes triple redundancy to ensure that the TSM is withdrawn even if the first and second contingencies fail. *Id.* 21:13–22:5. The first trade secret document, titled "Common

---

[12] Counsel for Mr. Chung argues that because Mr. Chung did not first possess the documents within the limitations period, he cannot be found guilty on these counts. Counsel is mistaken. Because Mr. Chung continued to possess the documents in 2006, there is no statute of limitations problem here. "[P]ossessory offenses have long been described as 'continuing offenses' that are not complete upon receipt of the prohibited item. Rather, the statute of limitations does not begin to run until the possessor parts with the item." *United States v. Krstic*, 558 F.3d 1010, 1017 (9th Cir. 2009).

Booster Core (CBC) Tail Service Mast (TSM) Overview," contains a detailed overview of the TSM, including information regarding the location on the launch pad of the TSMs, diagrams detailing placement of umbilical hoses and installation of the TSM, electrical requirements for the system, and timelines for specific sequences. Ex. 76-1–76-54. The document includes a comprehensive overview of the separation methods used on the TSM system. Ex. 76-21–76-44. The second document, titled "Delta IV/EELV[13] Common Booster Core (CBC) Tail Service Mast (TSM) Overview," provides extensive details regarding design and test requirements, design verification procedures, and design schematics and contains information on how the backup umbilical release system functions. Ex.76-55–76-106. This document also contains drawings and detailed descriptions of the technology. *Id.*

The Phased Array Antenna was developed to address several problems with the current communications system—a gimbaled dish—on the Space Shuttle. Tr. 14:15–16:4, June 9, 2009. The Phased Array Antenna is placed in the skin of the Space Shuttle, and it provides better coverage and can be used at any time during flight. *Id.* 15:19–25. Mr. Chung possessed: (1) a document titled "Item Change Analysis;" (2) an email with the subject line "ROM For Cost of Cooling Phased Array Antenna" and related documents; (3) a document titled "Boeing Phased Array Antenna Internal Research & Development Option for Orbiter Communications Upgrades" dated March 1999; and (4) a document titled "Boeing Phased Array Antenna Internal Research & Development Option for Orbiter Communications Upgrades" dated May 1999. The four Phased Array Antenna documents detail processes and plans related to the technology. Ex. 65. The first and second documents contain internal costing data, which reveal the specific tasks that need to be accomplished in order to produce the technology. The third and fourth documents are overviews of the work being done to place a Phased Array Antenna on the

---

[13] EELV stands for Evolved Expendable Launch Vehicle.

Space Shuttle.  As the titles of the documents indicate, they contain internal information regarding the number of elements in the Phased Array Antenna.

All six of the documents charged in the indictment contain trade secret information.[14]  Boeing took more than reasonable measures to protect the documents. Armed guards secured the Boeing facility, and employees had to show their identification to enter the building.  Tr. 121:15–25, June 5, 2009.  Boeing reserved the right to search its employees' belongings and their cars for violations of its security policies.  Ex. 192. Access to the documents was restricted to those engineers who needed access and had approval from their managers.  Tr. 128:5–9, June 5, 2009.  Rockwell and Boeing disseminated written guidelines and conducted trainings in which the companies made clear the importance of not sharing the documents with outside parties.  *Id.* 118:15– 121:11, 126:12–25; Ex. 83.  Boeing took even further precautions with respect to the TSM documents.  Hard copies of the TSM documents had to be locked up at night and could not be removed from the facility.  Tr. 48:7–10, June 5, 2009.

The information contained in the six documents charged in the indictment also has independent economic value.  None of the information in the six documents is available in the public domain.  Tr. 26:8–24, 27:2–16, 38:10, 45:13–20, June 5, 2009; Tr. 40:24, June 9, 2009.  The TSM documents found in Mr. Chung's library constitute a "do-it-yourself kit" that would allow another engineer to build the system.  Tr. 41:19–23, June 5, 2009.  The TSM assembly took a large team of engineers five years to develop, and its development cost Boeing close to $50 million.  Tr. 24:6–19, June 5, 2009.  The TSM system is currently in use, and Boeing hopes to place the system at Vandenberg Air Force

---

[14] The definition of a trade secret includes all technical information that the owner has taken reasonable measures to keep secret, and the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public.  18 U.S.C. § 1839.  The documents at issue unquestionably contain business, scientific, and technical information within the meaning of the statute.

Base. *Id.* 48:17–49:2. If Boeing's competitors were to acquire a "do-it-yourself" kit to recreate this technology, Boeing would be at a serious competitive disadvantage. Similarly, the four Phased Array Antenna documents reveal information that would allow a competitor to determine the number of elements needed and Boeing's cost to produce the Phased Array Antenna. Tr. 29:7–15, 34:10–16, June 9, 2009. Based on this information, a competitor would be able to undermine Boeing's ability to win competitive contracts. Although the first two Phased Array Antenna documents are not marked proprietary, they are never published or distributed by the company. *Id.* 29:18– 30:21. This information has both actual and potential economic value to Boeing. Rockwell spent considerable time and well over a million dollars developing this technology. *Id.* 20:12–25:17. Although the Phased Array Antenna is not currently used on the Space Shuttle, the work done by Rockwell was successful and the technology is currently in use in a number of "black programs" at Boeing. *Id.* 26:7–11. Additionally, the Phased Array Antenna may be viable technology for the Space Shuttle in the future. *Id.* 19:23–25.

    The Court also has no doubt that Mr. Chung knew that he possessed trade secret information. Mr. Chung, a long-time employee of Boeing and Rockwell, was well aware of the numerous security measures in place to protect all of Boeing's information. Mr. Chung had to show his identification each day to enter the building. Tr. 121:15–25, June 5, 2009. Most of the documents Mr. Chung possessed were stamped proprietary. Mr. Chung signed agreements confirming his understanding that he could not disclose any of the information developed by Boeing. Exs. 83, 194, 195. Mr. Chung also did not request his supervisor's permission to take any of the documents home. Tr. 95:22–96:9; 116:20– 25, 124:4–9, 125:22–24, June 5, 2009. Had Mr. Chung requested permission to bring home the TSM and Phased Array Antenna documents, his supervisor would have denied Mr. Chung's request because Boeing simply did not allow engineers to keep any of its proprietary documents at home—much less its highly valuable trade secret ones. *Id.*

Mr. Chung also knew that the information derived value from being not readily available to the public.  If the information were worthless or readily available in the public domain, Mr. Chung surely would not have gathered it for the PRC in violation of well-established Boeing policies and subjected himself to immediate termination by the company.  Mr. Chung knew that the PRC could not obtain the information and that it desperately wanted to get its hands on it.  Tragically, Mr. Chung was willing to betray the trust Boeing placed in him to safeguard the information in the documents.  The reason for that betrayal is obvious to the Court.  Mr. Chung was a devoted spy for the PRC.

Accordingly, the Court finds Mr. Chung guilty beyond a reasonable doubt on all six counts of economic espionage.  Mr. Chung possessed six trade secret documents for the benefit of the PRC.  Boeing took more than reasonable measures to protect the information in the documents, and the information in the documents derived substantial value because it was not known to Boeing's competitors.  And finally, Mr. Chung knew the information in the documents was trade secret information.

### 2. Conspiracy to Violate the EEA

Mr. Chung is charged with conspiracy to commit an offense against the United States pursuant to 18 U.S.C. § 371, which provides:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years.

18 U.S.C. § 371. To show that Mr. Chung is guilty of conspiracy, the Government must prove beyond a reasonable doubt that: (1) there was an agreement between two or more persons to commit at least one violation of the EEA; (2) Mr. Chung became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and (3) one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy. The Government proved each of these elements beyond a reasonable doubt.

First, Mr. Chung conspired with numerous Chinese officials to collect trade secret and proprietary information for the benefit of the PRC. Exs. 274 (Professor Chen Lung Ku); 261 (Chen Qinan); 269 (Engineer Feng); 269 (Zhao Zhen Lan); 359 (Gu Weihao); 325-2 (Consul Wu Hui Jun); 326-2 (Chi Mak); 326-3 (Bu Shi Lin); 326-3 (Consul Shang). Mr. Chung continued to correspond with his co-conspirators through at least 2003. Exs. 314, 315, 325.

Second, Mr. Chung joined the conspiracy with the intent to commit economic espionage. Mr. Chung communicated with numerous PRC officials about his desire to share his engineering expertise and gather information on behalf of the PRC. Exs. 259 ("It's a great honor and I am excited to be able to make some contributions to the four modernizations of the motherland. . . . As to the outline details for the exchange, I am working actively on its draft recently."); 264 (offering to contribute his "expertise"); 269 (providing "answers for the questions that were not answered" when Mr. Chung was in Nanchang); 272 (informing Chen Qinan that he had experience "space shuttle design" and offering to "provide information in this field"); 325-4–325-5 (journal entry detailing presentations at Peking University and Shanghai University in 2001).

Finally, Mr. Chung committed many overt acts in furtherance of the conspiracy. Mr. Chung kept six trade secret documents as well as over 300,000 pages of other

documents in his home for the benefit of the PRC. Mr. Chung sent this information to the PRC via mail, sea freight, and through other Chinese agents. Mr. Chung also used the information that he misappropriated from Boeing to conduct technology exchanges with the PRC and to prepare detailed briefings that he presented in the PRC. And up to the time of his arrest, Mr. Chung maintained a secret library in his home and selectively destroyed documents in an ongoing effort to conceal the conspiracy and avoid detection by law enforcement.

### C. False Statement

Mr. Chung is charged with making a false statement pursuant to 18 U.S.C. § 1001, which provides, in pertinent part:

(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—

    (2) makes any materially false, fictitious, or fraudulent statement or representation . . .

shall be fined under this title, imprisoned not more than 5 years.

18 U.S.C. § 1001. To show that Mr. Chung is guilty on this count, the Government must prove beyond a reasonable doubt that: (1) Mr. Chung made a false statement on a matter within the jurisdiction of the FBI; (2) Mr. Chung acted willfully, that is deliberately and with knowledge that the statement was untrue; and (3) the false statement was material to the FBI's activities and decisions. The Government proved each of these elements beyond a reasonable doubt.

During their September 11, 2006 search, federal agents were shocked to discover both Mr. Chung's library of technical materials and the mountains of evidence that suggested he collected those materials for the benefit of the PRC.  Federal agents immediately asked Mr. Chung why he had so much information stored in his home.  Mr. Chung told FBI Special Agent Moberly that his supervisor at Boeing, William Novak, gave him permission to take all of the documents home.  Tr. 90:10–11, June 2, 2009.  Later the same day, Mr. Chung told FBI Special Agent Sheldon Fung that his boss had given him permission in 2001 to bring work documents home because the documents were otherwise going to be destroyed.  Tr. 46:15–19, June 11, 2009.

In fact, Mr. Novak never gave Mr. Chung permission to take work documents home.  Tr. 124:1–9, June 5, 2009.   At the time of the move from Downey to Huntington Beach, Mr. Novak instructed his engineers either to: (1) pack documents to take to Huntington Beach; (2) pack documents for storage at Iron Mountain; or (3) place documents in bins for disposal.  *Id.* 123:13–124:9.  Mr. Chung wrote a memo to Mr. Novak indicating that defendant had fourteen boxes packed and ready for shipment to Iron Mountain.  Ex. 73.

Mr. Chung knew his statements to the FBI agents were not true.  Federal agents found a staggering 300,000 pages of work-related documents in Mr. Chung's home.  Mr. Chung did not ask Mr. Novak for permission to take documents home, and employees were unequivocally not allowed to keep documents in their homes, for any purpose.  Tr. 95:22–96:9, 116:20–25, 125:22–24, June 5, 2009; Tr. 68:22–24, June 10, 2009.  Mr. Chung nonetheless insisted to two different FBI agents that he had permission to keep the documents in his home.  It is also very telling that Mr. Chung used correction fluid to cover information on the documents, and in one case, to cover a security warning.  Ex. 183.  Mr. Chung also admitted that he was hiding SDS and other work-related documents in newspapers so that they would not be found at the dump.  Tr. 89:23–90:2, June 2,

2009.  If Mr. Chung truly believed that he had permission to keep work documents in his home, he would not have covered up information in the documents or secretly disposed of them.

Mr. Chung's false statements were obviously material to the activities or decisions of the FBI.  At the time Mr. Chung made the statements, Mr. Chung was the target of a very serious and ongoing investigation focusing on whether he was spying for the PRC. Whether he had approval to possess more than 300,000 pages of documents in his home was material to that investigation.  Sadly, Mr. Chung chose to blatantly lie to the FBI.

**D. Obstruction of Justice**

Mr. Chung is charged with obstruction justice pursuant to 18 U.S.C. § 1512, which provides, in pertinent part:

> (b) Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—
>> (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense . . .
> shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512.  To show that Mr. Chung is guilty of obstructing justice, the Government must prove that: (1) Mr. Chung persuaded, or tried to persuade, another person to withhold certain information from an FBI agent; and (2) Mr. Chung acted knowingly and with intent to hinder, delay, or prevent the communication to an FBI agent of information relating to the commission or possible commission of a federal offense.

Because the Government has failed to prove beyond a reasonable doubt that Mr. Chung attempted to persuade or persuaded his son to withhold information, the Court finds Mr. Chung not guilty on this count.

The Government argues that Mr. Chung obstructed justice by encouraging his son to tell federal agents that he could not remember anything about the family trip to the PRC in 1985.  Before federal agents had an opportunity to interview Mr. Chung's son, Mr. Chung received a phone call from his son.  Speaking in Chinese, Mr. Chung responded to his son and, according to FBI agents who understood Chinese, told his son to tell the FBI that he did not remember anything about their 1985 trip to the PRC.  Tr. 33:14–16, June 11, 2009.  The Court finds the FBI agents' testimony credible.  Mr. Chung's son, however, was not a credible witness.  On the witness stand, Mr. Chung's son admitted that he has a poor memory, he is recklessly flippant, and even worse, he constantly lies.  Without knowing what Mr. Chung's son actually said to Mr. Chung on the other end of the line, it is impossible to determine whether Mr. Chung attempted to persuade his son to provide false information.  Mr. Chung's statement to his son may or may not be criminal depending on what Mr. Chung's son said to him.  If Mr. Chung's son expressed concern that he had no recollection of the 1985 trip or indicated that he was afraid or nervous, then Mr. Chung's statement would have been an appropriate and lawful response.  Without knowing what exactly Mr. Chung's son said to him, the Court simply cannot conclude that Mr. Chung is guilty of obstruction of justice.

**IV. CONCLUSION**

For the foregoing reasons, the Court finds Mr. Chung guilty on all counts except the count of obstruction of justice.

DATED: July 16, 2009

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE